1  David S. Torborg (*pro hac vice*)
   dstorborg@jonesday.com
2  Daniel T. Moss (*pro hac vice*)
   dtmoss@jonesday.com
3  JONES DAY
   51 Louisiana Avenue, N.W.
4  Washington, D.C. 20001-2113
   Telephone: (202) 879-3939
5  Facsimile: (202) 626-1700

6  Joshua M. Mester (SBN 194783)
   jmester@jonesday.com
7  JONES DAY
   555 South Flower Street
8  Fiftieth Floor
   Los Angeles, CA 90071.2452
9  Telephone: (213) 489-3939
   Facsimile: (213) 243-2539

10

11 *Attorneys for Creditors Yuntian 3 Leasing Company
   Designated Activity Company and Yuntian 4 Leasing
   Company Designated Activity Company*

12

13              **UNITED STATES BANKRUPTCY COURT**
                **CENTRAL DISTRICT OF CALIFORNIA**
14                   **LOS ANGELES DIVISION**

15 | In re:                                    | Lead Case No. 2:17-bk-21386-SK
16 | ZETTA JET USA., INC., a California        | (Jointly administered with 2:17-bk-21387-SK)
   | corporation,                              |
17 |                                           | Chapter 7 Cases
   |        Debtor.                            |
18 |                                           | Adv. Proc. No. 2:19-ap-01383-SK

19 | In re:                                    | **DEFENDANTS YUNTIAN 3 LEASING
   |                                           | COMPANY LIMITED DESIGNATED
20 | ZETTA JET PTE LTD., a Singaporean         | ACTIVITY COMPANY AND YUNTIAN 4
   | corporation,                              | LEASING COMPANY DESIGNATED
21 |                                           | ACTIVITY COMPANY'S NOTICE OF
   |        Debtor.                            | MOTION AND MOTION TO DISMISS
22 |                                           | COUNTS II, III, VI, VII, IX, X, XI, XII,
   |                                           | AND XV OF ADVERSARY COMPLAINT
23

24 | JONATHAN D. KING, solely in his           | Date: TBD
   | capacity as Chapter 7 Trustee of Zetta Jet | Time: TBD
   | USA, Inc. and Zetta Jet PTE, Ltd.,        | Place: Courtroom 1575
25 |                                           |     255 East Temple Street
   |                                           |     Los Angeles, Ca 90012
26 |        Plaintiff,                         | Judge: Hon. Sandra R. Klein

27 | v.

28 | YUNTIAN 3 LEASING COMPANY
   | LIMITED DESIGNATED ACTIVITY

1  COMPANY f/k/a YUNTIAN 3 LEASING
   COMPANY LIMITED, YUNTIAN 4
2  LEASING COMPANY DESIGNATED
3  ACTIVITY COMPANY f/k/a YUNTIAN 4
   LEASING COMPANY LIMITED,
4  MINSHENG FINANCIAL LEASING CO.,
   LTD., MINSHENG BUSINESS AVIATION
5  LIMITED, EXPORT DEVELOPMENT
   CANADA, LI QI, UNIVERSAL LEADER
6  INVESTMENT LIMITED, GLOVE ASSETS
   INVESTMENT LIMITED, and TRULY
7  GREAT GLOBAL LIMITED,
8
       Defendants.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1    **TO THE HONORABLE SANDRA R. KLEIN, UNITED STATES BANKRUPTCY**

2    **JUDGE, AND TO PLAINTIFF'S COUNSEL OF RECORD:**

3         **PLEASE TAKE NOTICE** that Defendants Yuntian 3 Leasing Company Limited

4    Designated Activity Company ("Yuntian 3") and Yuntian 4 Leasing Company Designated

5    Activity Company ("Yuntian 4," and, collectively, the "Yuntian Entities") will and hereby do

6    move (by this "Motion") the Court to dismiss, without leave to amend, Counts II-III, VI-VII, IX-

7    XII, and XV (as to claims pled against the Yuntian Entities) in the complaint (the "Complaint")

8    filed in the above-captioned adversary proceeding, for failure to state a claim upon which relief

9    can be granted, because the Complaint insufficiently pleads the facts necessary to plausibly state

10   claims for relief for fraudulent transfer, preference, turnover, and disallowance of claims under

11   title 11 of the United States Code (the "Bankruptcy Code"). The Complaint must also be

12   dismissed because it impermissibly seeks the extraterritorial application of the Bankruptcy Code's

13   avoidance provisions and violates principles of international comity.

14         **PLEASE TAKE FURTHER NOTICE** that this Motion is being brought under Rules

15   12(b)(6), 8(a), and 9(b) of the Federal Rules of Civil Procedure (the "Federal Rules" or "Rules"),

16   as made applicable under Rules 7012, 7008, and 7009 of the Federal Rules of Bankruptcy

17   Procedure (the "Bankruptcy Rules"), and is based on the accompanying memorandum of points

18   and authorities, the Court's files in this adversary proceeding, and the related Chapter 7 case, and

19   such other evidence and arguments as may properly come before this Court at any hearing.

20         **PLEASE TAKE FURTHER NOTICE** that Local Rule 9013-1(f) requires a written

21   response to be filed and served at least 14 days before the hearing.

22         **WHEREFORE**, the Yuntian Entities respectfully request that the Court enter an order (i)

23   granting the Motion, (ii) dismissing, without leave to amend, each claim for relief in the

24   Complaint against the Yuntian Entities for failure to state a claim upon which relief can be

25   granted, and (iii) granting any and all other relief the Court deems just and necessary.

26

27

28

| | | |
|---|---|---|
| 1 | Dated: December 9, 2019 | JONES DAY |
| 2 | | |
| 3 | | */s/ Daniel T. Moss*<br>Daniel T. Moss (*pro hac vice*)<br>dtmoss@jonesday.com |
| 4 | | David S. Torborg (*pro hac vice*)<br>dstorborg@jonesday.com |
| 5 | | JONES DAY<br>51 Louisiana Avenue, N.W. |
| 6 | | Washington, D.C. 20001-2113<br>Telephone: (202) 879-3939 |
| 7 | | Facsimile: (202) 626-1700 |
| 8 | | Joshua M. Mester (SBN 194783)<br>jmester@jonesday.com |
| 9 | | JONES DAY<br>555 South Flower Street |
| 10 | | Fiftieth Floor<br>Los Angeles, CA 90071.2452 |
| 11 | | Telephone: (213) 489-3939<br>Facsimile: (213) 243-2539 |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

**INTRODUCTION**............................................................................................................. 1

**FACTUAL BACKGROUND** ......................................................................................... 4

    A.   The Debtors' Prepetition Operations .......................................................... 4

    B.   The "Minsheng Refinancing" And "Challenger Transactions".......................... 5

    C.   Zetta Jet's Defaults Under The Agreements ................................................ 9

    D.   The Trustee's Claims Against The Yuntian And Minsheng Entities.................... 9

**ARGUMENT** ................................................................................................................. 11

**I.**    **THE PRESUMPTION AGAINST EXTRATERRITORIALITY AND**

**INTERNATIONAL COMITY REQUIRE DISMISSAL OF ALL CLAIMS.** ...................... 12

    A.   The Presumption Against Extraterritoriality Bars The Trustee's Avoidance Claims........ 12

        1.   The Bankruptcy Code's Avoidance Provisions Do Not Apply Extraterritorially. ........ 12

        2.   The Transactions At Issue Are Indisputably Foreign. ................................... 14

    B.   Principles Of International Comity Demand Dismissal Of The Trustee's Claims. ........... 17

        1.   A True Conflict Of Laws Exists. ................................................................ 18

        2.   Application Of U.S. Law Against The Yuntian Entities Is Unreasonable..................... 19

**II.**    **THE TRUSTEE HAS NO BASIS TO AVOID ANY PART OF THE $12.4 MILLION**

**TRANSFER BECAUSE IT DID NOT INVOLVE THE DEBTOR'S PROPERTY**. ............ 22

**III.**    **THE TRUSTEE HAS FAILED TO ADEQUATELY PLEAD HIS FRAUDULENT**

**TRANSFER CLAIMS**. ...................................................................................... 24

    A.   Actual Fraudulent Transfer ...................................................................... 24

    B.   Constructive Fraudulent Transfer .............................................................. 29

**IV.**    **THE TRUSTEE HAS FAILED TO ADEQUATELY PLEAD HIS PREFERENCE**

**CLAIMS**........................................................................................................... 31

**V.    THE TRUSTEE HAS FAILED TO ADEQUATELY PLEAD HIS TURNOVER
CLAIMS, WHICH IN ANY EVENT FAIL AS A MATTER OF LAW**................................. 34

**VI.        THE TRUSTEE'S REQUEST FOR DISALLOWANCE UNDER SECTION 502
ALSO FAILS UNDER RULE 12(B)(6)**...................................................................................... 35

**CONCLUSION**.................................................................................................................................... 35

1

# TABLE OF AUTHORITIES

2

Cases

3   *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800 (9th Cir. 1994) .................................. 26

4   *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................................. 11, 32

5   *Bear, Sterns [Stearns] Secs. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*, 397 B.R. 1 (S.D.N.Y.
6   2007).................................................................................................................................... 29

    *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ..................................................................... 25, 30
7
8   *Blantz v. Cal. Dep't of Corr. & Rehab., Div. of Corr. Health Care Servs.*, 727 F.3d 917 (9th Cir.
    2013) .................................................................................................................................... 31

9   *Chuidian v. Philippine Nat. Bank*, 976 F.2d 561 (9th Cir. 1992) ................................................. 21

10  *de Fontbrune v. Wofsy*, 838 F.3d 992 (9th Cir. 2016) ............................................................ 12, 18

11  *Donell v Kowell*, 533 F.3d 762 (9th Cir. 2008).......................................................................... 19, 26

12  *Eclectic Props. E. v. Marcus & Millichap Co.*, 751 F.3d 990 (9th Cir. 2014) ................... 4, 32, 34

13  *Fowler v. Univ. of Phoenix*, Inc., No. 18CV1544-WQH-KSC, 2019 WL 1746576, at *9 (S.D. Cal.
14  Apr. 18, 2019) ............................................................................................................ 32, 33, 34

15  *Gerritsen v. Warner Bros. Entm't Inc.*, 116 F. Supp. 3d 1104 (C.D. Cal. 2015) ......................... 6, 11

    *Goodman v. H.I.G. Capital, LL (In re Gulf Fleet, Inc.)*, 491 B.R. 747 (Bankr. W.D. La. 2013) ..... 30
16
    *Gushi Bros. Co. v. Bank of Guam*, 28 F.3d 1535 (9th Cir. 1994).................................................. 16
17
18  *Hayes v. Palm Seedlings Partners-A (In re Agric. Research and Tech. Group, Inc.)* ("*Agretech*"),
    916 F.2d 528 (9th Cir. 1990)......................................................................................... 26, 28, 29

19  *Henry v. Lehman Commercial Paper, Inc. (In re First Alliance Mortg. Co.)*, 471 F.3d 977 (9th
20  Cir. 2006) ............................................................................................................................. 31

21  *In re Adbox, Inc.*, 488 F.3d 836 (9th Cir. 2007)............................................................................ 23

22  *In re AFI Holding, Inc.*, 525 F.3d 700 (9th Cir. 2008) ................................................................. 26

23  *In re Am. Hous. Found.*, 785 F.3d 143 (5th Cir. 2015), *as revised* (June 8, 2015)........................ 27

24  *In re Ampal-Am. Israel Corp.*, 562 B.R. 601 (Bankr. S.D.N.Y. 2017)...................................... 13, 17

    *In re Arcapita Bank B.S.C.(c)*, 575 B.R. 229 (Bankr. S.D.N.Y. 2017).......................................... 13
25
26  *In re Bankr. Estate of Midland Euro Exch. Inc.*, 347 B.R. 708 (Bankr. C.D. Cal. 2006)....... passim

    *In re Bonham*, 251 B.R. 113 (Bankr. D. Alaska 2000).................................................................. 28
27
28  *In re Caremerica, Inc.*, 409 B.R. 737 (Bankr. E.D.N.C. 2009) ..................................................... 32

*In re Chappel*, 189 B.R. 489 (B.A.P. 9th Cir. 1995) ...................................................... 21

*In re CIL Ltd.*, 582 B.R. 46 (Bankr. S.D.N.Y. 2018), *amended on reconsideration*, No. 13-11272-JLG, 2018 WL 3031094 (Bankr. S.D.N.Y. June 15, 2018)...................................... 13, 14, 15, 20

*In re Coco*, 67 B.R. 365 (Bankr. S.D.N.Y. 1986) ............................................................ 33

*In re Cohen*, 199 B.R. 709 (B.A.P. 9th Cir. 1996)........................................................... 18

*In re Continental Airlines, Inc.*, 932 F.2d 282 (3d Cir. 1991) ....................................... 7, 29

*In re Dreier LLP*, 453 B.R. 499 (Bankr. S.D.N.Y. 2011).................................................. 33

*In re EDP Investment Co., LLC*, 587 B.R. 711 (C.D. Cal. 2018) .................................... 28

*In re Equip. Acquisition Res., Inc.*, 481 B.R. 422 (Bankr. N.D. Ill. 2012) ..................... 28

*In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141 (9th Cir. 2013)..................................... 31

*In re French*, 440 F.3d 145 (4th Cir. 2006) ..................................................................... 13

*In re Hellas Telecomm. (Luxembourg) II SCA*, 535 B.R. 543 (Bankr. S.D.N.Y. 2015)............... 19

*In re Hunt*, 540 B.R. 438 (Bankr. D. Idaho 2015) ........................................................... 21

*In re Imperial Corp. of Am.*, 144 B.R. 115 (Bankr. S.D. Cal. 1992) ......................... 31, 32

*In re Interbulk, Ltd.*, 240 B.R. 195 (Bankr. S.D.N.Y. 1999) ........................................... 17

*In re International Manufacturing Group, Inc.*, 538 B.R. 22 (Bankr. E.D. Cal. 2015)................ 28

*In re Kemp Pac. Fisheries, Inc.*, 16 F.3d 313 (9th Cir. 1994) ......................................... 23

*In re Maxwell Commc'n Corp. plc* (*Maxwell I*), 186 B.R. 807 (S.D.N.Y. 1995)................... 14, 16

*In re Maxwell Commc'n Corp. plc by Homan* (*Maxwell II*), 93 F.3d 1036 (2d Cir. 1996).. 14, 17, 20, 22

*In re Miller*, 292 B.R. 409 (B.A.P. 9th Cir. 2003) ....................................... 21, 30, 32, 34

*In re Moriarty*, No. 12-22878-MLB, 2014 WL 6623005, at *7 (Bankr. C.D. Cal. Nov. 20, 2014) ................................................................................................................................ 24

*In re Newton Enterprises*, No. 9:13-BK-12388-PC, 2015 WL 3524603, at *2 (Bankr. C.D. Cal. June 3, 2015) ............................................................................................................. 33

*In re Pearlman*, 440 B.R. 569 (Bankr. M.D. Fla. 2010) .................................................. 29

*In re Picard, Tr. for Liquidation of Bernard L. Madoff Inv. Sec. LLC*, 917 F.3d 85 (2d Cir. 2019) ................................................................................................................................ 20

*In re Pringle*, 495 B.R. 447 (B.A.P. 9th Cir. 2013) ........................................................ 26

*In re Process Am., Inc.*, 588 B.R. 82 (Bankr. C.D. Cal. 2018) ....................................... 34

*In re Rebel Rents, Inc.*, 291 B.R. 520 (Bankr. C.D. Cal. 2003) ...................................................... 21

*In re SCI Real Estate Investments, LLC*, No. 2:11-BK-15975-PC, 2013 WL 1829648, at *3
    (Bankr. C.D. Cal. 2013) ............................................................................................... 25, 30, 31

*In re Simon*, 153 F.3d 991 (9th Cir. 1998) ................................................................................ 16, 17

*In re Smith's Home Furnishings, Inc.*, 265 F.3d 959 (9th Cir. 2001) ........................................ 4, 32

*In re Superior Stamp & Coin Co., Inc.*, 223 F.3d 1004 (9th Cir. 2000) ......................................... 23

*In re TriGem Am. Corp.*, 431 B.R. 855 (Bankr. C.D. Cal. 2010) ............................................ 23, 24

*In re United Corp.*, 944 F.2d 589 (9th Cir. 1991) ......................................................................... 30

*In re United Energy Corp.*, 944 F.2d 589 (9th Cir. 1991) ............................................................. 27

*In re Workboats Nw., Inc.*, 201 B.R. 563 (Bankr. W.D. Wash. 1996) ........................................... 33

*Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116 (9th Cir. 2008) .................................. 11

*Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108 (2013) ......................................................... 15

*Knievel v. ESPN*, 393 F.3d 1068 (9th Cir. 2005) ........................................................................... 11

*Levitt v. Yelp! Inc.*, 765 F.3d 1123 (9th Cir. 2014) ....................................................................... 11

*Loginovskaya v. Batratchenko*, 764 F.3d 266 (2d Cir. 2014) ....................................................... 16

*McCuskey v. Nat'l Bank of Waterloo (In re Bohlen Enters., Ltd.)*, 859 F.2d 561 (8th Cir. 1988) 23

*Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010) ......................................... 13, 15, 16, 17

*Mujica v. AirScan Inc.*, 771 F.3d 580 (9th Cir. 2014) ................................................. 18, 19, 20, 22

*Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480 (9th Cir. 1995) ............................................ 11

*Rivera v. Peri & Sons Farms, Inc.*, 735 F.3d 892 (9th Cir. 2013) ................................................. 33

*RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090 (2016) ................................... 12, 13, 14, 17

*Sams v. Yahoo! Inc.*, 713 F.3d 1175 (9th Cir. 2013) ...................................................................... 11

*Screen Capital Int'l Corp. v. Library Asset Acquisition Co.*, 510 B.R. 248 (C.D. Cal. 2014) 12, 26,
    31, 32

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 513 B.R. 222 (S.D.N.Y. 2014) .. 13, 14

*Seismic Reservoir 2020, Inc. v. Paulsson*, 785 F.3d 330 (9th Cir 2015) ....................................... 19

*Subafilms, Ltd. v. MGM–Pathe Communications Co.*, 24 F.3d 1088 (9th Cir. 1994) (en banc)... 14

*Sunnyside Dev. Co. LLC v. Cambridge Display Tech. Ltd., CDT*, No. C 08-01780 MHP, 2008
    WL 4450328, at *9 (N.D. Cal. Sept. 29, 2008) .......................................................................... 19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ................................................ 11

*Unified Commercial Capital, Inc.*, 280 B.R. 343 (Bankr. W.D.N.Y. 2001).................................. 19

*United Airlines, Inc. v. U.S. Bank N.A.*, 406 F.3d 918 (7th Cir. 2005).......................................... 35

*Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097 (9th Cir. 2003) ..................................................... 11

Statutes

11 U.S.C. 502(d) ................................................................................................................................. 35

11 U.S.C. § 541 ............................................................................................................................. 13, 17

11 U.S.C. § 547 ................................................................................................................................ passim

11 U.S.C. § 548 ................................................................................................................................ passim

11 U.S.C. § 550 ............................................................................................................................. 13, 17

11 U.S.C. § 1110 ......................................................................................................................... 4, 9, 35

Other Authorities

Fed. R. Bankr. P. 7009 ................................................................................................................... 1, 11

Fed. R. Bankr. P. 7012(b) ............................................................................................................. 1, 11

Fed. R. Bankr. P. 9037(a)(4) ................................................................................................................ 6

Fed. R. Civ. P. 8 ............................................................................................................. 4, 24, 26, 32

Fed. R. Civ. P. 12(b)(6)......................................................................................................... 1, 11, 35

Fed. R. Civ. P. 9(b) ...................................................................................................................... passim

Restatement (Second) of Conflict of Laws § 187(2)(a)........................................................... 21, 22

Restatement (Third) of Foreign Relations.......................................................................... 18, 20, 21

Black's Law Dictionary (11th ed. 2019).............................................................................................. 5

David R. Hague, *Expanding the Ponzi Scheme Presumption*, 64 DePaul L. Rev. 867, 880 (2015)
............................................................................................................................................................ 27

- v -

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2    In accordance with Federal Rules of Civil Procedure 12(b)(6) and 9(b) and Federal Rules

3    of Bankruptcy Procedure 7012(b) and 7009(b), defendants Yuntian 3 Leasing Company

4    Designated Activity Company ("Yuntian 3") and Yuntian 4 Leasing Company Designated

5    Activity Company ("Yuntian 4") (collectively, the "Yuntian Entities") move to dismiss each of

6    the claims asserted against them in this Adversary Proceeding. In particular, this motion seeks

7    dismissal, as to the Yuntian Entities, of Counts II-III, VI-VII, IX-XII, and XV.[1]

8

**INTRODUCTION**

9    The avoidance and turnover claims that Plaintiff Jonathan D. King (the "Trustee"), acting

10    on behalf of Debtors Zetta Jet PTE, Ltd. ("Zetta Singapore") and Zetta Jet USA, Inc. ("Zetta

11    USA"), has asserted against the Yuntain Entities are baseless and should be dismissed in their

12    entirety. The Yuntian Entities, acting through a nominal trustee, entered into agreements to (1)

13    purchase two airplanes already used in Zetta Jet's fleet from its existing owners (entities affiliated

14    with defendant Li Qi) and lease those planes to Zetta Jet and (2) purchase four additional aircraft

15    that would also be leased to Zetta Jet through a nominal trustee. These transactions were arm's-

16    length in every respect and in line with industry norms. There are no factual allegations that the

17    agreements' terms were unreasonable or that the specific monetary transfers the Trustee seeks to

18    avoid against the Yuntian or Minsheng Entities bear any hallmark or were in furtherance of any

19    "Ponzi scheme." And beyond flimsy legal conclusions that merely recite the statutory elements of

20    his claims—uniformly made on "upon information and belief" (a term that occurs some 32 times

21    in the Complaint)—the Trustee pleads no facts that, even if credited, would support his claims.

22    In any event, a threshold issue warrants dismissal of each of the fraudulent transfer and

23    preference claims made against the Yuntian Entities: the Bankruptcy Code's avoidance provisions

24    _____

25    [1] The Yuntian Entities, both of which are Irish entities, are affiliated with defendants
Minsheng Financial Leasing Co., Ltd. ("MSFL") (a Chinese entity headquartered in Beijing) and

26    Minsheng Business Aviation Limited ("Minsheng Business") (a Chinese entity with its principal
place of business in Hong Kong) (collectively, the "Minsheng Entities"). *See* Compl. ¶¶ 41-44.

27    Minsheng Business, which according to the Trustee was served with the Complaint on October
23, 2019, will file a separate responsive pleading within the time limits provided in the summons.

28    As of the date of this Motion, MSFL has not been served with the Complaint.

1    cannot be applied extraterritorially to transactions that are overwhelmingly foreign in nature. *See*

2    *In re Bankr. Estate of Midland Euro Exch. Inc.*, 347 B.R. 708, 715 (Bankr. C.D. Cal. 2006)

3    (holding Congress did not intend 11 U.S.C. § 548 to have extraterritorial application).

4         The Complaint makes no effort to connect the transfers at issue with the United States.

5    That is understandable, given that all of the parties in interest and all of the underlying transactions

6    are indisputably foreign. In sum: two Irish entities (Yuntian 3 and Yuntian 4) affiliated with a two

7    Chinese entities (MSFL and Minsheng Business) entered into agreements to (1) purchase two

8    aircraft from entities based in the British Virgin Islands ("<u>BVI</u>") affiliated with a Hong Kong

9    resident (Li Qi) and lease those planes to a Singaporean entity (Zetta Singapore) through two

10    special purpose entities located in the BVI (Zetta Jet 6000-2 and Zetta Jet 6000-3) (a set of

11    agreements the Complaint refers to as the "Minsheng Refinancing") and (2) purchase, with the

12    help of financing from a Canadian state-owned enterprise (Export Development Canada ("<u>EDC</u>")),

13    four additional aircraft that would be leased to Zetta Singapore special purpose vehicles located in

14    the BVI (the so-called "Challenger Transactions"). *See* Compl. ¶¶ 97-99 106, 108, 122-24. The

15    underlying agreements were governed by English law and include English forum-selection

16    clauses. To the extent the transfers the Trustee seeks to avoid even involved an interest of a Debtor

17    in property—and one plainly does not—the funds came from Zetta Singapore's accounts in

18    Singapore and went to the Yuntian and Minsheng Entities in foreign bank accounts.

19         Relatedly, use of the Bankruptcy Code's avoidance and turnover provisions here is

20    precluded by principles of international comity. Any avoidance or turnover claim against the

21    Yuntian or Minsheng Entities should not be adjudicated under U.S. law. As described below and

22    in the foreign law Declarations attached hereto, there are significant and particularly relevant

23    differences between U.S., Singapore (the center of activity for the transactions at issue), and

24    English law applicable to the Trustee's claims. Notably, the Trustee has previously acknowledged

25    that he may have to adjudicate his claims in Singapore under Singapore law since "numerous

26    transfers were made out of or through Zetta PTE's bank accounts located in Singapore." Dkt. No.

27    897 ¶ 14.[2]

28         [2] Unless otherwise indicated, "Dkt. No." citations are to the main bankruptcy proceeding.

1    Regardless of the extraterritoriality and comity inquiries, each of the Trustee's claims are

2    fatally deficient on the merits for several independent reasons.

3    *First*, a material part of the Trustee's fraudulent transfer claims does not involve the

4    *Debtors'* property. In particular, Counts II and VI seek recovery of approximately $12.4 million

5    of the $80 million of proceeds generated through the "Minsheng Refinancing" that the Complaint

6    alleges was "transferred" to Minsheng Business. But the Complaint neglects to mention the actual

7    *source* of the "transferred" funds. In fact, the funds indisputably came *from Minsheng Business*

8    (not Zetta Singapore or Zetta USA) and—as was the plan all along—were immediately returned

9    to Minsheng Business through an escrow agent in order "to pay fees and down payments and

10   deposits of four Bombardier Challenger aircraft." Compl. ¶ 106. No Debtor ever possessed or

11   controlled these earmarked funds. The suggestion that the $12.4 million involved "a transfer of

12   Zetta PTE's property," Compl. ¶¶ 195, 242, is specious.

13   *Second*, the cursory allegations pled to support the Trustee's fraudulent transfer claims are

14   insufficient. The Trustee makes no effort to apply the "badges of fraud" generally required by

15   Rule 9(b) to support his actual fraudulent transfer claim, which          is unsurprising given the

16   utter absence of such facts here. This failure cannot be excused by any reliance on the so-called

17   "Ponzi scheme presumption," as neither the Debtors nor their collapse remotely resembles the

18   kind of "Ponzi" or "Ponzi-like" schemes seen in cases invoking that presumption. There are

19   simply no Ponzi-like facts of funneling proceeds from new investors to repay existing investors

20   under the guise of a legitimate business. In any event, the Complaint fails to connect the transfers

21   involving the Yuntian and the Minsheng Entities with any "Ponzi-like" scheme.

22   The threadbare allegations made to support the constructive fraudulent transfer claims fare

23   no better. The Trustee provides nothing more than conclusory allegations that Zetta Singapore

24   "did not receive reasonably equivalent value" for obligations it incurred through the sale and

25   leasing transaction. *Id.* ¶ 186. But rather than provide any supporting *facts*, the Trustee merely

26   speculates—"upon information and belief'—that "Plane 6, Plane 7, and other consideration

27   received were worth less than the total amount of debt the Debtors incurred under such

28   transactions." *Id.* The Trustee's failure to offer anything more is predictable given the arm's-

1    length nature of the transactions. The Complaint's conclusory allegations of insolvency are

2    similarly deficient.

3         *Third*, the allegations pled in support of the Trustee's preference claims (Counts III, IX,

4    X, and XII) are also insufficient to support a claim. There can be no dispute that the Yuntian

5    Entities are secured parties. The Trustee's factually unsupported speculation—again "upon

6    information and belief"—that they might be "undersecured" does nothing more than suggest a

7    "'possible' entitlement" to relief, which is insufficient under Rule 8 to state a claim. *See Eclectic*

8    *Props. E. v. Marcus & Millichap Co.*, 751 F.3d 990, 996-97 (9th Cir. 2014); *In re Smith's Home*

9    *Furnishings, Inc.*, 265 F.3d 959, 963 (9th Cir. 2001) ("Pre-petition transfers to a creditor that is

10   fully secured on the petition date are generally not preferential because the secured creditor is

11   entitled to 100 percent of its claims."). Guessing that there might be a claim is insufficient.

12   Moreover, the challenged payments involved contemporaneous exchanges for new value, made in

13   the ordinary course.

14        *Finally*, the Trustee's turnover claims (Counts VII and XI)—alleging, "upon information

15   and belief," that a Yuntain or Minsheng entity may have "sold" up to four Challenger aircraft to a

16   third party for "profit"—are wholly speculative and devoid of supporting factual contentions. In

17   fact, the three undelivered aircraft were never acquired by any Yuntian or Minsheng Entity (the

18   orders for those planes were canceled *by Zetta Singapore*), and the delivered aircraft was leased

19   to a third party. In any event, as matter of law, Section 1110 of the Bankruptcy Code provides that

20   the parties' rights under aircraft leases govern upon repossession. The Debtors simply have no

21   rights to any "profits" under the applicable contracts.

22        For the foregoing reasons, all claims against the Yuntian Entities should be dismissed.

23                          **FACTUAL BACKGROUND**

24   **A.**      **The Debtors' Prepetition Operations**

25        As alleged in the Complaint, Zetta Singapore was formed by Geoff Cassidy, James

26   Seagrim, and Matthew Walter on July 15, 2015 "to conduct a private luxury jet charter business."

27   Compl. ¶ 60. Zetta Singapore was born through the marriage of two existing companies,

28

1    Cassidy's Asia Aviation Company Pte. Ltd ("Asia Aviation") and Seagrim and Walter's

2    Advanced Air Management, Inc. ("AAM"), with the aim of capitalizing on Cassidy's purported

3    access to financing and wealthy Asian clientele. *Id.* ¶¶ 13-15, 59. As stated in the Complaint,

4    Cassidy took immediate control of the new company after its formation, even consolidating the

5    two entities' financial records under his direction in Singapore. *Id.* ¶ 61.

6        As acknowledged in the Complaint and the Trustee's other filings in the Debtors' main

7    bankruptcy proceeding, there is no dispute that the new venture—operating under the name "Zetta

8    Jet"—was a real business with real assets. And that it took real customers on real flights. *See id.*

9    ¶¶ 68-70; Dkt. No. 217 (Trustee's declaration in support of status report); Dkt. No. 381 (Trustee's

10    motion in support of postpetition financing). Zetta Jet eventually failed, which the Complaint

11    attributes to aggressive expansion in "one of the worst luxury jet markets in recent history"; paying

12    "at or very close to asking price for these aircraft" (along with alleged "kickbacks"); incurring too

13    much debt; and failing to charge rates sufficient to support their debt service and other obligations.

14    Compl. ¶¶ 63-65. In short, Zetta Jet was a business failure, which the Complaint strains to flavor as

15    a "Ponzi scheme" with past indiscretions (having nothing to do with this Adversary Proceeding)

16    and alleged embezzlement (totaling less than $10 million) by its founder, Mr. Cassidy.

17        **B.**     **The "Minsheng Refinancing"[3] and "Challenger Transactions"**

18        The Yuntian and Minsheng Entities had a minor, innocuous role in the Zetta Jet story. As

19    stated in the Complaint, Cassidy approached the Minsheng Entities in Shanghai, China in mid-

20    2016 with an interest in a potential sale and leasing transaction involving two of Zetta Jet's

21    "Global 6000" airplanes (referred to as "Plane 6" and "Plane 7" in the Complaint)—which Zetta

22    Singapore was then leasing from entities affiliated with Li Qi—and the leasing of four new

---

23        [3] Notwithstanding the Complaint's reference to the "Minsheng Refinancing," the
transactions here were not in the nature of "refinancing." A refinancing is "[a]n exchange of an

24    old debt for a new debt, as by negotiating a different interest rate or term or by repaying the
existing loan with money acquired from a new loan." *Refinancing*, Black's Law Dictionary (11th

25    ed. 2019) (definition of refinancing). Here, the transactions did not result in the property owner
simply changing lenders or the terms of debt financing for a piece of property. Rather, as

26    acknowledged in the Complaint, the beneficial owner of the aircraft was changed from Li Qi's
Universal Leader and Glove Assets to Yuntian 3. Compl. ¶ 112 ("Following the closing on the

27    refinance on September 21, 2016, Yuntian 3 was the beneficial owner of Plane 6 and Plane 7.").

28

1    "Challenger" aircraft of which one was actually delivered ("Plane 12" and the "Undelivered

2    Aircraft"). *See id.* ¶¶ 98-111, 119. Upon reaching an agreement in principal, Zetta Singapore

3    provided Minsheng Business with a goodwill payment of $2 million on July 20, 2016;

4    subsequently, on September 13 and 14, 2016, Zetta Singapore provided Yuntian 3 with security

5    deposits and service fees of $3,590,017 related to Planes 6 and 7. *Id.* ¶ 195, Schedule B.[4]

6        Thereafter, after due diligence was completed (including onsite due diligence at Zetta

7    Singapore's home offices), the Yuntian and Minsheng Entities took various steps to finalize the

8    purchase of Planes 6, 7, 12, and the Undelivered Aircraft.

9        *First*, on September 19, 2016, in anticipation of closing, Minsheng Business transferred

10    two payments of $40 million from a China Minsheng Bank Hong Kong bank account in Hong

11    Kong to a Bank of America account in the name of Insured Aircraft Title Service, Inc. ("IATS"),

12    an escrow agent used in the transaction, for the purchase of Planes 6 and 7. *See* Exs. P & Q

13    (Outward Remittance Advices). The two $40 million payments corresponded to the $40 million

14    purchase price for each of Planes 6 and 7. *See* Exs. J & K (Invoices).[5]

15        *Second*, on September 20, 2016, Yuntian 3, acting through a nominal trustee, entered into

16    agreements to purchase Planes 6 and 7 from Li Qi's Universal Leader and Glove Assets,

17        ───────────────

18        [4] The $2 million payment was made from Zetta Singapore's HSBC bank account in
Singapore to Minsheng Business' bank account in Hong Kong, while the September payments
were made from Zetta Singapore's HSBC account in Singapore to Yuntian 3's bank account in
19    Ireland. *See* Exs. N (July 20, 2016 Remittance Advice), O (Balance and Transaction Report).
Copies of the Exhibits cited in support of this Motion—which include bank records and
20    contractual agreements associated with the transfers the Trustee seeks to avoid in the Complaint—
are attached in the Declaration of David S. Torborg, filed contemporaneously herewith. In
21    accordance with Bankruptcy Rule 9037(a)(4), the last four digits of financial-account numbers
22    have been redacted in the Exhibits.

23        As stated *infra*, a court may consider documents attached to a defendant's motion to dismiss
when the documents are central to the plaintiff's claims and the authenticity of the document is not
24    in dispute. *See, e.g.*, *Gerritsen v. Warner Bros. Entm't Inc.*, 116 F. Supp. 3d 1104, 1118 (C.D. Cal.
2015). The exhibits cited in support of this Motion are appropriate for consideration because they
25    constitute bank records demonstrating the very transfers the Trustee seeks to avoid (and which are
summarized in the "Schedules" to the Complaint), as well as contractual agreements referenced in
26    the Complaint. Given how the materials reconcile with the amounts and agreements depicted in the
Complaint, there can be no dispute concerning their authenticity.
27
        [5] The agreements refer to Plane 6 as "MSN 9606"; Plane 7 is referred to as "MSN 9688."
28

respectively, and lease them to two Zetta Jet subsidiaries (Zetta Jet 6000-2 and 6000-3).[6] At the same time, the parties entered into agreements granting Yuntian 3 a first in right security interest in the proceeds and underlying rights to Planes 6 and 7 as established in the sale and leasing transaction and providing corporate guarantees from Zetta Jet entities.[7] The agreements are governed by English law and provide the courts of England and Wales with exclusive jurisdiction to settle any disputes arising out of them.[8]

*Third*, the sale of Planes 6 and 7 to Yuntian 3 closed September 21, 2016. Compl. ¶ 111. Consistent with Payment Instructions provided in the closing documents, *see* Exs. L & M, IATS, as escrow agent, transferred $55 million of those proceeds to Universal Leader; approximately $12.4 million was paid to Minsheng Business (earmarked for payment of fees and down payments and deposits for the Challenger Transaction); and the rest (approximately $12.6 million) was paid to Zetta Singapore. *See* Compl. ¶¶ 4, 101, 106, 190, 242.[9]

*Fourth*, on September 23, 2016, Minsheng Business used the $12.4 million to pay fees

---

[6] As detailed in the Complaint, Yuntian 3 (acting through its Trustee Wells Fargo) purchased the planes by entering into two Sale and Leaseback Purchase Agreements with Universal Leader and Glove Assets, respectively, and TVPX ARS Inc. ("TVPX"). Compl. ¶ 108. TVPX acted as Trustee for Zetta Jet 6000-2 and Zetta Jet 6000-3, two entities formed under BVI law and wholly owned by Zetta Singapore. *Id.* ¶¶ 20, 108. Yuntian 3 (acting through Wells Fargo) leased the planes back to Zetta Jet 6000-2 and Zetta Jet 6000-3 through two Aircraft Lease Agreements with TVPX. *Id.* ¶ 112. As noted in the Complaint, Wells Fargo and TVPX acted on behalf of Yuntian 3, Zetta Jet 6000-2, and Zetta Jet 6000-3, the real parties in interest. *Id.* ¶ 108.

[7] The Trustee's labeling of the various agreements associated with the sale and leasing transaction of Planes 6, 7, and 12 as creating a "disguised financing" structure, Compl. ¶¶ 97, 106-07, 109, is meritless. As noted, the agreements effectuated sale-leaseback transactions, not a refinancing, and are common in the industry. *See e.g., In re Continental Airlines, Inc.*, 932 F.2d 282, 284 (3d Cir. 1991) ("[S]ale-leaseback transactions are widely used in the airline industry as a means of raising working capital.").

[8] *See, e.g.*, Ex. A at § 11.3 (excerpt from Sale and Leaseback Purchase Agreement for Plane 6); Ex. B §§ 31.1-31.2 (excerpt from Aircraft Lease Agreement for Plane 6); Ex. C §§ 15.1, 15.2 (excerpt from Lessee Security Assignment for Plane 6); Ex. G §§ 18, 19.1 (excerpt from Deed of Guarantee and Indemnity).

[9] The $55 million provided to Universal Leader was paid to its HSBC account in Hong Kong. *See* Exs. L and M. The approximate $12.4 million returned to Minsheng Business was paid to its account at the China Minsheng Bank in Hong Kong. *Id.* The approximate $12.6 million provided to Zetta Singapore was paid to its HSBC account in Singapore. *Id.*

1  and down payments and deposits for four new Challenger Aircraft. *Id.* ¶ 106. Per the Complaint,

2  "$6,852,560 was applied towards the purchase of Plane 12 and $5,557,680 was applied towards

3  the purchase of the Undelivered Aircraft." *Id.* ¶ 120.[10] The following graphic summarizes the

4  monetary transactions occurring over this five-day period.



14      Zetta Singapore was to make quarterly lease payments to Yuntian 3 and Yuntian 4 under

15  the Aircraft Lease Agreements for seven years (28 consecutive quarterly installments). Exs. B &

16  E § 5.2.1; Ex. H §§ 3.1, 5.1. Zetta Singapore would have the option to purchase the aircraft at the

17  end of the lease periods, assuming it had made all of the required payments and was otherwise in

18  compliance with the agreements. Failure to make the payments or comply with other provisions

19  of the agreements entitled the Yuntian Entities to immediately repossess the aircraft.

20      Zetta Singapore's compliance with its obligations was short-lived. Beyond its initial

21  security deposits, it made just three quarterly payments on Planes 6 and 7 and accumulated

22

23      [10] The Trustee's claim that Zetta Singapore "purchase[d]" the Challenger planes through
financing from "Minsheng (through Yuntian 4) and EDC," Compl. ¶ 122, is false. Yuntian 4

24  (through its Trustee Wells Fargo) was to become the owner of the aircraft and, as acknowledged
in the Complaint, then leased the aircraft to TVPX, as Trustee for Zetta Singapore special purpose

25  entities. *Id.* ¶ 124 (discussing Plane 12 Master Lease). Zetta Jet Challenger 650-1 Limited

26  (through its Trustee TVPX) provided a security interest in Plane 12 to Yuntian 4 (through its
Trustee Wells Fargo). Ex. I. The Aircraft Lease Agreement and security documents are governed

27  by English law and provide that English courts shall have exclusive jurisdiction over any
disputes. *E.g.*, Exs. H §§ 32.1, 32.2 (excerpts of Aircraft Lease Agreement); I §15 (excerpt of

28  Owner Participant Security Assignment).

1  impermissible maintenance liens and failed to meet registration obligations. The rental payments

2  at issue in the Complaint are detailed below. *See also* Compl., Schedules B & C.

| Transferor | Transferee | Amount | Date of Transfer |
|---|---|---|---|
| Zetta Singapore | Yuntian 3 | $1,964,282.43 | 12/22/2016 |
| Zetta Singapore | Yuntian 3 | $1,964,282.43 | 12/22/2016 |
| Zetta Singapore | Yuntian 3 | $3,917,342.22 | 3/20/2017 |
| Zetta Singapore | Yuntian 3 | $3,906,759.14 | 6/27/2017 |
| Zetta Singapore | Yuntian 4 | $63,140.28 | 7/26/2017 |
| Zetta Singapore | EDC | $956,244.53 | 7/26/2017 |

9    In each case, the rental payments were made from Zetta Singapore's HSBC account in

10  Singapore to Yuntian 3's bank account in Ireland.[11]

11      **C.    Zetta Jet's Defaults Under the Agreements**

12      On September 7, 2017 (a week prior to the Petition Date), Zetta Singapore notified the

13  Minsheng Entities that it had canceled orders for the three Undelivered Aircraft. On September

14  20, 2019, Yuntian 4 received official cancellation notices from Bombardier. *See* Dkt. No. 537,

15  Ex. D. Zetta Singapore and Zetta USA filed for chapter 11 relief on September 15, 2017 (the

16  "Petition Date"). Compl. ¶ 137.

17      On November 29 and 30, 2017, the Yuntian Entities repossessed Planes 6, 7, and 12,

18  exercising their rights under Section 1110 of the Bankruptcy Code. The Yuntian Entities incurred

19  significant costs to repossess the aircraft and return the aircraft to the serviceable condition required

20  by the leasing agreements. *Id.* ¶ 294; Proof of Claim 150 ("POC 150"), Addendum at ¶¶ 7, 11-15;

21  Proof of Claim 151 ("POC 151"), Addendum at ¶¶ 7, 11-15. The Yuntian and Minsheng Entities

22  eventually re-leased Planes 6, 7, and 12 to another private jet company. *See* Dkt. No. 908, at ¶ 15.

23      **D.    The Trustee's Claims Against the Yuntian and Minsheng Entities**

24      After seeking broad Bankruptcy Rule 2004 discovery related to the above-described

25  transactions, *see* Dkt. No. 908, the Trustee filed the Complaint just two days shy of the two-year

26

27      [11] *See* Exs. T, U, V, W. The slight difference in transfer amounts as alleged by the Trustee
    and the amounts listed in Exhibit T, the balance and transaction report of the Yuntian Entities'
28  Bank of Ireland accounts, are due to certain bank withholding fees.

deadline by which to commence actions. The Trustee asserts claims under Bankruptcy Code

Sections 547 (preference), 548 (fraudulent transfer), and 542 (turnover) against the Yuntian and

Minsheng Entities. The claims fall into five categories:

1. $12.4 million transfer. Count II (fraudulent transfer) seeks recovery of $12,410,240 that Minsheng Business received on September 21, 2016 (the "$12.4 Million Transfer") from the $80 million proceeds of the "Minsheng Refinancing"—funds supplied to an escrow agent two days earlier by Minsheng Business. In the alternative, Count II seeks recovery (against both Minsheng Business and Yuntian 4) of $5,557,680 of the $12.4 Million Transfer used to pay fees, down payments, and security deposits for the three Undelivered Aircraft.

2. $17.3 million of rental and goodwill payments (Schedule B). Count II also seeks recovery of $17.3 million in rental and goodwill payments made by Zetta Singapore to Yuntian 3 for Planes 6 and 7. The Trustee contends Zetta Singapore "did not receive reasonably equivalent value" because, "[u]pon information and belief, Plane 6, Plane 7, and other consideration received were worth less than the total amount of debt the Debtors incurred under such transactions." Compl. ¶ 186. In the alternative, Count III (preference) seeks recovery of $3,906,759 of the rental payments made within 90 days of the Petition Date. The Trustee alleges the payments enabled Yuntian 3 to recover more than it would have received under Chapter 7, an allegation based on the speculation (made "upon information and belief") that Yuntian 3 was "undersecured." Id. ¶ 205.

3. $1,019,385 in rental payments for Plane 12 (Schedule C). Counts IX and X seek recovery of $956,245 and $63,140 in rental payments for Plane 12 made within 90 days of the Petition Date to EDC and Yuntian 4, respectively. The Trustee again speculates that "to the extent Yuntian 4 was a secured creditor, it was, upon information and belief, undersecured." Id. ¶¶ 275, 286.

4. $652,757 in "Legal Fee Transfers" (Schedule F). Count XII (preference) seeks recovery of $652,757 that Zetta Singapore allegedly made to various law firms, putatively related to the Planes 6 and 7 sale and leasing transaction. The Trustee alleges, in conclusory fashion, that the "Legal Fee Transfers were for the benefit of these defendants because the defendants owed these amounts to the law firms." Id. ¶ 302. The Trustee again speculates that, "to the extent these amounts were secured by Plane 6, Plane 7, and Plane 12," the Yuntian and Minsheng Entities "were undersecured." Id. ¶ 302.

5. "Profits" on alleged aircraft resales. Counts VII and XI seek the turnover of any "profit" made on the resale to third parties of the Undelivered Aircraft and Plane 12, respectively. The Trustee speculates that defendants may have been able to sell the aircraft and that any sales netted more than the Debtors' remaining obligations under the agreements. Id. ¶¶ 254, 296.

For the reasons more fully detailed below, each category of the Trustee's claims against

the Yuntian Entities fails as a matter of law and should be dismissed.

1

**ARGUMENT**

2      On a motion to dismiss for failure to "state a claim upon which relief can be granted,"

3 Fed. R. Civ. P. 12(b)(6), Fed. R. Bank. P. 7012(b), "dismissal may be based on either a 'lack of a

4 cognizable legal theory' or 'the absence of sufficient facts alleged under a cognizable legal

5 theory.'" *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121 (9th Cir. 2008). While

6 the Court must "take all allegations of material fact as true and construe them in the light most

7 favorable to the nonmoving party," *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th

8 Cir. 1995), that "tenet . . . is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662,

9 678 (2009). "[T]he factual allegations that are taken as true must plausibly suggest an entitlement

10 to relief, such that it is not unfair to require the opposing party to be subjected to the expense of

11 discovery and continued litigation." *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014)

12 (citations omitted). For allegations sounding in fraud, "a party must state with particularity the

13 circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); Fed. R. Bank. P. 7009; *Vess v.*

14 *Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003).

15      In addition to the allegations in the Complaint, the Court may consider "documents

16 incorporated into the Complaint by reference, and matters of which a court may take judicial

17 notice," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 (2007), as well as

18 "documents that were not physically attached to the complaint where the documents' authenticity

19 is not contested, and the plaintiff's complaint necessarily relies on them," *Sams v. Yahoo! Inc.*,

20 713 F.3d 1175, 1179 (9th Cir. 2013); *see also Gerritsen v. Warner Bros. Entm't Inc.*, 116 F.

21 Supp. 3d 1104, 1118 (C.D. Cal. 2015) ("[The Ninth Circuit] ha[s] extended the 'incorporation by

22 reference' doctrine to situations in which the plaintiff's claim depends on the contents of the

23 document, the defendant attaches the document to its motion to dismiss, and the parties do not

24 dispute the authenticity of the document, even though the plaintiff does not explicitly allege the

25 contents of that document in the complaint.") (citing *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th

26 Cir. 2005)). "The Court is not required to accept as true allegations in the complaint which are

27 contradicted by these documents, 'or allegations that are merely conclusory, unwarranted

28 deductions of fact, or unreasonable inferences.'" *Screen Capital Int'l Corp. v. Library Asset*

1    *Acquisition Co.*, 510 B.R. 248, 254 (C.D. Cal. 2014) (citation omitted). The Court may also take

2    account of "foreign legal materials—including expert testimony and declarations—at the pleading

3    stage." *de Fontbrune v. Wofsy*, 838 F.3d 992, 1000 (9th Cir. 2016).

4
     **I.      THE PRESUMPTION AGAINST EXTRATERRITORIALITY AND
             INTERNATIONAL COMITY REQUIRE DISMISSAL OF ALL CLAIMS.**
5

6            **A.     The Presumption Against Extraterritoriality Bars the Trustee's Avoidance
                     Claims.**

7            "Absent clearly expressed congressional intent to the contrary, federal laws will be

8    construed to have only domestic application." *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct.

9    2090, 2100 (2016). To determine whether this presumption against extraterritorial application of

10   the law applies to a given case, courts engage in a two-step framework. At step one, courts

11   consider "whether the presumption against extraterritoriality has been rebutted—that is, whether

12   the statute gives a clear, affirmative indication that it applies extraterritorially." *Id.* at 2101. If a

13   statute applies extraterritorially, it can be applied to events and transactions regardless of where

14   those events and transactions occurred. If the presumption is not rebutted, courts consider, at step

15   two, whether the underlying events or transactions at issue "involve[] a domestic application of

16   the statute" or are predominantly foreign in nature. *Id.*

17           The Trustee's avoidance claims against the Yuntian and Minsheng Entities fail to

18   overcome the presumption against extraterritoriality. Congress did not affirmatively state that the

19   Bankruptcy Code's avoidance provisions apply extraterritorially (prong one), and the claims at

20   issue relate to foreign transactions (prong two).

21                   **1.     The Bankruptcy Code's avoidance provisions do not apply
                            extraterritorially.**
22

23           This District has already held that Section 548 does not apply extraterritorially. *See In re*

24   *Estate of Midland Euro Exch. Inc.*, 347 B.R. at 719. That is because "neither the plain language of

25   the statute nor its reading in conjunction with other parts of the Code establish congressional

26   intent to apply § 548 extraterritorially." *Id.* Section 548 "speaks of avoiding transfers of 'an

27   interest in the debtor in property,'" but "the Bankruptcy Code does not define the term

28   'property,'" *In re CIL Ltd.*, 582 B.R. 46, 92 (Bankr. S.D.N.Y. 2018), *amended on*

1   *reconsideration*, No. 13-11272-JLG, 2018 WL 3031094 (Bankr. S.D.N.Y. June 15, 2018), nor

2   does it provide any other "clear, affirmative indication" that the provision applies

3   extraterritorially, *RJR Nabisco*, 136 S. Ct. at 2101. The other provisions the Trustee seeks to

4   employ—Sections 547 and 550—similarly lack any clear indication of extraterritorial intent. *See,*

5   *e.g.*, *In re Arcapita Bank B.S.C.(c)*, 575 B.R. 229, 245 (Bankr. S.D.N.Y. 2017).

6           Elsewhere in the Bankruptcy Code, Congress expressly provides for extraterritorial

7   application of the law. For example, "§ 541(a)(1) states that 'property of the estate' includes, *inter*

8   *alia*, all of the debtor's legal and equitable interests in property as of the commencement of the case,

9   '*wherever located*,' and 28 U.S.C. § 1334(e)(1) grants the district court exclusive jurisdiction 'of all

10  the property, *wherever located*, of the debtor as of the commencement of such case, and of property

11  of the estate.'" *In re Ampal-Am. Israel Corp.*, 562 B.R. 601, 612 (Bankr. S.D.N.Y. 2017) (emphasis

12  added). Those provisions contain what the avoidance provisions at issue here lack: "a clear statement

13  of extraterritorial effect." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 265 (2010); *see* 11

14  U.S.C. §§ 547, 548, 550. "Congress's failure to [express an affirmative intent], particularly in light of

15  the fact that sections 541(a)(1) and 1334(e) expressly apply extraterritorially, operates to limit

16  sections [547, 548, 550] to their terms." *In re CIL Ltd.*, 582 B.R. at 92. (Bankr. S.D.N.Y. 2018),

17  *amended on reconsideration*, No. 13-11272-JLG, 2018 WL 3031094 (Bankr. S.D.N.Y. June 15,

18  2018).[12]

19          With "no evidence of congressional intent to extend the application of § 548 [or §§ 547 or

---

20  [12] Some courts have incorporated the "wherever located" language from § 541(a) into
21  § 548 and concluded that § 548 applies extraterritorially, *see, e.g.*, *In re French*, 440 F.3d 145,
    152 (4th Cir. 2006), but their reasoning ignores the plain text of the Code and, as this Court
22  recognized in *Midland Euro*, requires a "logical leap" that runs afoul of the requirement that there
    be a clear, affirmative indication of extraterritorial intent. 347 B.R. at 718. Section 541(a)
23  provides that property of the estate includes only the debtor's interests in property "*as of the*
    *commencement of the case*," 11 U.S.C. § 541(a)(1) (emphasis added), and "any interest in
24  property that the trustee *recovers* under section … 550 … of this title," § 541(a)(3) (emphasis
    added). "Property of the estate," wherever located, thus does not include interests in property that
25  the trustee has not yet recovered. *Midland Euro Exch.*, 347 B.R. at 719 (noting the "majority of
    courts have concluded that property held by third-party transferees only becomes 'property of the
26  estate' after the transfer has been avoided" and commenting that "*In re French* totally ignores §
    541(a)(3) and uses an unclear and convoluted method to reach its conclusion"); *accord In re*
27  *Ampal-Am. Israel Corp.*, 562 B.R. 601, 612 (Bankr. S.D.N.Y. 2017); *Sec. Inv'r Prot. Corp. v.*
28  *Bernard L. Madoff Inv. Sec. LLC*, 513 B.R. 222, 229 (S.D.N.Y. 2014).

1   550] extraterritorially," the presumption has not been rebutted. *Midland Euro Exch.*, 347 B.R. at

2   719; *In re Maxwell Commc'n Corp. plc* (*Maxwell I*), 186 B.R. 807, 820-21 (S.D.N.Y. 1995)

3   ("Because Congress has not 'clearly expressed' its desire that § 547 govern extraterritorial

4   conduct, that section cannot apply to the foreign transfers at issue in this case." (citation

5   omitted)); *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 513 B.R. 222, 231

6   (S.D.N.Y. 2014) ("[T]he presumption against extraterritorial application of federal statutes has

7   not been rebutted" with respect to §§ 548, 550.); *In re CIL Ltd.*, 582 B.R. at 92 (same). Further,

8   "[t]he Ninth Circuit has held that policy considerations alone are insufficient to overcome the

9   presumption against extraterritoriality." *Midland Euro Exch.*, 347 B.R. at 718 (citing *Subafilms,*

10  *Ltd. v. MGM–Pathe Communications Co.*, 24 F.3d 1088, 1096 (9th Cir. 1994) (en banc)).

11          **2.      The transactions at issue are indisputably foreign.**

12          Turning to step two, courts look to a "statute's 'focus'" in determining whether a claim calls

13  for improper foreign application. *RJR Nabisco*, 136 S. Ct. at 2101. "[I]f the conduct relevant to the

14  focus occurred in a foreign country, then the case involves an impermissible extraterritorial

15  application regardless of any other conduct that occurred in U.S. territory." *Id.* As relevant here, "the

16  focus of [the] avoidance and recovery provisions is the initial transfer that depletes the property that

17  would have become property of the estate." *In re CIL Ltd.*, 582 B.R. at 93. *See also Maxwell I*, 186

18  B.R. at 817 (courts "consider[] the location of the transfers," including "whether the participants,

19  acts, targets, and effects involved in the transaction at issue are primarily foreign or primarily

20  domestic"); *In re Maxwell Commc'n Corp. plc by Homan* (*Maxwell II*), 93 F.3d 1036, 1047 (2d Cir.

21  1996) ("scrutiny of the transfer is at the heart" of suits seeking avoidance of transactional transfers).

22          Here, the Complaint itself demonstrates that the transactions are predominantly foreign in

23  nature. None of the parties in interest were located in the United States, but instead hail from

24  Singapore, China, Hong Kong, Ireland, Canada, and the British Virgin Islands. *See* Compl. ¶¶ 20,

25  22, 24, 26, 28, 41-45, 97-99, 106, 108, 122-24.[13]  The funds came from and landed with entities

26  ───────────────

27          [13] The Complaint clouds the nature of the transactions by attributing acts to "Zetta,"
    without specifying to which Debtor the Complaint is referring. *See e.g.*, Compl. ¶ 112 (stating
    "[u]nder these lease agreements, Zetta made various transfers"). In fact, only Zetta Singapore was
28  involved in any of the financial transfers at issue. *See* Exs. N, O, P, Q, R, S, T, U, V, W.

1    outside the United States. The agreements underlying the transactions call for application of

2    English law. *See supra* at 7; *e.g.*, Exs. A & D at § 11.3 (excerpts from Sale and Leaseback

3    Purchase Agreements for Planes 6 and 7). And the specific acts relevant to each transfer occurred

4    abroad. In particular:

- <u>Rental payments</u>. The $17.3 million in rental and goodwill payments at issue in Counts II and III (Planes 6 and 7), as well as the $63,140 rental payment at issue in Count X (Plane 12), were sent directly from Zetta Singapore's account in Singapore to the Yuntian Entities' accounts in Ireland. *See supra* at 9; Exs. T, U, V, W. The $956,245 rent payment at issue in Count IX (Plane 12) occurred between two foreign entities, Zetta Singapore and EDC, and there is no allegation that these transfers touched the United States. Compl. ¶ 271.

- <u>$12.4 Million Transfer</u>. The funds used to make the $12.4 Million Transfer originated abroad in Minsheng Business's Hong-Kong-based account and were almost immediately returned to that same account, without ever entering the control or accounts of Zetta Singapore or Zetta USA. *See supra* at 8; Exs. L, M, R, S; *see also* Compl. ¶ 106.

- <u>$652,757 in "Legal Fee Transfers."</u> Zetta Singapore allegedly initiated these payments to law firms in accordance with the terms of the sale and leasing transaction involving Planes 6, 7, 12 and the Undelivered Aircraft, which was inherently a foreign transaction. Compl. ¶ 298, Schedule F.

16    Because "all the relevant conduct took place outside the United States," *Kiobel v. Royal*

17    *Dutch Petroleum Co.*, 569 U.S. 108, 124 (2013), the challenged transfers were extraterritorial.

18    *See In re CIL Limited*, 582 B.R. at 93 (holding transfer occurred abroad where it was "one among

19    foreign entities that allegedly harmed foreign creditors, [and] it was accomplished outside of the

20    United States"). The $12.4 Million Transfer's fleeting, two-day connection to a U.S.-based

21    escrow agent, and the parties' use of nominal U.S.-based "trustee" intermediaries to facilitate the

22    transactions, are immaterial. *See supra* at 7-8; Exs. L, M, R, S; Compl. ¶ 108 (noting that Yuntian

23    3 acted "by and through its trustee Wells Fargo" and that Wells Fargo and TVPX acted on behalf

24    of Yuntian 3 and the Zetta BVI Subsidiaries "solely as trustees"). The Supreme Court has

25    emphasized that, "even where the claims touch and concern the territory of the United States, they

26    must do so with sufficient force to displace the presumption against extraterritorial application."

27    *Kiobel*, 569 U.S. at 124-25; *see also Morrison*, 561 U.S. at 266 ("It is a rare case of prohibited

28    extraterritorial application that lacks all contact with the territory of the United States. . . . [T]he

1  presumption against extraterritorial application would be a craven watchdog indeed if it retreated

2  to its kennel whenever some domestic activity is involved in the case.").

3      Decisions involving similar incidental U.S. contacts illustrate that the minimal contacts

4  with the United States here are insufficient. In *Midland Euro*, the court noted that there was no

5  dispute that the relevant transfers there occurred abroad, where "[t]he transferor was a Barbados

6  corporation, the transferee was an English corporation, [and] the funds originated from a bank

7  account in London … [and] ended up in another bank account in England," even though the funds

8  were "transferred through a bank account in New York." 347 B.R. at 715. Similarly, in *Maxwell

9  I*, the relevant transfers occurred between foreign entities, but they derived from the sale of U.S.

10  assets and the initial transfer was routed through the transferee's bank account in New York. 186

11  B.R. at 817 & n.5. The court concluded that the U.S. asset sale was "more appropriately

12  characterized as a preparatory step to the transfers." *Id.* (citing *Gushi Bros. Co. v. Bank of Guam*,

13  28 F.3d 1535, 1538 (9th Cir. 1994)). The fact that funds briefly touched an account in New York

14  was incidental and had no bearing on the court's decision that the transfer was extraterritorial. *See

15  id.* at 817 n.5. Likewise, in *Loginovskaya v. Batratchenko*, 764 F.3d 266 (2d Cir. 2014), the

16  Second Circuit held that the relevant transfer was foreign even though the funds were wire

17  transferred to New York. *Id.* at 275 (noting the wire transfers "were actions needed to carry out

18  the transactions, and not the transactions themselves," and holding that the "direction to wire

19  transfer money to the United States is insufficient to demonstrate a domestic transaction.").

20      The fact that the Yuntian Entities filed proofs of claim in the bankruptcy proceedings has

21  no bearing on the applicability of the presumption against extraterritoriality. Prior to the Supreme

22  Court's decision in *Morrison*, some courts mistakenly considered the presumption against

23  extraterritoriality to be an issue relating to a court's jurisdiction, *see Morrison*, 561 U.S. at 253-

24  54, and suggested that submitting proofs of claim subjected a party to the court's jurisdiction and

25  thus displaced the presumption against extraterritoriality. *See, e.g.*, *In re Simon*, 153 F.3d 991,

26  997 (9th Cir. 1998) ("By acceding to bankruptcy court jurisdiction so that it might recover a

27  portion of the money it was owed, Hong Kong–Shanghai forfeited any right it had to claim that

28  the court *lacked the power* to enjoin Hong Kong–Shanghai from commencing a post-bankruptcy

1  collection proceeding against the debtor." (emphasis added)); *see also In re Interbulk, Ltd.*, 240

2  B.R. 195, 199 (Bankr. S.D.N.Y. 1999).

3        As the Court in *Morrison* explained, however, the presumption against extraterritoriality is

4  an issue of statutory interpretation, not jurisdiction. "[T]o ask what conduct [a statutory provision]

5  reaches is to ask what conduct [the provision] prohibits, which is a merits question." 561 U.S. at

6  254. In *RJR Nabisco*, the Court further described the presumption against extraterritoriality as "a

7  canon of statutory construction." 136 S. Ct. at 2100. Whether the Yuntian Entities submitted

8  proofs of claim in this bankruptcy proceeding thus has no bearing on the statutory question of

9  whether Sections 547, 548, and 550 reach extraterritorial conduct, or whether the conduct

10  relevant to the focus of the statute—the initial transfers that the Trustee seeks to avoid—occurred

11  extraterritorially. *See In re Ampal-Am. Israel Corp.*, 562 B.R. at 614 (finding that the presumption

12  against extraterritoriality had not been displaced, despite the fact that the transferee had submitted

13  a claim in the bankruptcy proceedings).[14]

14        Because the Complaint calls for extraterritorial application of §§ 547, 548, and 550, which

15  do not reach foreign conduct, Counts II, III, VI, IX, and X must be dismissed.

16        **B.**     **Principles of International Comity Demand Dismissal of the Trustee's Claims.**

17        Alternatively, all of the Trustee's claims should be dismissed under principles of

18  international comity. International comity is a "separate notion from the 'presumption against

19  extraterritoriality,'" and may preclude application of a statute that could otherwise be applied

20  extraterritorially. *Maxwell II*, 93 F.3d at 1047. Comity "rests on respect for the legal systems of

21  members of the international legal community—a kind of international federalism—and thus

22  'serves to protect against unintended clashes between our laws and those of other nations which

23  could result in international discord.'" *Mujica v. AirScan Inc.*, 771 F.3d 580, 605 (9th Cir. 2014)

24

25  ——————————————

      [14] The Ninth Circuit's decision in *Simon* is distinguishable in any event because the
Bankruptcy Code provision at issue in that case, Section 541(a)—which provides that the debtor's

26  estate includes its interests in property "wherever located and by whomever held"—was one that
Congress affirmatively indicated should be applied exterritorialy. *See In re Simon*, 153 F.3d at

27  996. Moreover, the court found in *Simon* that a creditor's attempt to subvert the bankruptcy
court's discharge injunction "would have 'substantial effects within the United States.'" *Id.* at 997

28  (citation omitted).

1    (citation omitted). Two distinct doctrines fall within the umbrella of international comity: (1)

2    "'comity among courts' or adjudicatory comity, which 'may be viewed as a discretionary act of

3    deference by a national court to decline to exercise jurisdiction in a case properly adjudicated in a

4    foreign state'"; and (2) "legislative or 'prescriptive comity,' which guides domestic courts as they

5    decide the extraterritorial reach of federal statutes." *Id.* at 599 (citations omitted).

6        Here, principles of comity demand dismissal of all claims against the Yuntian Entities.

7    Because a true conflict of laws exists between U.S. law and the law of another nation (here,

8    Singapore and England), and because applying the U.S. statute under such circumstances would

9    be "unreasonable" under a choice-of-law analysis set forth in § 403 of the Restatement (Third) of

10   Foreign Relations, comity calls for dismissal of the claims.

11                    **1.    A true conflict of laws exists.**

12        As explained in the foreign law Declarations filed with this Motion, there are significant

13   differences in U.S., Singapore, and English law directly pertinent to the claims the Trustee has

14   pled against the Yuntian and Minsheng Entities.[15] Three differences are particularly notable.

15        *First*, under U.S. law, "[t]he mere existence of the Ponzi scheme is sufficient to prove the

16   Debtor's actual intent to hinder, delay, or defraud its creditors." *Midland Euro Exch.*, 347 B.R. at

17   715. Neither Singapore nor English law recognize this so-called "Ponzi scheme presumption."

18   *See* Declaration of Sushil Nair (Singapore counsel), attached hereto as Exhibit A ("Nair Decl.") at

19   ¶¶ 9-11, 26; Declaration of Jeremy John Richmond (English barrister), attached hereto as Exhibit

20   B ("Richmond Decl.") at ¶¶ 6.3, 7.4.1, 9.2.2. Because the Complaint relies entirely on allegations

21   of a "Ponzi-like scheme" to plead its claims of actual fraudulent transfer, Compl. ¶ 183; *see, e.g.*,

22   Compl. ¶¶ 2, 65, 134, this conflict is critical.[16]

23   _____

24   [15] The Yuntian Entities request that the Court take judicial notice of foreign law for
     purposes of this motion to dismiss. *de Fontbrune v. Wofsy*, 838 F.3d 992, 1000 (9th Cir. 2016);
     *see also Midland Euro Exch.*, 347 B.R. at 714.

25

26   [16] Another potentially significant difference relating to the Trustee's actual fraudulent
     transfer claims concerns the ability to plead claims against a good-faith transferee. Under U.S.
     law, a transferee can be liable without a showing of actual fraudulent intent. *See In re Cohen*, 199
27   B.R. 709, 716-17 (B.A.P. 9th Cir. 1996). English law contains two provisions (sections 213 and
     423 of Insolvency Act of 1986) for avoiding transfers intended to defraud creditors. Richmond

28

1    *Second*, in certain U.S. jurisdictions even an innocent transferee acting in good faith and

2    providing value may be ordered to disgorge "profits" received as part of a Ponzi scheme. *See,*

3    *e.g.*, *Donell v Kowell*, 533 F.3d 762, 776-80 (9th Cir. 2008); *compare Unified Commercial*

4    *Capital, Inc.*, 280 B.R. 343, 349-52 (Bankr. W.D.N.Y. 2001) (holding plaintiff could not recover

5    interest payments paid in connection with alleged Ponzi scheme). Similar precedent does not exist

6    under Singapore or English law. *See* Nair Decl. at ¶¶ 12-13; Richmond Decl. at ¶ 6.5.

7         *Third*, to avoid a transaction as a preference, both Singapore and English law require that the

8    plaintiff prove that the transferor had a specific intention and desire to place the transferee in a better

9    position than it otherwise would have been had the transfer not been made. *See* Nair Decl. at ¶¶ 24.c,

10   26-27; Richmond Decl. at ¶ 9.2.2. Bankruptcy Code Section 547, by contrast, contains no such

11   subjective requirement and instead employs an entirely objective test. *See* 11 U.S.C. § 547(b)(5).

12              **2.    Application of U.S. law against the Yuntian Entities is unreasonable.**

13        In light of these conflicts, the Court must determine if application of U.S. law here would

14   be unreasonable. The Ninth Circuit has divided the factors relevant to this analysis, set forth in

15   the Restatement (Third) of Foreign Relations § 403(2), into three general categories: U.S.

16   interests, foreign interests, and adequacy of the alternative forum. *Mujica*, 771 F.3d at 603 &

17   n.21. Each weighs in favor of dismissal. Both Singapore and the courts of England and Wales

18   have a greater interest in the dispute than the United States and both are adequate forums to

19   resolve the claims. Resolution of the dispute under Singapore or English law also comports with

20   Decl. ¶ 5. Section 213, *Fraudulent trading*, requires a showing of fraudulent intent on the part of
     both the transferor *and the transferee*. *Id.* ¶¶ 6.2, 6.2.1, 6.2.2. The Complaint here includes no
21   allegations that the Yuntian Entities did not act in good faith. Section 423, *Transactions*
     *defrauding creditors*, permits the *High Court of England and Wales* to avoid "undervalue
22   transactions," but U.S. courts are split on whether courts other than the High Court of England
     and Wales have authority to avoid transactions under this section. *Id.* ¶¶ 7.1-7.2.  *Compare*
23   *Sunnyside Dev. Co. LLC v. Cambridge Display Tech. Ltd., CDT*, No. C 08-01780 MHP, 2008
     WL 4450328, at *9 (N.D. Cal. Sept. 29, 2008) (holding court lacked subject matter jurisdiction to
24   avoid transfers under Section 423); *In re Hellas Telecomm. (Luxembourg) II SCA*, 535 B.R. 543,
25   562-71 (Bankr. S.D.N.Y. 2015) (holding court had subject matter jurisdiction and authority to
     issue remedies under Section 423); *cf. Seismic Reservoir 2020, Inc. v. Paulsson*, 785 F.3d 330,
26   333-35 (9th Cir. 2015) (holding only Court of Queen's Bench of Alberta had power to issue
     remedy under Albert Business Corporations Act, noting that while "foreign law cannot limit the
27   jurisdiction of an Article III court to entertain controversies, when it creates a right, that foreign
28   law can determine the remedy").

1  the parties' reasonable expectations given the inherently foreign nature of the transactions, as well

2  as the choice of English law and forum selection clauses in the underlying agreements.

3  (a)    **U.S. Interests**

4  "The (nonexclusive) factors [courts] should consider when assessing U.S. interests include

5  (1) the location of the conduct in question, (2) the nationality of the parties, (3) the character of

6  the conduct in question, (4) the foreign policy interests of the United States, and (5) any public

7  policy interests." *Mujica*, 771 F.3d at 604. In general, "U.S. courts have afforded far less weight,

8  for comity purposes, to U.S. … interests when the activity at issue occurred abroad." *Id.* at 604.

9  As already discussed at length above, the conduct relevant to the transfers the Trustee seeks to

10  avoid overwhelmingly occurred abroad and took place between foreign parties. Compl. ¶¶ 41-44,

11  97-99, 106-09, 112, 122-23; *supra* at 6-9, 15.

12  Moreover, the interest in "promoting a friendly intercourse between the sovereignties"

13  furthers "American self-interest, especially where the workings of international trade and

14  commerce are concerned." *Maxwell II*, 93 F.3d at 1053 (citation omitted). Indeed, "Congress

15  explicitly recognized the importance of the principles of international comity in transnational

16  insolvency situations when it revised the bankruptcy laws." *In re Picard, Tr. for Liquidation of*

17  *Bernard L. Madoff Inv. Sec. LLC*, 917 F.3d 85, 103 (2d Cir. 2019).

18  (b)    **Foreign Interests**

19  Singapore has a strong interest in this dispute. As illustrated by *In re CIL Ltd.*, a country

20  "has a strong interest in evaluating allegedly fraudulent transfers that involve . . . debtors

21  [incorporated there], and applying its avoidance provisions to conduct originating in the [country]

22  and involving mostly [local] parties." 582 B.R. at 102. Here, Zetta Singapore—the Debtor at the

23  center of the sale and leasing transactions involving Planes 6, 7, 12, and the Undelivered

24  Aircraft—is a Singapore entity. And the transfers at issue originated from Zetta Singapore's

25  financial accounts in Singapore (though, with respect to at least the $12.4 Million Transfer, it

26  originated from Minsheng Business's property). *See supra* at 6-9.

27  The Trustee has already conceded Singapore's interest in the dispute. The Trustee sought

28  and obtained a recognition order from the High Court of the Republic of Singapore ("<u>Recognition</u>

- 20 -

1    Order"). *See* Dkt. No. 898. And, in moving to establish a cross-border insolvency protocol, the

2    Trustee noted that "numerous transfers were made out of or through Zetta PTE's bank accounts

3    located in Singapore" and the Recognition Order "allows the Trustee to bring certain avoidance

4    actions under Singaporean law before the Singaporean Court." Dkt. No. 897 ¶ 14.

5           The courts of England and Wales also have stronger interests in this litigation than the

6    United States. The contracts underlying the challenged transfers call for the application of English

7    law in English courts. *Supra* at 7; *e.g.*, Ex. A at § 11.3 (excerpt from Sale and Leaseback

8    Purchase Agreement for Plane 6); Ex. B §§ 31.1-31.2 (excerpt from Aircraft Lease Agreement for

9    Plane 6); Ex. C §§ 15.1, 15.2 (excerpt from Lessee Security Assignment for Plane 6); Ex. G §§

10   18, 19.1 (excerpt from Deed of Guarantee and Indemnity).[17] Such choice-of-law and choice-of-

11   forum provisions factor into the comity analysis under the Restatement (Third) of Foreign

12   Relations, which calls for consideration whether "justified expectations might be . . . hurt by

13   [U.S.] regulation." 11 U.S.C. § 403(2)(d). The contractual provisions establish that the parties

14   never contemplated the application of U.S. law to the transactions at issue, and favor the courts of

15   England and Wales over the United States. The contractual provisions also weigh against the

16   application of U.S. law under federal choice-of-law principles. *Cf.* Restatement (Second) of

17   Conflict of Laws § 187(2)(a) (providing that "[t]he law of the state chosen by the parties to

18   govern their contractual rights and duties will be applied . . . unless the chosen state has no

19   substantial relationship to the parties or the transaction and there is no other reasonable basis for

20   the parties' choice."); *Chuidian v. Philippine Nat. Bank*, 976 F.2d 561, 564 (9th Cir. 1992).[18]

21   ─────────────────

22   [17] These same principles of international comity apply to the Trustee's turnover claims
     (Counts VII and XI) to the extent they require a determination of the nature of Zetta Singapore's

23   interest in Plane 12. Such a determination would require substantive application of English law
     pursuant to the choice of law and forum clauses in the underlying contracts. *See In re Hunt*, 540

24   B.R. 438, 441-42 (Bankr. D. Idaho 2015) ("State law determines the existence and scope of a
     debtor's interest in property."); *In re Chappel*, 189 B.R. 489, 491 (B.A.P. 9th Cir. 1995) ("The

25   existence and scope of a debtor's interest in a given asset is determined by state law."); *see also
     In re Rebel Rents, Inc.*, 291 B.R. 520, 525 (Bankr. C.D. Cal. 2003).

26
     [18] The Ninth Circuit has held that courts should apply a federal choice-of-law analysis to

27   bankruptcy cases. *See In re Miller*, 292 B.R. 409, 413 (B.A.P. 9th Cir. 2003). Whether that points

28   to Singapore law under a "most significant relationship" analysis, *see id.*, or English law under

1

(c)    **Adequacy of the Alternative Forum**

2      The Ninth Circuit has applied a burden-shifting framework regarding the adequacy of the

3   alternative forum in the context of a comity analysis. "[O]nce a defendant shows that a foreign

4   forum would have jurisdiction and would provide a remedy for a meritorious claim, the party

5   'asserting inadequacy or delay must make a powerful showing.'" *Mujica*, 771 F.3d at 612. In light

6   of the Recognition Order and the Trustee's actions signaling an intention to seek relief in the

7   Singapore courts—including avoidance claims—there can be no dispute that the Singapore courts

8   are adequate to resolve any claims against the Yuntian and Minsheng Entities. Likewise, the

9   courts of England and Wales are undeniably adequate to adjudicate avoidance claims involving

10  international parties. *See, e.g.*, *Maxwell II*, 93 F.3d at 1053 (noting that the "parallel proceedings

11  in the English and American courts have resulted in a high level of international cooperation and

12  a significant degree of harmonization of the laws of the two countries").

13     In sum, the presumption against extraterritoriality and principles of international comity

14  call for the Court to dismiss the Complaint as to all claims pled against the Yuntian Entities. The

15  Trustee should not be permitted to use the more generous avoidance provisions of the U.S.

16  Bankruptcy Code to avoid what are indisputably foreign transactions.

17  **II.    THE TRUSTEE HAS NO BASIS TO AVOID ANY PART OF THE $12.4 MILLION
18          TRANSFER BECAUSE IT DID NOT INVOLVE THE DEBTOR'S PROPERTY.**

19     As stated above, Counts II and VI seek recovery, from either Minsheng Business or

20  Yuntian 4, of all or some part the $12.4 Million Transfer as a fraudulent transfer. These claims

21  should be dismissed for the independent reason that they do not involve any Debtor's property.

22     Section 548(a) allows the trustee to avoid, under the conditions set forth in Sections

23  (a)(1)(A) & (B), "any transfer . . . of *an interest of the debtor in property*, or any obligation . . .

24  incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing

25  of the petition . . . ." The Trustee has the initial burden of establishing that the $12.4 Million

26  Transfer actually involved a transfer of the Zetta Singapore's property. *See In re Adbox, Inc.*, 488

27  F.3d 836, 842 (9th Cir. 2007) (noting, in analogous context, that the "trustee bears the initial

28  the Restatement (Second) of Conflict of Laws § 187(2)(a), or some other foreign law, is beyond
    the scope of this memorandum. What is clear is that there is little basis to apply U.S. law.

1   burden of establishing that a transfer is an avoidable preference under § 547" by "establish[ing]

2   that the transfer of the disputed funds was from one of the debtor's accounts over which the

3   debtor ordinarily exercised total control"). The Complaint contains no allegations that the $12.4

4   million touched Zetta Singapore's or Zetta USA's bank accounts, much less that either entity

5   exercised any control over the funds. That is because, of course, these funds came from Minsheng

6   Business itself—just two days earlier—not Zetta Singapore or Zetta USA. For this reason alone,

7   the Trustee has no claim to the $12.4 million.

8          Even if the funds in question could somehow be characterized as Zetta Singapore's

9   property, the $12.4 Million Transfer falls squarely within the earmarking doctrine. "[T]he

10  earmarking doctrine applies 'when a third party lends money to a debtor for the specific purpose

11  of paying a selected creditor.'" *In re Superior Stamp & Coin Co., Inc.*, 223 F.3d 1004, 1008 (9th

12  Cir. 2000). "Reduced to its essence, the earmarking defense merely holds for the unsurprising

13  conclusion that where creditors would not otherwise have any reason or expectation to look to the

14  assets transferred, there is no diminution of the net recovery on account of the earmarked funds

15  and there can therefore be no avoidance." *In re TriGem Am. Corp.*, 431 B.R. at 864; *see also In re*

16  *Kemp Pac. Fisheries, Inc.*, 16 F.3d 313, 316 (9th Cir. 1994) (where the earmarking doctrine

17  applies, "[t]he money never becomes part of the debtor's assets; rather, the transaction merely

18  substitutes one creditor for another without diminishing the value of the bankruptcy estate").

19         To invoke the earmarking doctrine, the defendant must prove: "(1) the existence of an

20  agreement between the new lender and the debtor that the new funds will be used to pay a

21  specified antecedent debt; (2) performance of that agreement according to its terms; (3) the

22  transaction viewed as a whole . . . does not result in any diminution of the estate." *In re Superior*

23  *Stamp & Coin Co.*, 223 F.3d at 1008 (quoting *McCuskey v. Nat'l Bank of Waterloo (In re Bohlen*

24  *Enters., Ltd.)*, 859 F.2d 561, 566 (8th Cir. 1988)). Here, the Complaint admits that the $12.4

25  million was earmarked for payment to Minsheng Business "for amounts allegedly due and owing

26  by Zetta PTE on the four additional Bombardier Challenger 650 planes." Compl. ¶ 120; *see also*

27  *id.* ¶ 243. This was memorialized in the payment instructions for the distribution of the $80

28  million in proceeds generated from the sale and leasing transaction. *See* Exs. L & M.

1    This is a prime example of earmarking—the parties tagged the $12.4 million for payment

2    of an antecedent debt such that the funds never belonged to or were controlled by Zetta

3    Singapore. When viewed "as a whole," the earmarking doctrine excepts the $12.4 Million

4    Transfer from avoidance because the parties never intended for it to be among Zetta Singapore's

5    assets and, as such, the transfer did not result in a diminution of the estate. *In re TriGem Am.*

6    *Corp.*, 431 B.R. at 862. To the contrary, the Zetta Singapore estate was enhanced by obtaining the

7    three revenue-generating aircraft.

8    For the foregoing reasons, Count II should be dismissed to the extent it seeks recovery of

9    the $12.4 Million Transfer, and Count VI should be dismissed entirely.

10   **III.   THE TRUSTEE HAS FAILED TO ADEQUATELY PLEAD HIS FRAUDULENT
         TRANSFER CLAIMS.**

11
12   The Trustee's fraudulent transfer claims (Counts II and VI)—which seek recovery of the

     $12.4 Million Transfer and the $17.3 million of rental and goodwill payments made for Planes 6
13
     and 7—should also be dismissed because the Complaint fails to plead *facts* sufficient to support
14
     either claims for actual or constructive fraudulent transfer. The Trustee meets neither the
15
     minimum standards under Federal Rule 8(a) nor the more exacting standards of Rule 9(b)
16
     applicable to his claim of actual fraudulent transfer.
17
     **A.   Actual Fraudulent Transfer**
18
19   The Trustee alleges one actual fraudulent transfer claim, in Count II, against the Yuntian

20   and Minsheng Entities. *See* Compl. ¶¶ 183-84. The Complaint alleges, first, that "Cassidy (on

     behalf of Zetta PTE) entered in the sale and leasing transaction (including the Second Plane 7
21
     Purchase Agreement, the Second Plane 6 Purchase Agreement, the Third Plane 7 Purchase
22
     Agreement, the Third Plane 6 Purchase Agreement, the Clarification, the Plane 6 and Plane 7
23
     Master Leases, and the Plane 6 and Plane 7 Sub- Leases) with actual intent to hinder, delay, and
24
     defraud Zetta PTE's creditors." *Id.* ¶ 183.
25
     This allegation, standing alone, is plainly insufficient. *See In re Moriarty*, No. 12-22878-
26
     MLB, 2014 WL 6623005, at *7 (Bankr. C.D. Cal. Nov. 20, 2014) ("In the bankruptcy context,
27
     *Twombly* means that a plaintiff can no longer simply recite the statutory language of the particular
28

- 24 -

1  Code section under which a claim is brought and expect the complaint to give sufficient notice to

2  a defendant of the plaintiff's claim for relief."). The Complaint here pleads no facts to support the

3  notion that Zetta Singapore's entry into various agreements associated with the acquisition and

4  leasing of its aircraft—everyday occurrences across the industry—was intended to hinder, delay,

5  and defraud creditors. "A plaintiff must state a plausible claim for relief by identifying the

6  specific facts upon which the plaintiff relies to support a finding on each element of the plaintiff's

7  claim." *In re SCI Real Estate Investments, LLC*, No. 2:11-BK-15975-PC, 2013 WL 1829648, at

8  *3 (Bankr. C.D. Cal. 2013).

9  The Trustee further contends that Cassidy's "actual intent is evidenced by [his] fraudulent

10  scheme to misappropriate funds for his personal use," pointing to (i) Cassidy's alleged diversion of

11  $2.66 million from the proceeds of sale and leasing transaction to pay for his yacht (the Dragon

12  Pearl) and (ii) alleged "kickbacks that were generated from the other aircraft transactions." Compl.

13  ¶ 184. The Complaint pleads no connection between the "kickbacks" that Cassidy allegedly

14  arranged and Planes 6 and 7 (the transactions at issue in Count II) or any other transaction related to

15  the Yuntian or Minsheng Entities. For good reason. In a separate adversary proceeding, the Trustee

16  has alleged that the kickbacks allegedly arranged by Cassidy concern a "First Element Transaction"

17  and "Second Element Transaction," involving the purchase of Plane 1 and Plane 10, respectively.

18  *See* Compl. in Adv. Proc. No. 2:19-AP-01382-SK ¶¶ 103-08, 147-58.

19  Nor does an allegation that Cassidy looted $2.66 million of the sale and leasing

20  transaction plausibly state a claim that the transfers that Count II seeks to avoid—$17.3 million in

21  rental and goodwill payments on Planes 6 and 7 and the $12.4 Million Transfer (used to fund the

22  Challenger Transactions)—were intended to hinder, delay, or defraud *creditors*. The allegation

23  suggests that Cassidy sought to enrich himself and perpetuate a lavish lifestyle, not that he

24  intentionally sought to defraud creditors. In any event, Cassidy's alleged looting of a relatively

25  small portion of the proceeds has nothing to do with the transfers the Trustee seeks to avoid.

26  Generally speaking, Rule 9(b) requires a plaintiff pleading a claim of actual fraudulent

27  transfer to demonstrate how the well-established "badges of fraud" apply to the transactions at

28  issue. *See Screen Capital*, 510 B.R. at 257 (actual fraudulent transfer claims are subject to the

- 25 -

1    heightened pleading standards of Rule 9(b)). "Among the more common circumstantial indicia of

2    fraudulent intent at the time of the transfer are: (1) actual or threatened litigation against the

3    debtor; (2) a purported transfer of all or substantially all of the debtor's property; (3) insolvency

4    or other unmanageable indebtedness on the part of the debtor; (4) a special relationship between

5    the debtor and the transferee; and, after the transfer, (5) retention by the debtor of the property

6    involved in the putative transfer." *In re Pringle*, 495 B.R. 447, 467 (B.A.P. 9th Cir. 2013)

7    (quoting *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 806 (9th Cir. 1994)).

8         With the possible exception of insolvency—which the Trustee pleads in a conclusory

9    fashion (*see* Compl. ¶¶ 73, 173, 188)—none of these indicia are present here. There are no

10   allegations that the transactions at issue were motivated by hiding assets in connection with a

11   recently filed litigation or involved a transfer of all or substantially all of Zetta Singapore's

12   property. Nor is there any suggestion of a "special relationship" between Cassidy and the Yuntian

13   and Minsheng Entities or that transfers allowed Zetta Singapore to retain any of its property. The

14   allegation that Cassidy looted a relatively minor amount of the sale and leasing transaction

15   proceeds does not transform the transactions into actual fraudulent transfers.

16        The Trustee seemingly seeks to excuse his obligations under Rule 8 and Rule 9(b) through

17   reliance on the so-called "Ponzi scheme presumption." *See In re AFI Holding, Inc.*, 525 F.3d 700,

18   704 (9th Cir. 2008) (quoting *Hayes v. Palm Seedlings Partners-A (In re Agric. Research and*

19   *Tech. Group, Inc.)* ("*Agretech*"), 916 F.2d 528, 535 (9th Cir. 1990) ("'[T]he mere existence of a

20   Ponzi scheme' is sufficient to establish actual intent under § 548(a)(1) or a state's equivalent to

21   that section." ). But the Ponzi scheme presumption has no place in this case.

22        The hallmark of a Ponzi scheme is "funneling [sic] proceeds received from new investors

23   to previous investors in the guise of profits from the alleged business venture, thereby cultivating

24   an illusion that a legitimate profit-making business opportunity exists and inducing further

25   investment." *Donell v. Kowell*, 533 F.3d 762, 767 n.2 (9th Cir. 2008) (quoting *In re United Energy*

26   *Corp.*, 944 F.2d 589, 590 n.1 (9th Cir. 1991).[19] Neither Zetta Singapore nor Zetta USA involved

27        [19] *See also* David R. Hague, *Expanding the Ponzi Scheme Presumption*, 64 DePaul L.
28   Rev. 867, 880 (2015) ("Notwithstanding the varying descriptions of a Ponzi scheme, and, in some

1  some overarching scheme to use investments from new investors to pay off existing investors. The

2  Complaint acknowledges that "Li Qi was Zetta PTE's first (and *ultimately only*) outside investor."

3  Compl. ¶ 79 (emphasis added). And even he is not the type of jilted investor seen in Ponzi

4  schemes. Li Qi is alleged to be both an existing and new investor. *See* Compl. ¶¶ 89-91, 117-18,

5  126-27. Tellingly, the unsecured creditors that stand to benefit from the Trustee's claims are *not*—

6  as is typically the case in Ponzi schemes—primarily composed of the "new investors" left holding

7  the bag at the end of a Ponzi scheme but, instead, are comprised of trade creditors, aircraft

8  maintenance providers, and an aircraft manufacturer, *see* Dkt. No. 1 in Case 2:17-bk-21386-SK

9  and Dkt. No. 1 in Case 2:17-bk-21387-SK (Official Form 204 listing 20 largest unsecured claims),

10  Compl. ¶ 79 ("Li Qi was Zetta PTE's first (and ultimately only) outside investor"), no different

11  than typically seen in a case of business failure. The premise behind the Ponzi scheme (or Ponzi-

12  like scheme) presumption simply has no application to this case.

13      Zetta Singapore and Zetta USA were legitimate businesses with real assets and actual

14  customers, not a Ponzi scheme. *See* Compl. ¶¶ 68-70; Dkt. No. 217 at 3 (Trustee's declaration in

15  support of status report, noting Debtors "are a global leader in private flight operations for

16  domestic and international business and luxury travel" and "provide the highest luxury travel to

17  A-list celebrities and an ultra-wealthy clientele base"); Dkt. No. 381 at ¶¶ 1-7 (Trustee's motion

18  in support of postpetition financing, detailing Debtors' business operations). The company failed

19  not because it was a fictitious house of cards, but because it expanded too aggressively in a down

20  market and was unable to generate sufficient revenues to meet its obligations. *See* Compl. ¶¶ 63-

21  65. That Zetta Singapore was founded by an alleged con man who purportedly looted from the

22  company does not transform it into a "Ponzi-like" scheme. *See In re Am. Hous. Found.*, 785 F.3d

23  143, 161 (5th Cir. 2015), *as revised* (June 8, 2015) (holding debtor's business was not a Ponzi

24  scheme, even if that "business appears to have deteriorated over time—leading to [the owner's]

25  and [the debtor's] later misuse of funds"); *cf. In re EDP Investment Co., LLC*, 587 B.R. 711, 717-

26  20 (C.D. Cal. 2018) (rejecting bankruptcy court's application of Ponzi scheme presumption,

27  cases, the contradictions, there appears to be one common thread among all courts: a Ponzi
scheme requires proof that returns paid to existing investors came from funds infused into the

28  fraudulent scheme by later investors.").

1  noting "a company is not a Ponzi scheme merely because it has negative cash flow for several

2  years"). To hold otherwise would invite dependence on the Ponzi scheme presumption in almost

3  any claim alleging fraudulent transfers, undermining the requirements and purpose of Rule 9(b).[20]

4      The decision in *In re Equip. Acquisition Res., Inc.*, 481 B.R. 422 (Bankr. N.D. Ill. 2012),

5  is particularly instructive. There, the trustee for the debtor (EAR) sought to recover lease

6  payments as actual fraudulent transfers allegedly made as part of a fraudulent scheme

7  orchestrated by an individual named Sheldon Player.[21] As here, the trustee did "not allege badges

8  of fraud" but instead alleged that an individual's "misconduct amounted to a *Ponzi* or *Ponzi*-like

9  scheme." *Id.* at 431. The court rejected the trustee's reliance on the Ponzi scheme presumption,

10  observing: "The facts in this case do not fit the classic *Ponzi* scheme model; the Defendant is not

11  an investor and the Complaint itself alleges that EAR was in a legitimate business of 'refurbishing

12  and selling high-tech machinery." *Id.* The court further noted that the trustee "has failed to allege

13  sufficient facts to establish even a "*Ponzi*-like" or fraudulent scheme with the required

14  particularity. *Id.* at 432 (noting the rampant use of allegations made "upon information and

15  belief" and the lack of "specific facts or details to support the allegations that payments to earlier

16  lenders were made from later lenders and not from EAR's other revenues or profits").

17      Even if the Ponzi scheme presumption were applied to this case, the "presumption does not

18  relieve [the] Trustee of the burden to show that the Transfers at issue were made 'in furtherance of'

19  _____

20  [20] The facts here do not resemble the cases in the Ninth Circuit applying the Ponzi scheme
presumption. *See, e.g.*, *Agretech*, 916 F.2d at 536 (applying presumption in case where debtor's
21  transfer of funds from later investors to earlier investors was a "hallmark of Ponzi schemes"); *In
re Bonham*, 251 B.R. 113, 116 (Bankr. D. Alaska 2000) (applying presumption in case where "the
22  debtors procured numerous investors at an increasing rate, ostensibly to finance the [airline] ticket
business, but whose investments were used almost exclusively to pay off earlier investors at
23  exorbitant interest rates"); *In re International Manufacturing Group, Inc.*, 538 B.R. 22, 31
(Bankr. E.D. Cal. 2015) (loan proceeds from commercial lender were allegedly "deposited into
24  'the primary bank account through which Ponzi scheme payments to investors were made'").

25  [21] In particular, Player allegedly caused EAR to enter into financing-type lease agreements
with various entities (including the defendant-creditor) for equipment owned by a company named
26  MTD. *See id.* at 425. MTD, however, was a mere strawman in Player's scheme and caused EAR to
lease equipment at costs far exceeding the equipment's value. *Id.* Player's actions slowly depleted
27  the fund EAR had available to repay its equipment lease obligations, thus requiring EAR to enter a
series of "circular transfers" and additional equipment lease transactions to cover its current debts.
28

1  the Ponzi scheme." *In re DBSI*, 593 B.R. 795, 822 (Bankr. D. Idaho 2018) (citing *Bear, Sterns*

2  *[Stearns] Secs. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*, 397 B.R. 1, 11 (S.D.N.Y. 2007)

3  (court must determine "whether the transfers at issue were related to a Ponzi scheme" before it can

4  apply the Ponzi presumption); *In re Pearlman*, 440 B.R. 569, 575 (Bankr. M.D. Fla. 2010) ("To rely

5  on the Ponzi scheme presumption, the trustee must allege the debtors' loan repayments were

6  somehow in furtherance of either the EISA Program or the TCTS Stock Program Ponzi schemes.")).

7  Here, the Trustee fails to connect the transfers pled against the Yuntian and Minsheng Entities in

8  Count II—the $12.4 Million Transfer and the $17.3 million in rental and goodwill payments—to

9  some larger "Ponzi-like" scheme. The $12.4 Million Transfer went to purchasing new, tangible assets,

10  not repaying existing investors. And the $17.3 million in rental and goodwill payments related to

11  ordinary, arm's-length financing leases. *In re Continental Airlines*, 932 F.2d at 284 ("[S]ale-leaseback

12  transactions are widely used in the airline industry as a means of raising working capital."). Nor does

13  Yuntian and Minsheng Entities' role here bear any resemblance to typical, Ponzi scheme cases where

14  an investor-transferee was an active participant in the scheme. *See, e.g.*, *Agretech*, 916 F.2d at 535.[22]

15        **B.**    **Constructive Fraudulent Transfer**

16       To avoid a transaction as a constructive fraudulent transfer, the Trustee must establish that

17  (1) the transfer involved the debtor's property; (2) the transfer was made within two years of the

18  filing of the petition date; (3) the debtor did not receive reasonable equivalent value for the

19  property transferred; and (4)(a) the debtor was insolvent at the time of the transfer (or was made

20  insolvent by the transfer), had unreasonably small capital, or incurred more debt than it had the

21  ability to repay or (b) the transfer was to an insider and not in the ordinary course of business. *See*

22  11 U.S.C. § 548(a)(1)(B); *In re United Corp.*, 944 F.2d 589, 594 (9th Cir. 1991)). The Trustee

23  alleges that both the $12.4 Million Transfer and the $17.3 million rental and goodwill payments

24          [22] While $55 million of the proceeds from the sale and leasing transaction was allegedly

25  used to repay Li Qi, that repayment was a separate, isolated transaction, not some large or
reoccurring Ponzi scheme. It was used to pay off a loan for specific tangible business assets,

26  Compl. ¶¶ 82, 97, 101, not to pay off prior investors. Nor is there any allegation that the Yuntian
or Minsheng Entities were aware of the alleged use of the $55 million to repay only the Li Qi loan

27  on Plane 7. Compl.¶¶ 4, 110. In any event, just as the $12.4 Million Transfer did not involve Zetta
Singapore's property, nor did the $55 million transfer to Universal Leader. The monies came

28  from Minsheng Business and were earmarked for a specific purpose. *See* Exs. L & M.

1    were constructive fraudulent transfers. *See* Compl. ¶¶ 186-90, 195, 244-50.

2           As discussed above (Section III), the $12.4 Million Transfer fails the first requirement—it

3    does not involve property of the Debtors. That, alone, defeats any claim relating to that transfer.

4           With respect to the $17.3 million rental and goodwill payments, the Complaint contains

5    only one cursory allegation relevant to whether Zetta Singapore received reasonably equivalent

6    value in exchange for those payments. In paragraph 186, the Complaint alleges:

7                   Alternatively, Zetta PTE did not receive reasonably equivalent value
                    for entering into, and incurring the obligations under, the Minsheng
8                   Refinancing. *Upon information and belief*, Plane 6, Plane 7, and other
                    consideration *received were worth less than the total amount of debt*
9                   *the Debtors incurred under such transactions* and, by reason of the
                    transactions thereunder, the Debtors incurred additional incremental
10                  debt obligations that could never be repaid as described herein.

11   Compl. ¶ 186 (emphasis added). The Complaint provides no factual basis for this allegation, which

12   is insufficient as a matter of law. *See, e.g.*, *In re SCI Real Estate Investments*, 2013 WL 1829648 at

13   *6 (dismissing state law fraudulent transfer action because, among other things, the complaint failed

14   to specify the value of the debtor's property conveyed to the defendants); *Scouler & Co.*, 2012 WL

15   1502762 at *6 (dismissing claim because the "conclusory allegation [of no reasonably equivalent

16   value] is insufficient to state a claim under § 548(a)(1)(B)"); *Goodman v. H.I.G. Capital, LL (In re*

17   *Gulf Fleet, Inc.)*, 491 B.R. 747, 770 (Bankr. W.D. La. 2013) (plaintiff must plead "more than a

18   mere conclusion that [the debtor] failed to receive reasonably equivalent value from the

19   transaction").

20          Worse, the Trustee has made his claim regarding "reasonably equivalent value" only

21   "upon information and belief." This speculation is insufficient to state a claim. *See Miller v. City*

22   *of Los Angeles*, No. CV 13-5148-GW(CWX), 2014 WL 12610195, at *5 (C.D. Cal. Aug. 7, 2014)

23   ("[A] plaintiff cannot avoid Rule 12 simply by slapping the 'information and belief' label onto

24   speculative or conclusory allegations." (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557

25   (2007); *Blantz v. Cal. Dep't of Corr. & Rehab., Div. of Corr. Health Care Servs.*, 727 F.3d 917,

26   926-27 (9th Cir. 2013)).[23]

27   _____
            [23] Similarly, the Trustee has failed to provide sufficient allegations regarding Zetta
28   Singapore's insolvency. *See* Compl. ¶¶ 188, 247; *In re SCI Real Estate Investments*, 2013 WL

1    Finally, the Ninth Circuit has held that debt repayments are generally not avoidable as

2    fraudulent transfers. *See In re Fitness Holdings Int'l, Inc.,* 714 F.3d 1141, 1145-46 (9th Cir. 2013)

3    ("[T]o the extent a transfer constitutes repayment of the debtor's antecedent or present debt, the

4    transfer is not constructively fraudulent."); *see also Henry v. Lehman Commercial Paper, Inc. (In*

5    *re First Alliance Mortg. Co.)*, 471 F.3d 977, 1008 (9th Cir. 2006) ("[R]epayments of fully secured

6    obligations" are not avoidable as fraudulent transfers because they "do not put assets otherwise

7    available in a bankruptcy distribution out of [the] reach [of other creditors]." (*quoting Austin v.*

8    *Chisick (In re First Alliance Mortgage Co.)*, 298  B.R. 652, 665 (C.D. Cal 2003)). The Yuntian

9    Entities were secured creditors and the debt repayments paid by Zetta Singapore were dollar-for-

10   dollar transactions pursuant to sale and leaseback agreements. Exs. B, C, E, F, H, I. The Ninth

11   Circuit has held that when payment for a preexisting debt is "dollar-for-dollar, full value is

12   given." *See In re Fitness Holdings*, 714 F.3d at 1145-46.

13   **IV.    THE TRUSTEE HAS FAILED TO ADEQUATELY PLEAD HIS PREFERENCE**
14   **CLAIMS.**

15       The Trustee seeks to recover $4,926,144 of rental payments on Planes 6, 7, and 12 paid by

16   Zetta Singapore in the 90 days prior the Petition Date. Compl. ¶ 151. To state a preference claim,

17   the plaintiff "must prove: (1) [the debtor] made a transfer (2) of its property (3) to or for the

18   benefit of a creditor; (4) for or on account of an antecedent debt; (5) while [the debtor] was

19   insolvent; (6) within 90 days of the petition's filing; and (7) the transfer enabled the defendants to

20   receive more than they would have received in a Chapter 7 case." *In re Imperial Corp. of Am.*,

21   144 B.R. 115, 119 (Bankr. S.D. Cal. 1992) (granting motion to dismiss preference claims); *Screen*

22   *Capital*, 510 B.R. at 260. With respect to the last element, which is based on Section 547(b)(5), it

23   is well-established that "[p]re-petition transfers to a creditor that is fully secured on the petition

24   date are generally not preferential because the secured creditor is entitled to 100 percent of its

25   claims." *In re Smith's Home Furnishings, Inc.*, 265 F.3d at 963. The court looks at the creditor's

26   _____

27   1829648 at *6 ("Hoffman's Complaint does not state sufficient facts to plausibly show that on the
     date of the transfer the Debtors were actually insolvent or received less than was given to the
     Defendants. Absent [such] facts, Hoffman's Complaint fails to state a plausible claim to recover a

28   constructive fraudulent transfer.").

1    secured status on the petition date. *Id.*

2           The Trustee's preference claims relating to the $4,926,144 in rental payments should be

3    dismissed for three independent reasons.

4           *First*, the Trustee's allegations do not meet the requirements of Rule 8, as "establishing

5    only a 'possible' entitlement to relief . . . [does] not support further proceedings." *Fowler v. Univ.*

6    *of Phoenix*, Inc., No. 18CV1544-WQH-KSC, 2019 WL 1746576, at *9 (S.D. Cal. Apr. 18, 2019)

7    (quoting *Eclectic Props. E. v. Marcus & Millichap Co.*, 751 F.3d 990, 996-97 (9th Cir. 2014)). The

8    Trustee alleges—"upon information and belief"—that the Yuntian Entities are "undersecured" and

9    thus received more than they would have under Chapter 7. Compl. ¶¶ 205, 286, 304.[24] There can

10   be no dispute that the Yuntian Entities are secured creditors given the security interests granted in

11   the sale and leasing transaction involving Planes 6, 7, and 12. *See supra* at 7; *e.g.*, Exs. C, F, I. The

12   Trustee's failure to affirmatively plead *facts* to support its wholly speculative allegation that the

13   Yuntian Entities were "undersecured" is insufficient as a matter of law. *See Screen Capital*, 510

14   B.R. at 255 ("Despite the liberal pleading standards of Rule 8, conclusory allegations [of a

15   preferential transfer] will not save a complaint from dismissal."); *Miller*, 2014 WL 12610195 at

16   *5; *Gold River, LLC v. La Jolla Band of Luiseno Mission Indians*, No. 11CV1750 JM BGS, 2011

17   WL 6152291 at *2 (S.D. Cal. Dec. 9, 2011).[25] The Trustee's allegations suggest nothing more than

18   a "'possible' entitlement to relief," and should therefore be dismissed. *Iqbal*, 556 U.S. 662 at 678;

19   *see Eclectic Properties East*, 751 F.3d at 997 (*quoting Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir.

20   2011)  (factual allegations must plausibility suggest "an entitlement to relief, such that it is not

21   unfair to require the opposing party to be subjected to the expense of discovery and continued

22   litigation"); *Fowler*, 2019 WL 1746576 at *9.

23

_____

24          [24] The Trustee also makes conclusory statements devoid of any facts that the Debtors were
     insolvent. Compl. ¶¶ 201, 272, 282. This is not sufficient to satisfy the Trustee's burden. *See In re*
25   *Imperial Corp.*, 144 B.R. at 120 ("Pleading the element of insolvency in a preference action is
     critical . . . [and] the failure to allege insolvency would be fatal to [a preference] cause of action.").

26          [25] *See also In re Caremerica, Inc.*, 409 B.R. 737, 754 (Bankr. E.D.N.C. 2009) ("Under
     Rule 8(a)(2), and in light of the heightened pleading standard expressed in *Iqbal*, the trustee is
27   obligated to support his allegation with facts showing that it is plausible that creditors would
     receive less than a 100% payout in a liquidation.").

28

1    *Second* and *third,* the rental payments cannot be avoided as preferential transfers because

2    they constituted "contemporaneous exchange[s] for new value" and (2) were "made in the

3    ordinary course of business or financial affairs of the debtor." *See* 11 U.S.C. §§ 547(c)(1), (2).

4    Courts routinely hold that rental payments qualify under Section 547(c)(1) because the "new

5    value . . . is the debtor's right to occupancy." *See In re Coco*, 67 B.R. 365, 371 (Bankr. S.D.N.Y.

6    1986) (citing cases); *see also In re Workboats Nw., Inc.*, 201 B.R. 563 (Bankr. W.D. Wash. 1996)

7    (finding rental payments constituted "new value" for purposes of Section 547 defenses). Because

8    the rental payments, among other things, entitled the Debtors to continue using the aircraft, *see,*

9    *e.g.*, Exs. B, E, H §§ 23.1.1; 23.3, the rental payments at issue provided a contemporaneous

10   exchange of new value. *See Rivera v. Peri & Sons Farms, Inc.*, 735 F.3d 892, 902 (9th Cir. 2013)

11   ("When an affirmative defense is obvious on the face of a complaint . . . a defendant can raise that

12   defense in a motion to dismiss."); *In re Dreier LLP*, 453 B.R. 499, 516 (Bankr. S.D.N.Y. 2011)

13   (granting motion to dismiss under Section 547(c)(1)).

14   A creditor qualifies for Section 547(c)(2)'s "ordinary course" exception by "establish[ing]

15   'a baseline of past practices between itself and the debtor,' and that the transfer was 'ordinary in

16   relation to [these] past practices.'" *In re Newton Enterprises*, No. 9:13-BK-12388-PC, 2015 WL

17   3524603, at *2 (Bankr. C.D. Cal. June 3, 2015) (citation omitted)). Here, Zetta Singapore's June

18   27, 2017 rent transfer of $3,906,759.14 for Planes 6 and 7 was made pursuant to the Aircraft

19   Lease Agreements and, as demonstrated by the Complaint, the payments were consistent with the

20   timing and method of previous quarterly payments. *See* Compl. ¶¶ 109, 151, 152, 190, 195,

21   Schedule B (prior payments were made on December 22, 2016 and March 20, 2017).

22   Accordingly, these rental payments were made in the ordinary course and cannot be avoided.

23   Separately, the Trustee seeks to avoid certain payments made to various law firms that

24   allegedly were incurred "for the benefit of" of the Yuntian or Minsheng Entities. Compl. ¶¶ 298,

25   303, 307. The Trustee again resorts to guesswork, stating that, "upon information and belief," the

26   legal fees were incurred *by the Yuntian or Minsheng Entities* in connection with the negotiation

27   and finalization of the sale and leasing transaction involving Planes 6, 7, and 12. Compl. ¶¶ 298,

28

302. That speculation fails the basic pleading standard.[26] It is also directly inconsistent with the Trustee's allegations in other adversary proceedings, where he has alleged that the law firms "entered into agreements *with the Debtors*." *See* Adv. Proc. No. 2:19-ap-01339, Dkt. No. 1 ¶ 18; Adv. Proc. No. 2:19-ap-01358, Dkt. No. 1 ¶ 18.[27]

## V. THE TRUSTEE HAS FAILED TO ADEQUATELY PLEAD HIS TURNOVER CLAIMS, WHICH IN ANY EVENT FAIL AS A MATTER OF LAW.

To state a cause of action for turnover, the plaintiff must "establish that: (1) the property is in the possession, custody or control of a noncustodial third party; (2) the property constitutes property of the estate; (3) the property is of the type that the trustee could use, sell or lease pursuant to section 363 or that the debtor could exempt under section 522, and (4) that the property is not of inconsequential value or benefit to the estate." *In re Process Am., Inc.*, 588 B.R. 82, 98 (Bankr. C.D. Cal. 2018). Here, the Trustee alleges—"upon information and belief"—that a Yuntian or Minsheng Entity "sold" Plane 12 and the three Undelivered Aircraft to a third party and suggests that the Debtors have a right to the "profit, if any" on those sales. Compl. ¶¶ 254 55, 295-96. The multiple levels of speculation in the Trustee's allegations are insufficient to plausibly state a claim. *See Eclectic Properties East*, 751 F.3d at 996-97; *Fowler*, 2019 WL 1746576, at *9 *Miller*, 2014 WL 12610195 at *5; *Gold River*, LLC v., 2011 WL 6152291, at *2.[28]

In any event, the Trustee has no turnover rights as a matter of law. Yuntian 4 repossessed Plane 12 on November 29, 2017.[29] Section 1110 of the Bankruptcy Code protects the contractual

---

[26] *See Eclectic Properties East*, 751 F.3d at 996-97; *Fowler*, 2019 WL 1746576 at *9; *Miller*, 2014 WL 12610195 at *5; *Gold River, LLC v.*, 2011 WL 6152291 at *2.

[27] The Trustee even seeks to recover Legal Fee Transfers that were made outside the 90-day preference period, which is prohibited as a matter of law. Compl., Schedule F. The Trustee has also filed avoidance claims against two of the law firms, Mourant Ozannes and Milbank Tweed, who received payments at issue. *See* Adv. Proc. No. 2:19-ap-01339 [Dkt. No. 1] and Adv. Proc. No. 2:19-ap-01358 [Dkt. No. 1].

[28] The Trustee's speculation is also demonstrably false. No Yuntian or Minsheng Entity purchased the three Undelivered Aircraft. Indeed, *Zetta Singapore* itself cancelled the orders for those planes a week before the Petition Date. Shortly thereafter, Yuntian 4 received official cancellation notices from Bombardier for the three Undelivered Aircraft. *See* Dkt. No. 537, Ex. D.

[29] Section 1110 authorizes an aircraft financier, subject to certain preconditions, to "enforce any of its . . . rights or remedies, under such security agreement, lease, or conditional sale contract, to sell, lease, or otherwise retain or dispose of such equipment." 11 U.S.C. § 1110(a)(1).

1    rights and remedies and expressly provides that such rights are "not limited or otherwise affected

2    by any other provision of this title or by any power of the court." 11 U.S.C. § 1110(a)(1). In short,

3    once the repossession right arises, the terms of the contract govern the rights of the parties. *See*

4    *United Airlines, Inc. v. U.S. Bank N.A.*, 406 F.3d 918, 922 (7th Cir. 2005) (reversing bankruptcy

5    court's injunction to halt enforcement of creditor's Section 1110 rights, noting the debtor "must

6    live with those terms now, just as it must pay the current market price for jet fuel"). Here, the

7    Aircraft Lease Agreements for Planes 6, 7, and 12 do not provide the Debtors with any right to

8    ownership until the lease term had ended, all rental payments were made, and all obligations were

9    performed. *See* Exs. B, E, II § 22.1. The agreements further provided that the Yuntian Entities

10   had the right to repossess and then dispose of the aircraft in their sole authority as they saw fit in

11   the event of any default. Exs. B, E, H §§ 23.1.1(a), 23.3, 23.5.

12          Moreover, the Trustee's turnover claims are premised on supposed "equity" interests

13   funded entirely (Count VII, relating to the Undelivered Aircraft) or mostly (Count XI, relating to

14   Plane 12) from the $12.4 Million Transfer, funds that were never property of any Debtor and

15   therefore cannot support any supposed equity in the aircraft. *See* Compl. ¶¶ 120-21, 253, 292-93.

16   Counts VIII and XI should be dismissed.

17   **VI.   THE TRUSTEE'S REQUEST FOR DISALLOWANCE UNDER SECTION 502**
18   **      ALSO FAILS UNDER RULE 12(b)(6).**

19          Section 502(d) is a remedial provisions which provides for disallowance of a party's claim

20   to the extent a trustee is successful in establishing an avoidance transfer or turnover action.

21   Because none of the underlying claims asserted against the Yuntian Entities pleads a plausible

22   claim, Count XV should be dismissed.

23                                   **CONCLUSION**

24          For the foregoing reasons, Counts II, III, VI, VII, IX, X, XI, XII, and XV, to the extent

25   that they assert claims against the Yuntian Entities, should be dismissed.

26

27

28

1    Dated: December 9, 2019                    JONES DAY

2

3                                  */s/ Daniel T. Moss*
                                 Daniel T. Moss (*pro hac vice*)

4                                  dtmoss@jonesday.com
                                 David S. Torborg (*pro hac vice*)

5                                  dstorborg@jonesday.com
                                 JONES DAY

6                                  51 Louisiana Avenue, N.W.
                                 Washington, D.C. 20001-2113

7                                  Telephone: (202) 879-3939
                                 Facsimile: (202) 626-1700

8                                  Joshua M. Mester (SBN 194783)
                                 jmester@jonesday.com

9                                  JONES DAY
                                 555 South Flower Street

10                                Fiftieth Floor
                               Los Angeles, CA 90071.2452

11                                Telephone: (213) 489-3939
                               Facsimile: (213) 243-2539

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28