ROBBIN L. ITKIN (SBN 117105)
robbin.itkin@us.dlapiper.com
DLA PIPER LLP (US)
2000 Avenue of the Stars
Suite 400 North Tower
Los Angeles, California 90067-4704
Tel: (310) 595-3000
Fax: (310) 595-3300

JOHN K. LYONS (*Pro Hac Vice*)
john.lyons@us.dlapiper.com
JEFFREY S. TOROSIAN (*Pro Hac Vice*)
jeffrey.torosian@us.dlapiper.com
JOSEPH A. ROSELIUS (*Pro Hac Vice*)
joseph.roselius@us.dlapiper.com
DLA PIPER LLP (US)
444 West Lake Street, Suite 900
Chicago, Illinois 60606-0089
Tel: (312) 368-4000
Fax: (312) 236-7516

Attorneys for Jonathan D. King
as Chapter 7 Trustee

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>ZETTA JET USA, INC., a California corporation,<br><br>    Debtor. | Lead Case No.: 2:17-bk-21386-SK<br><br>Chapter 7<br><br>Jointly Administered With:<br>Case No.: 2:17-bk-21387-SK<br><br>Adv. Proc. No. 2:19-ap-01383-SK |
| In re:<br><br>ZETTA JET PTE, LTD., a Singaporean corporation,<br><br>    Debtor. | **TRUSTEE'S COMBINED OPPOSITION TO MOTIONS TO DISMISS ADVERSARY COMPLAINT BY DEFENDANTS YUNTIAN 3 LEASING COMPANY LIMITED DESIGNATED ACTIVITY COMPANY, YUNTIAN 4 LEASING COMPANY LIMITED DESIGNATED ACTIVITY COMPANY, MINSHENG BUSINESS AVIATION LIMITED, UNIVERSAL LEADER INVESTMENT LIMITED, GLOVE ASSETS INVESTMENT LIMITED, AND TRULY GREAT GLOBAL LIMITED** |
| JONATHAN D. KING, solely in his capacity as Chapter 7 Trustee of Zetta Jet USA, Inc. and Zetta Jet PTE, Ltd.<br><br>    Plaintiff,<br><br>v.<br><br>YUNTIAN 3 LEASING COMPANY DESIGNATED ACTIVITY COMPANY f/k/a YUNTIAN 3 LEASING COMPANY LIMITED, YUNTIAN 4 LEASING COMPANY DESIGNATED ACTIVITY | |

COMPANY f/k/a YUNTIAN 4 LEASING
COMPANY LIMITED, MINSHENG
FINANCIAL LEASING CO., LTD.,
MINSHENG BUSINESS AVIATION
LIMITED, EXPORT DEVELOPMENT
CANADA, LI QI, UNIVERSAL LEADER
INVESTMENT LIMITED, GLOVE ASSETS
INVESTMENT LIMITED, and TRULY
GREAT GLOBAL LIMITED,

    Defendants.

[Relates to Adv. Docket Nos. 1, 32, 44 & 45][1]

[Hearing date has not been set]

---

[1] The "Yuntian Motion" [Dkt. No. 32], the "Minsheng Business Motion" [Dkt. No. 44] and the "LQE Motion" [Dkt. No. 45] all raise similar issues. In addition, the Minsheng Business Motion joins in the Yuntian Motion and includes its own arguments and the Li Qi Entities Motion adopts a large portion of the Yuntian Motion. Accordingly, and in the interest of judicial economy, the Trustee has filed a single combined opposition to these three motions.

DLA PIPER LLP (US)
LOS ANGELES

# <u>TABLE OF CONTENTS</u>

**Page(s)**

Introduction ................................................................................................................... 1

Background .................................................................................................................... 4

    A.  The Debtors ......................................................................................................... 4

    B.  Cassidy's Ponzi-like scheme ............................................................................. 4

    C.  The initial acquisitions of Planes 6 and 7 ......................................................... 5

    D.  The disastrous Minsheng Refinancing ............................................................... 6

    E.  The U.S. focus of the transactions and transfers .............................................. 7

    F.  The Debtors' downfall ....................................................................................... 8

Pleading Standard .......................................................................................................... 8

Argument ....................................................................................................................... 9

    I.  The presumption against extraterritoriality does bar the Trustee's claims. ........ 9

        A.  The Bankruptcy Code's avoidance statutes apply extraterritorially ........... 10

        B.  Filing a proof of claim waives the presumption against extraterritoriality. ........ 12

        C.  The relevant conduct occurred in the United States ................................... 15

        D.  The Court may disgorge or avoid extraterritorial transfers made on domestic obligations. ....................................................................................................... 18

    II.  The principle of international comity does not mandate dismissal of the Complaint. ...... 19

        A.  There is no true conflict of law. ................................................................... 19

        B.  The application of U.S. law against the Defendants is reasonable. ............ 20

            1.  The United States has a strong interest in adjudicating the avoidance claims. ...... 20

            2.  This matter lacks the relevant foreign interests. .................................... 21

            3.  The Defendants fail to identify a proper alternative forum. ................. 21

    III.  The Complaint states claims to avoid and recover fraudulent transfers. .......... 21

        A.  All of the transfers were of the Debtors' property. ..................................... 22

DLA Piper LLP (US)
Los Angeles

1.  The Li Qi Entities rewrite the Complaint and ignore the economic reality
of the Minsheng Refinancing and the prior agreements with the Debtors............ 22

2.  Whether the funds were paid from escrow or
the Debtors' account is irrelevant. ............................................................ 24

3.  The earmarking doctrine does not apply............................................................ 25

C.  Actual Intent: Cassidy actually intended to hinder, delay,
or defraud creditors through the initial purchases of Planes 6 and 7
and the Minsheng Refinancing................................................................... 27

1.  First Basis: Cassidy had actual intent because he operated
the Debtors as a Ponzi-like scheme......................................................... 28

2.  Second Basis: Cassidy knew or was substantially certain that his actions would
hinder, delay, or defraud creditors. ....................................................... 30

3.  Third Basis: Cassidy entered into the Minsheng Refinancing
to steal millions of dollars for his personal use and
pay off Li Qi at the expense of other creditors.................................... 31

D.  Constructive Fraud: The initial purchases of Planes 6 and 7 and the Minsheng
Refinancing resulted in constructive fraudulent transfers............................ 34

1.  The Complaint pleads that the Debtors did not receive
"reasonably equivalent value."............................................................ 35

2.  The Complaint pleads the second element of constructive fraudulent transfer. ... 36

IV.  The Complaint states claims to avoid and recover preference transfers. ................... 38

A.  The Complaint sufficiently pleads insolvency. .......................................... 39

B.  Each of the Counts pleads that the Defendants received more
than they would under a Chapter 7 liquidation. ....................................... 39

C.  The "ordinary course of business" and "new value" defenses are
affirmative defenses, which cannot form the basis of a motion to dismiss. ............... 40

V.  The Complaint states the other bankruptcy claims against Minsheng. ...................... 42

A.  Count VII states a claim for turnover of the equity in the Undelivered Aircraft. ....... 42

B.  Count IX states a claim for turnover of the equity in Plane 12................................ 42

VI.  The Complaint states the other claims against the Li Qi Entities. .................................. 43

A.  Count XIII states a claim for recharacterization of the Third Loan. ...................... 43

B.  Count XIV states a claim for violation of the automatic stay. .................................. 44

DLA PIPER LLP (US)
LOS ANGELES

VII. Count XV states a claim for disallowance of claims...................................................... 45

VIII. In the event of dismissal, the Court should grant leave to re-plead ............................... 45

Conclusion ........................................................................................................................... 45

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DLA Piper LLP (US)
Los Angeles

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Acequia, Inc.*,
  34 F.3d 800 (9th Cir. 1994).........................................................................................32, 33

*In re Adams Golf, Inc. Sec. Litig.*,
  381 F.3d 267 (3d Cir. 2004)................................................................................................41

*Adelphia Commc'ns Corp. v. Bank of Am., N.A.*,
  365 B.R. 24 (Bankr. S.D.N.Y. 2007)..................................................................................41

*In re Agric. Research & Tech. Grp.*,
  916 F.2d 528 (9th Cir. 1990)........................................................................................28, 31

*In re Allegheny Label, Inc.*,
  128 B.R. 947 (Bankr. W.D. Pa. 1991) ......................................................................22, 24, 26

*In re Alpha Protective Servs., Inc.*,
  531 B.R. 889 (M.D. Ga. 2015)............................................................................................40

*AMA Multimedia, LLC v. Sagan Ltd.*,
  720 F. App'x 873 (9th Cir. 2018) .......................................................................................44

*In re Ampal-Am. Israel Corp.*,
  562 B.R. 601 (S.D.N.Y. 2017)......................................................................................13, 14

*In re Arcapita Bank B.S.C.*,
  575 B.R. 229 (Bankr. S.D.N.Y. 2017) ...............................................................16, 17, 19, 20

*ASARCO, LLC v. Union P. R. Co.*,
  765 F.3d 999 (9th Cir. 2014)...............................................................................................43

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..............................................................................................................8

*In re Autobacs Strauss, Inc.*,
  473 B.R. 525 (Bankr. D. Del. 2012) ..................................................................................41

*AWTR Liquidation Inc.*,
  548 B.R. 300 (Bankr. C.D. Cal. 2016)................................................................................39

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...............................................................................................................9

*Bencomo v. Avery (In re Bencomo)*,
  2016 WL 4203918 (B.A.P. 9th Cir. Aug. 8, 2016) .............................................................42

*In re Bender Shipbuilding & Repair Co.*,
    479 B.R. 899 (Bankr. S.D. Ala. 2012) ................................................................41

*In re Beverly*,
    374 B.R. 221 (B.A.P. 9th Cir. 2007) ...................................................................32

*Blazevska v. Raytheon Aircraft Co.*,
    522 F.3d 948 (9th Cir. 2008) ...............................................................................9

*In re Blue Earth, Inc.*,
    2019 WL 4929933 (B.A.P. 9th Cir. 2019) ..........................................................37

*Bly–Magee v. California*,
    236 F.3d 1014 (9th Cir. 2001) ............................................................................45

*In re BMT-NW Acquisition, LLC*,
    582 B.R. 846 (Bankr. D. Del. 2018) ............................................................34, 36

*Braunstein v. McCabe*,
    571 F.3d 108 (1st Cir. 2009) ..............................................................................42

*In re BR Festivals, LLC*,
    2015 WL 1216836 (Bankr. N.D. Cal. Mar. 11, 2015) ........................................25

*In re Bullion Reserve of N. Am.*,
    836 F.2d 1214 (9th Cir. 1988). ...........................................................................26

*Camreta v. Greene*,
    563 U.S. 692 (2011) ............................................................................................11

*In re Caremerica, Inc.*,
    409 B.R. 759 (Bankr. E.D.N.C. 2009). ...............................................................38

*In re CIL Ltd.*,
    582 B.R. 46 (Bankr. S.D.N.Y. 2018) .............................................................16, 17

*In re City of San Bernardino*,
    558 B.R. 321 (C.D. Cal. 2016) ...........................................................................44

*In re Cohen*,
    199 B.R. 709 (B.A.P. 9th Cir. 1996) ...................................................................28

*In re CRC Parent Corp.*,
    2013 WL 781603 (Bankr. D. Del. March 1, 2013) ..............................................38

*Credit Mgrs. Ass'n of S. Cal. v. Fed. Co.*,
    629 F. Supp. 175 (C.D. Cal. 1985). ....................................................................37

*Crocker Nat'l Bank v. Emerald*,
    221 Cal. App. 3d 852 (3d Dist. 1990) .................................................................43

*In re Crucible Materials Corp.*,
  2011 WL 2669113 (Bankr. D. Del. July 6, 2011) ...................................................38

*Cunningham v. Brown*,
  265 U.S. 1 (1924) ...................................................................................................29

*Cutler v. Rancher Energy Corp.*,
  2014 WL 12599602 (C.D. Cal. June 2, 2014) ........................................................9

*In re Delano Retail Partners, LLC*,
  2014 WL 4966476 (Bankr. E.D. Cal. Sept. 29, 2014) ...........................................33

*Diaz-Barba v. Kismet Acquisition, LLC*,
  2010 WL 2079738 (S.D. Cal. May 20, 2010) ........................................................12

*In re E. Coast Foods, Inc.*,
  2017 WL 3701211 (Bankr. C.D. Cal. Aug. 25, 2017) ............................................32

*In re Eagle Enters., Inc.*,
  223 B.R. 290 (Bankr. E.D. Pa. 1998) ....................................................................16

*EEOC v. Arabian Am. Oil Co.*,
  499 U.S. 244 (1991) ...............................................................................................10

*In re Estate of Midland Euro Exch. Inc.*,
  347 B.R. 708 (Bankr. C.D. Cal. 2006) .......................................................11, 12, 17

*In re Evergreen Energy, Inc.*,
  546 B.R. 549 (Bankr. D. Del. 2016) ......................................................................34

*In re FAH Liquidating Corp.*,
  572 B.R. 117 (Bankr. D. Del. 2017) .........................................................11, 15, 17

*In re Fitness Holdings Int'l, Inc.*,
  714 F.3d 1141 (9th Cir. 2013) ...............................................................................43

*Florsheim Grp. Inc. v. USAsia Int'l Corp. (In re Florsheim Grp. Inc.)*,
  336 B.R. 126 (Bankr. N.D. Ill. 2005) ..................................................9, 15, 19, 20

*In re French*,
  440 F.3d 145 (4th Cir. 2006) .................................................................................10

*In re Gluth Bros. Const., Inc.*,
  424 B.R. 379 (Bankr. N.D. Ill. 2009) ....................................................................41

*Hart v. Massanari*,
  266 F.3d 1155 (9th Cir. 2001). ..............................................................................13

*In re Hobbick*,
  2001 WL 34076375 (Bankr. C.D. Ill. Sept 10, 2001) ...........................................26

*In re Huber*,
493 B.R. 798 (Bankr. W.D. Wash. 2013) ...................................................................33

*In re Imperial Corp. of Am.*,
144 B.R. 115 (Bankr. S.D. Cal. 1992) ........................................................................39

*In re Interbulk, Ltd.*,
240 B.R. 195 (Bankr. S.D.N.Y. 1999) ........................................................................12

*In re Interior Wood Prods. Co.*,
986 F.2d 228 (8th Cir. 1993)......................................................................................26

*In re Int'l Mfg. Grp., Inc.*,
538 B.R. 22 (Bankr. E.D. Cal. 2015) ..........................................................................29

*In re James River Coal Co.*,
360 B.R. 139 (Bankr. E.D. Va. 2007) .........................................................................33

*Janvey v. Alguire*,
647 F.3d 585 (5th Cir. 2011).......................................................................................27

*In re Jet Florida Systems, Inc.*,
861 F.2d 1555 (11th Cir. 1988)...................................................................................41

*In re Kalisch*,
413 B.R. 115 (Bankr. S.D.N.Y. 2008) ........................................................................34

*Katchen v. Landy*,
382 U.S. 323 (1966) ....................................................................................................13

*Kearns v. Ford Motor Co.*,
567 F.3d 1120 (9th Cir. 2009)....................................................................................27

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
232 F.3d 979 (9th Cir. 2000) ......................................................................................45

*In re Know Weigh*,
576 B.R. 189 (Bankr. C.D. Cal. 2017).............................................................23, 27, 34

*In re L. Scott Apparel, Inc.*,
2019 WL 1768235 (Bankr. C.D. Cal. Jan. 29, 2019) ..................................................43

*In re Lang*,
246 B.R. 463 (Bankr. D. Mass. 2000).........................................................................33

*Langenkamp v. Culp*,
498 U.S. 42 (1990) ......................................................................................................13

*In re Libby Int'l*,
247 B.R. 463 (B.A.P. 8th Cir. 2000)............................................................................26

*In re Life Partners Holdings, Inc.*,
    926 F.3d 103 (5th Cir. 2019)................................................................................27

*In re LLS Am., LLC*,
    2013 WL 3305393 (Bankr. E.D. Wash. July 1, 2013)...............................28, 30

*Loginovskaya v. Batratchenko*,
    764 F.3d 266 (2d Cir. 2014)................................................................................17

*Lopez v. Smith*,
    203 F.3d 1122 (9th Cir. 2000)............................................................................45

*Lovett v. St. Johnsbury Trucking*,
    931 F.2d 494 (8th Cir. 1991)..............................................................................41

*In re Lykes Bros. S.S. Co., Inc.*,
    196 B.R. 574 (Bankr. M.D. Fla. 1996) ..............................................................23

*In re Lyondell Chem. Co.*,
    543 B.R. 127 (S.D.N.Y. 2016).....................................................................10, 11

*In re Martinez*,
    2019 WL 6112676 (Bankr. N.D. Cal. Nov. 15, 2019)......................................44

*Matter of Lawrence*,
    82 B.R. 157 (Bankr. M.D. Ga. 1988) ................................................................40

*In re Maxwell Commc'n Corp.*,
    93 F.3d 1036 (2d Cir. 1996).........................................................................14, 19

*In re Maxwell Commc'n Corp.*,
    186 B.R. 807 (S.D.N.Y. 1995)............................................................................17

*In re Maxwell Commc'n Corp.*,
    170 B.R. 800 (Bankr. S.D.N.Y. 1994) ...............................................................15

*M.M. v. Cnty. of San Mateo*,
    2019 WL 414962 (N.D. Cal. Feb. 1, 2019)..........................................................9

*Milbeck v. TrueCar, Inc.*,
    2019 WL 476004 (C.D. Cal. Feb. 5, 2019)...........................................................8

*Moody v. Security Pacific Bus. Credit, Inc.*,
    971 F.2d 1056 (3d. Cir. 1992)............................................................................37

*Morrison v. Nat'l Australia Bank Ltd.*,
    561 U.S. 247 (2010)......................................................................................10, 13

*Mujica v. Airscan, Inc.*,
    771 F.3d 580 (9th Cir. 2014)..............................................................................20

*Mujica v. Occidental Petro. Corp.,*
    381 F. Supp. 2d 1134 (C.D. Cal. 2005)..................................................19

*In re Nat'l Audit Def. Network,*
    367 B.R. 207 (Bankr. D. Nev. 2007) ..................................28, 30, 33

*Neitzke v. Williams,*
    490 U.S. 319 (1989)........................................................................24

*In re Nirvana Restaurant Inc.,*
    337 B.R. 495 (Bankr. S.D.N.Y. 2006) ...........................................37

*In re Nite Lite Inns,*
    13 B.R. 900 (Bankr. S.D. Cal. 1981) ..............................................22

*In re Oakwood Homes Corp.,*
    340 B.R. 510 (Bankr. D. Del. 2006) ...............................................38

*Odom v. Microsoft Corp.,*
    486 F.3d 541 (9th Cir. 2007)..............................................................9

*In re Operations NY LLC,*
    490 B.R. 84 (S.D.N.Y. 2013)..........................................................37

*In re PennySaver USA Publ'g, LLC,*
    587 B.R. 445 (Bankr. D. Del. 2018) ..........................................34, 36

*In re Picard,*
    917 F.3d 85 (2d Cir. 2019).........................................................18, 21

*In re Preserve, LLC,*
    2018 WL 4292023 (B.A.P. 9th Cir. Sep. 7, 2018)..........................44

*In re Process Am., Inc.,*
    588 B.R. 82 (Bankr. C.D. Cal. 2018)..............................................42

*See In re Qimonda Richmond, LLC,*
    467 B.R. 318 (Bankr. D. Del. 2012) ...............................................40

*In re RDM Sports Grp., Inc.,*
    250 B.R. 805 (Bankr. D. Del. 2000) ...............................................40

*In re Richards & Conover Steel, Co.,*
    267 B.R. 602 (8th Cir. B.A.P. 2001)...............................................35

*Rieser v. Hayslip,*
    343 B.R. 615 (Bankr. S.D. Ohio 2006)...........................................28

*RJR Nabisco, Inc. v. European Community,*
    136 S. Ct. 2090 (2016)....................................................................15

DLA PIPER LLP (US)
LOS ANGELES

*Sale v. Haitian Ctrs. Council, Inc.*,
  509 U.S. 155 (1993) ................................................................................10

*Screen Capital Int'l Corp. v. Library Asset Acquisition Co.*,
  510 B.R. 248 (C.D. Cal. 2014) ................................................................27

*Securities Investor Protection Corp. v. Madoff Inv. Securities LLC*,
  480 B.R. 501 (Bankr. S.D.N.Y. 2012) ....................................................11

*In re S.E.L. Maduro (Fla.), Inc.*,
  205 B.R. 987 (Bankr. S.D. Fla. 1997) ....................................................24

*In re Sentinel Mgmt. Grp., Inc.*,
  728 F.3d 660 (7th Cir. 2013) ..................................................................31

*In re Simon*,
  153 F.3d 991 (9th Cir. 1998) ................................................12, 13, 14, 19

*Smith v. Arthur Andersen L.L.P.*,
  175 F. Supp. 2d 1180 (D. Ariz. 2001) ....................................................27

*Stern v. Marshall*,
  564 U.S. 462 (2011) ..........................................................................13, 15

*In re Straightline Invs.*,
  525 F.3d 870 (9th Cir. 2002) ..................................................................25

*U.S. v. Tabor Court Realty Corp.*,
  803 F.2d 1288 (3d. Cir. 1986) ................................................................31

*Tamayo v. Blagojevich*,
  526 F.3d 1074 (7th Cir. 2008) ................................................................41

*In re The Russ Cos., Inc.*,
  2013 WL 4028098 (Bankr. D.N.J. Aug. 6, 2013) ..................................41

*In re TOUSA, Inc.*,
  2017 WL 8785510 (S.D. Fla. Mar. 7, 2017) ......................................18, 36

*In re TransVantage Solutions, Inc.*,
  2016 WL 5854197 (Bankr. D.N.J. Oct. 6, 2016) ....................................40

*U.S. v. Whiting Pools*,
  462 U.S. 198 (1983) ................................................................................22

*In re Valley Media, Inc.*,
  288 B.R. 189 (Bankr. D. Del. 2003) ........................................................38

*WesternGeco LLC v. ION Geophysical Corp.*,
  138 S. Ct. 2129 (2018) ......................................................................10, 18

DLA PIPER LLP (US)
LOS ANGELES

*Zochlinski v. Regents of the Univ. of Cal.*,
578 F. App'x 636 (9th Cir. 2014) ..................................................................24

**Statutes and Rules**

11 U.S.C. § 362 ..................................................................................3, 21, 44

11 U.S.C. § 363 ..........................................................................................42

11 U.S.C. §522 ...........................................................................................42

11 U.S.C. § 524 ..............................................................................12, 13, 14

11 U.S.C. § 541 ..........................................................10, 11, 12, 22, 27

11 U.S.C. § 542 ..........................................................................................21

11 U.S.C. § 547 ..............................................................................2, 14, 21, 24

11 U.S.C. § 548 ........................................2, 10, 11, 12, 13, 14, 18, 22, 24, 27

11 U.S.C. § 549 ..........................................................................................12

11 U.S.C. § 550 ..............................................................11, 12, 18, 21

11 U.S.C. § 1504 ........................................................................................20

11 U.S.C. §1511 .........................................................................................20

Fed. R. Bankr. P. 9017 ................................................................................5

Fed. R. Civ. P. 8 .......................................................................................34

Fed. R. Civ. P. 9 .........................................................................27, 34, 45

Fed. R. Civ. P. 12 ...............................................................................23, 41

Fed. R. Evid. 106 ........................................................................................5

**Other Authorities**

5 Collier on Bankruptcy ¶ 542.02 ...........................................................42

5 Collier on Bankruptcy ¶ 547.03 ...........................................................25

5 Collier on Bankruptcy ¶ 548.03 ...........................................................36

Hon. Louise De Carl Adler, *Managing the Chapter 15 Cross-Border Insolvency Case, A Pocket Guide for Judges*, 2nd ed., Federal Judicial Center (2014) ..........................20

DLA PIPER LLP (US)
LOS ANGELES

Jay Lawrence Westbrook, *Avoidance of Pre-Bankruptcy Transactions in Multinational Bankruptcy Cases*, 42 Tex. Int'l L.J. 899, 910 (2007)..........................................................11, 12

DLA Piper LLP (US)
Los Angeles

The Trustee filed the Adversary Complaint ("Complaint") to avoid and recover fraudulent transfers of more than $75 million to the Li Qi Entities[2] and almost $30 million to Minsheng.[3] The majority of those transfers relate to the Minsheng Refinancing. In the Minsheng Refinancing, the Debtors' former managing director, Geoff Cassidy, fraudulently transferred nearly all of the $80 million in proceeds from the refinancing of two aircraft (Plane 6 and 7), at a time when the Debtors were insolvent, he could barely "keep[] off the wolves," and the Debtors only had "breathing room of 1.5 months." Rather than pay down exploding trade payables or other debt obligations, Cassidy paid $55 million to one of the Debtors' directors, Li Qi, through the Li Qi Entities to pay off the disguised financing obligation on one plane at a 40 percent annualized return. Cassidy sent another $12.4 million to Minsheng to buy four new aircraft the Debtors could not afford. Cassidy simply stole almost $5 million of the remainder. The Debtors were left with the same two planes, but with more than $20 million in additional debt because Cassidy and Li Qi agreed to leave a $48 million obligation on the other plane in place as an unsecured loan, in addition to the new $80 million in disguised financing loans from Minsheng. Cassidy caused the Debtors to enter these transactions not for rational economic reasons, but to steal the money for a yacht and a penthouse and to pay his initial investor, Li Qi, an above-market preference with Minsheng's new money as part of Cassidy's Ponzi-like scheme. The Complaint seeks to unwind these transactions.

Count I seeks to avoid and recover $11.9 million in fraudulent transfers to Universal Leader for the Debtors' initial purchase of Planes 6 and 7. Count II seeks to avoid and recover fraudulent transfers relating to the Minsheng Refinancing, including later payments on the obligations fraudulently incurred. Counts III, IV, and V are alternative preference claims relating to some of the same payments as Count II. Counts VI and VII are also in the alternative to Count II, but for a different reason: $5.5 million of the $12.4 million that went to Minsheng was payment for the Undelivered Aircraft, and the Trustee is entitled to avoid and recover the transfer as constructively fraudulent because the aircraft were never delivered, or to seek turnover of the proceeds of any later

---

[2] The Li Qi Entities include Universal Leader, Glove Assets, and Truly Great. Li Qi has not yet been served. All defined terms have the same meaning as in the Complaint unless otherwise noted.

[3] Minsheng includes Yuntian 3, Yuntian 4, Minsheng Business, and Minsheng Financial. Minsheng Financial has not yet been served.

sale of those Undelivered Aircraft. Counts IX, X, and XI are similar alternative claims relating to the remainder of the $12.4 million, which was used to purchase Plane 12. The Trustee is entitled to avoid the transfers as preferential, or to seek turnover of the proceeds of any later sale of Plane 12. Count VIII is a straightforward preference claim for payments on other unsecured loans to Universal Leader. Count XII is another straightforward preference claim for the Debtors' payment of legal fees incurred by Minsheng in connection with the Minsheng Refinancing. Count XIII is a claim to recharacterize a purported loan from Universal Leader as equity. Count XIV is a claim against Li Qi and Truly Great for violating the automatic stay. Last, Count XV seeks to disallow the Defendants' proofs of claim.

All Defendants first argue that United States bankruptcy law does not apply extraterritorially to these transactions. However, contrary to their assertions, Bankruptcy Code sections 547 and 548[4] do apply extraterritorially. Even if they did not, the Yuntian Defendants, Universal Leader, and Glove Assets forfeited this defense by filing proofs of claim, thus triggering the well-established equitable jurisdiction of this Court to adjudicate avoidance actions and fairly restructure the debtor-creditor relationship as part of the claims adjustment process. And in any event, the presumption against extraterritoriality does not apply to these transfers because the focus of the challenged transactions was in the United States and the transfers were made on account of avoidable domestic obligations, either of which is sufficient to establish the application of the Bankruptcy Code to these transactions.

Next, the Defendants contend that international comity requires dismissal of the Complaint. It does not. There are no parallel, competing insolvency proceedings in England or Singapore, so there is no true conflict of law. And, even if there were a conflict, the United States has a strong countervailing interest due to the U.S.-centric nature of the transactions and the Court's core jurisdiction as the recognized main bankruptcy proceeding over claims administration, the adjudication of related avoidance actions, and the equitable distribution of assets to the Debtors' global creditors.

On the specific claims, the Defendants' strategy is to throw as much against the wall as they

---

[4] Unless otherwise noted, all section references are to the Bankruptcy Code, Title 11 of the U.S. Code.

1   can in the hope that something sticks. On the fraudulent transfer claims, the Defendants challenge

2   whether some of the transfers were of the Debtors' property, but the $55 million transfer to

3   Universal Leader and the $12.4 million transfer to Minsheng Business were made from the Debtors'

4   escrowed loan proceeds in the refinancing of Planes 6 and 7. To claim otherwise, the Defendants

5   ignore both the allegations in the Complaint and the economic realities of the transactions.

6   Minsheng also raises an "earmarking" defense, but cannot show any of the three required elements.

7   Contrary to the Defendants' arguments, the Complaint pleads several independent bases for actual

8   and constructive fraudulent transfer, including the Ponzi-scheme presumption, direct evidence, and

9   badges of fraud. The Defendants also say the Complaint fails to plead constructive fraudulent

10   transfer because it does not allege the Debtors were insolvent or unable to pay debts as they came

11   due. The Trustee is not required to plead actual dollar amounts, and the Complaint plausibly alleges

12   that the Debtors could not pay their debts.

13        On the preference claims, the Defendants raise many of the same arguments as on fraudulent

14   transfer. They also argue that the Complaint fails to allege specific details showing that the

15   Defendants received more through the transfers than they would have received in a liquidation. The

16   allegations of the Complaint are sufficient on this point and are further buttressed by the

17   Complaint's reference to schedules listing over $978 million in claims, and Defendants' own proofs

18   of claim totaling over $286 million, that plausibly indicate that transfers allowed the Defendants to

19   receive more than in a liquidation. The Defendants also prematurely raise some affirmative

20   defenses, which are dispelled on a motion to dismiss.

21        Minsheng challenges the turnover claims in Counts VII and XI, but both counts sufficiently

22   allege that the Debtors had an equity interest in the aircraft and that they were resold. The Li Qi

23   Entities separately challenge Count XIII for recharacterization of debt to equity. They claim Hong

24   Kong law applies, but fail to explain why that requires a different result. They also challenge Count

25   XIV for violation of the automatic stay. The Court has already decided that their actions violated

26   the automatic stay, and in any event the Complaint's allegations fall within at least two subsections

27   of § 362. Finally, because the Complaint states other claims, the Court should disallow all of these

28   Defendants' claims pursuant to Count XV. In short, none of the Defendants' challenges has merit,

1    and the Motions should be denied.

2    **BACKGROUND**

3    **A.  The Debtors**

4    Geoff Cassidy, the Debtors' former board member and managing director, is a known

5    fraudster. (¶¶ 58-60.)[5] He ultimately found his mark in the Asian private jet industry, though his

6    initial efforts there were met with limited success in part because of regulatory requirements for

7    flights to and from the United States. (¶¶ 60-62.)

8    James Seagrim and Matt Walter owned a successful, revenue-generating charter airline

9    ("AAM") with a fleet of nine aircraft. (¶¶ 63-64.) In 2014, Cassidy approached Seagrim and Walter

10    about creating a new, combined airline. (¶¶ 65-66.) Cassidy needed to partner with Seagrim and

11    Walter to obtain the benefits of AAM's Part 135 Certificate that would enable the combined

12    business to operate charter flights for paying customers and gain Seagrim's and Walter's

13    operational expertise. (¶¶ 55-57, 59.) Ultimately, Cassidy, Seagrim, and Walter incorporated Zetta

14    PTE in Singapore in March 2015; AAM later became a subsidiary of Zetta PTE and changed its

15    name to Zetta USA. (¶ 67.) Cassidy planned to rapidly expand Seagrim and Walter's business

16    through the purchase of high-priced Bombardier aircraft. (¶ 69.) He ultimately caused the Debtors

17    to purchase or agree to purchase 16 aircraft and incur almost half-a-billion dollars in debt. (*Id.*)

18    While Seagrim and Walter ran the operations from California, Cassidy controlled the Debtors'

19    combined finances in Singapore. (¶¶ 19-20, 68.)

20    Although the private jet market, particularly in Asia, was facing one of the worst periods in

21    its history, Cassidy did not negotiate prices or implement a competitive bidding process before

22    incurring almost half-a-billion dollars in debt. (¶ 70.) Cassidy did so because he received at least

23    $1 million in kickbacks and other bribes and because the transactions allowed him to steal millions

24    of dollars from the Debtors and their investors and customers in a Ponzi-like scheme.

25    **B.  Cassidy's Ponzi-like scheme**

26    Cassidy was running a Ponzi-like scheme with two parts. (¶ 78.) First, Cassidy was causing

27

28    ───────────────

[5] All paragraph references are to the operative Complaint, unless otherwise noted. All capitalized terms have the same meaning as in the Complaint.

the Debtors to purchase the high-priced aircraft to generate a veneer of profitability or at least revenues. (*Id.*) Second, Cassidy was inducing a businessman from China, Li Qi, to lend the Debtors millions of dollars at exorbitant rates to purchase more planes and pay the debt service that the Debtors otherwise could not afford. (*Id.*) Cassidy later used funds from the Minsheng Refinancing to give Li Qi a significantly above-market return on these investments, and, to feed his Ponzi-like operation, was seeking new investors to pay off Li Qi and the older lenders at the time of the Debtors' ultimate collapse. (¶¶ 127, 132.) At the same time, Cassidy was receiving kickbacks and bribes from the aircraft brokers and manufacturers and embezzling millions from the Debtors. (¶¶ 1, 65, 76, 113.) Cassidy further fed the scheme by selling "block hours": cash up front for the promise of flights later. (¶ 81.) But because the kickback-induced prices required almost double the debt service he advertised and the rates were 25 percent lower, each plane was a net loser from the beginning. (¶¶ 81-84.) In fact, Cassidy's initial purchases in December 2015 made the debtors insolvent, and they never recovered despite additional cash infusions from Li Qi. (¶¶ 85-88.)

## C.  The initial acquisitions of Planes 6 and 7

As part of those initial purchases in December 2015, Li Qi lent the Debtors $100 million at exorbitant interest rates to purchase two Bombardier private jets, Planes 6 and 7. (¶¶ 79-88.) The Debtors' purchases were implemented through disguised financing arrangements under which Universal Leader and Glove Assets, through a corporate trust at Wells Fargo in Utah as "owner trustee," entered into "Master Aircraft Finance Leases" with the Debtors through (again) Wells Fargo as "buyer" and TVPX as "lessee," that enabled the Debtors, among other things, to purchase the planes following repayment of 59 scheduled "lease payments," *i.e.*, debt service, totaling $50.5 million plus a $20 million "balloon" payment at the end of the term (implying a well above market 12% effective rate of return on the two $50 million loans). (¶¶ 82, 86-87.)[6] The disguised lease arrangements contained onerous terms that were extremely unfavorable to the estates including a well above market prepayment termination fee of 50% of the remaining "interest" under the

---

[6] *See also* Declaration of John K. Lyons ("Lyons Decl.") Exs. A and B §§ 3.25, 4.1(5), and Annexes 3 and 4. Portions of these same documents are attached to the Li Qi Entities' motion to dismiss and thus are fairly before the court. *See* Fed. R. Bankr. P. 9017 (Federal Rules of Evidence apply in bankruptcy cases); Fed. R. Evid. 106 ("If a party introduces all or part of a writing . . . an adverse party may require the introduction, at that time, of any other part – or any other writing . . . – that in fairness ought to be considered at the same time.").

scheduled payments. *Id.* Universal Leader already owned Plane 7 (¶ 81) and subsequently transferred the Debtors $47.3 million to purchase Plane 6 from Bombardier (although the agreements were structured as if Glove Assets owned Plane 6). (¶¶ 84-85.) These transactions occurred within days of Cassidy causing the Debtors to purchase an additional plane from Jetcraft (in a deal where Cassidy received a $500,000 kickback) and four more directly from Bombardier. (¶¶ 74, 76, 89.) Between the initial purchases and the Minsheng Refinancing, Zetta PTE paid Universal Leader almost $12 million in debt service payments under the disguised financing arrangements on these planes. (¶ 88.) Less than three months later, Li Qi made a significant equity investment in Zetta PTE (through Universal Leader and Truly Great) and became a director. (¶¶ 89-90.)

### D.  The disastrous Minsheng Refinancing

By summer 2016, the Debtors were out of cash because of the exorbitant interest payments to Universal Leader and the unsustainable debt service on the planes, and trade payables were exploding. (¶ 96.) Cassidy approached Li Qi with a plan to refinance the purchase of Plane 6 and 7 with Minsheng, a bank located in China. (¶¶ 122-25.) Cassidy and Li Qi expressly agreed that Li Qi and the Li Qi Entities should get preference over the Debtors' other creditors. (¶¶ 4, 214.) Cassidy also planned to use millions of dollars of the proceeds to buy a yacht and a penthouse in Singapore. (¶¶ 106, 113-16.) Cassidy did not disclose any of this to the Debtors' other directors, telling them only that they needed to do the deal to "keep[] off the wolves" because the Debtors only had "breathing room of 1.5 months." (¶ 103.)

The Minsheng Refinancing was disastrous for the Debtors. Although they had purchased Planes 6 and 7 for approximately $100 million in December 2015, the net result of the Minsheng Refinancing was that they incurred obligations with respect to Planes 6 and 7 for more than $128 million in September 2016: $40 million for each plane to Minsheng, while leaving intact the $48 million in debt (albeit on an unsecured basis) to Glove Assets on Plane 6. (¶¶ 106, 110.) Of the $80 million in proceeds from the Minsheng Refinancing, Cassidy caused the Debtors to pay $55 million to Universal Leader for Plane 7 ($5 million more than the acquisition price paid nine months earlier) and $12.4 million to Minsheng Business to purchase four new aircraft, three of which were never

1  delivered, while Cassidy immediately stole at least $3.67 million in closing proceeds and paid

2  another $1 million for the Dragon Pearl and a deposit on a luxury condominium in Singapore ten

3  days later. (¶¶ 106, 113-16.) There was no reason for these machinations other than to prefer Li Qi

4  while stiffing the Debtors' trade creditors, pay for a yacht and a penthouse, and continue the Ponzi-

5  like scheme.

6       Like the original transactions with Universal and Glove Assets, the Minsheng Refinancing

7  also constituted disguised financing arrangements. Under the Minsheng Refinancing, Minsheng,

8  through a corporate trust at Wells Fargo as "lessor" in Utah, entered into an "Aircraft Lease

9  Agreement" with TVPX as "lessee," a U.S. corporate trust based in Wyoming, that enabled the

10  Debtors, among other things, to purchase Planes 6, 7, and 12 following repayment of scheduled

11  "rent," *i.e.*, debt service, through an end of an "option price" of $1. (¶¶ 106-09, 112, 123-25.)[7]

12  **E. The U.S. focus of the transactions and transfers**

13       The focus of all of the obligations that the Trustee seeks to avoid, and thus the payments

14  made to the Defendants on account of those obligations, was in the United States.

15       Zetta USA's Part 135 certificate, issued by the FAA and required to operate commercial

16  charter flights in the United States, was critical to all of the financing deals. (¶ 55.) The Master

17  Leases required the planes to be FAA registered.[8] The Master Leases required the planes to be

18  immediately subleased to Zetta USA and operated under its Part 135 certificate. (¶¶ 112, 124.)[9]

19       The transactions closed in the United States and closing proceeds flowed into and through

20  the United States. The Debtors and the Defendants used U.S. corporate trusts and U.S. trustees to

21  act as nominal owners and lessees and to register aircraft in the U.S. with the FAA, as is common

22  in the industry. (¶¶ 49-50, 108, 124; Yuntian Mot. at 7 n.6.) The Debtors' initial purchase of Plane

23  6 was made through Bombardier's U.S. bank account. (¶ 85.) The Minsheng Refinancing closed in

24  the United States, and the proceeds flowed from Minsheng to the U.S. escrow agent IATS's U.S.

25

26  [7] *See* Lyons Decl. Exs. C, D, and E § 22.1 (option to purchase) and Sch. 2 (setting the option price as $1.00).

27  [8] The Master Leases define the "State of Registration" as the United States, (*see* Lyons Decl. Exs. C, D, and E at Sch. 2), and required as a condition precedent that each plane be validly registered under the laws of the "State of Registration," (*see id.* Ex. E at Sch. 3 § 1(v); *id.* Exs. C and D at Sch. 3 § 1(t)).

28  [9] The Yuntian Defendants demanded "duly executed" sub-leases to Zetta USA as a condition precedent in all of the Master Leases. (*See* Lyons Decl. Exs. C and D at Sch. 3 § 1(i)(vii); *id.* Ex. E at Sch. 3 § 1(k)(ii).)

DLA PIPER LLP (US)
LOS ANGELES

-7-

1   bank account, and then from IATS to the U.S. bank accounts of the various parties. (Yuntian Mot.

2   at 6, Exs. J, K, P & Q.)

3       Other facts indicate a strong U.S. nexus. Under the disguised financings, the planes had to

4   be maintained at a U.S. base.[10] The security interests were all filed in the United States.[11] Finally,

5   "rent" payments had to be made in U.S. dollars, which required that all payments be routed through

6   U.S. banks, either directly or through correspondent banks.[12]

7   **F.   The Debtors' downfall**

8       By summer 2017, the Debtors desperately needed cash because they could not pay their

9   bills. (¶ 126.) Cassidy was searching for other victims, but he couldn't find them soon enough. (*Id.*)

10   So Li Qi caused Universal Leader to make a third cash investment in exchange for equity in the

11   Debtors for Truly Great. (¶ 131.) Cassidy used this investment to make desperate blow-out

12   payments to numerous creditors including Minsheng, who was threatening default. (¶¶ 152-55.)

13   This was but a band-aid on a mortal wound. Less than two months later, the scheme was finally

14   discovered by the Debtors' CFO, which led to the Board removing Cassidy from his positions at

15   both Zetta PTE and Zetta USA, accusing him of running a Ponzi scheme and later suing him for

16   RICO and fraud. (¶¶ 204-07.) But the Debtors could not recover, and filed for bankruptcy. (¶¶ 209-

17   10.)

18                           **PLEADING STANDARD**

19       "To survive a motion to dismiss, a complaint 'must contain sufficient factual matter,

20   accepted as true, to state a claim to relief that is plausible on its face.'" *Milbeck v. TrueCar, Inc.*,

21   2019 WL 476004, at *1 (C.D. Cal. Feb. 5, 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678

22   (2009)). A "claim is plausible on its face when the plaintiff pleads factual content that allows the

23   court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

24

25   [10] Each of the Master Leases provides that the Lessee shall "ensure that operational control over the Aircraft is
maintained in the Aircraft Base," which is "the principal place of business of the Operator in the United States of

26   America." (*See* Lyons Decl. Exs. C, D, and E § 12.6 and Sch. 2.)

27   [11] The Plane 12 Master Lease notes that the mortgage encumbering the plane is a "first priority New York law mortgage
and security agreement . . . which shall be registered at the FAA." (*See id.* Ex. E at Sch. 2.) This New York mortgage
and its registration with the FAA further shows that the sale of Plane 12 was a domestic transaction. EDC, the secured

28   lender, purposefully availed itself of U.S. law to perfect its security interest.

[12] Under the Master Leases, all "rent" payments had to be made in U.S. dollars. (*Id.* Exs. C, D, and E at § 6.3.)

1    In making this determination, the court "accepts as true a plaintiff's well-pled factual allegations

2    and construes all factual inferences in the light most favorable to the plaintiff." *Cutler v. Rancher*

3    *Energy Corp.*, 2014 WL 12599602, at *1 (C.D. Cal. June 2, 2014). "Allegations in the complaint,

4    together with reasonable inferences therefrom, are assumed to be true for purposes of the motion."

5    *Odom v. Microsoft Corp.*, 486 F.3d 541, 545 (9th Cir. 2007). A complaint must only "proffer

6    enough facts on its face to nudge the plaintiff's 'claims across the line from conceivable to

7    plausible'" in order to survive a motion to dismiss. *M.M. v. Cnty. of San Mateo*, 2019 WL 414962,

8    at *2 (N.D. Cal. Feb. 1, 2019) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007)). In

9    addition, as noted by Minsheng, the Court may consider documents incorporated into the Complaint

10    by reference, and matters of which a court may take judicial notice. (Yuntian Mot. at 11.)

11    **ARGUMENT**

12    **I.    The presumption against extraterritoriality does not bar the Trustee's claims.**

13        The Defendants contend that the presumption against extraterritoriality requires dismissal

14    of the Complaint. They are wrong for several reasons. First, the Bankruptcy Code's avoidance

15    statutes apply extraterritorially. Second, even if the statutes did not apply extraterritorially, the

16    Yuntian Defendants, Universal Leader, and Glove Assets waived the presumption against

17    extraterritoriality by filing proofs of claim. Third, even if the presumption were not waived, it does

18    not apply "when the conduct regulated by the government occurs within the United States."

19    *Blazevska v. Raytheon Aircraft Co.*, 522 F.3d 948, 953 (9th Cir. 2008); *see also Florsheim Grp.*

20    *Inc. v. USAsia Int'l Corp. (In re Florsheim Grp. Inc.)*, 336 B.R. 126, 130 (Bankr. N.D. Ill. 2005)

21    ("a court need not consider the presumption against extraterritoriality at all" if the conduct "took

22    place principally in the United States"). In this case, the parties deliberately structured the aircraft

23    acquisitions to close through the United States so they could obtain FAA registration and operate

24    the planes under Zetta Jet USA's Part 135 operating certificate, without which the planes would

25    have no commercial value. Finally, the underlying obligations that the Trustee seeks to avoid were

26    incurred in the United States. Accordingly, the Court does not need to apply fraudulent transfer law

27    extraterritorially to disgorge foreign transfers that arose from avoided domestic obligations. Since

28    all payments were made in U.S. dollars, they were made through U.S. correspondent banks, which

1    negates the presumption against extraterritoriality.

2    **A.  The Bankruptcy Code's avoidance statutes apply extraterritorially.**

3    Although the presumption against extraterritoriality is important, it "nevertheless must give

4    way when Congress exercises its undeniable 'authority to enforce its laws beyond the territorial

5    boundaries of the United States.'" *In re French*, 440 F.3d 145, 150 (4th Cir. 2006) (quoting *EEOC*

6    *v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991)). Thus, whether a statute applies extraterritorially

7    depends on whether Congress intended to apply the provision abroad. *Id*. There is no "clear

8    statement rule" to determine Congressional intent, rather, "context can be consulted as well."

9    *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 265 (2010); *see also WesternGeco LLC v.*

10   *ION Geophysical Corp.*, 138 S. Ct. 2129, 2137 (2018) ("If the statutory provision at issue works in

11   tandem with other provisions, it must be assessed in concert with those other provisions."); *French*,

12   440 F.3d at 150 ("courts may look to 'all available evidence,' . . . including the text of the statute,

13   the overall statutory scheme, and legislative history") (quoting *Sale v. Haitian Ctrs. Council, Inc.*,

14   509 U.S. 155, 177 (1993)); *In re Lyondell Chem. Co.*, 543 B.R. 127, 151 (S.D.N.Y. 2016)

15   (explaining that the presumption "is not a 'clear statement rule' and courts may look to 'context,'

16   including surrounding provisions of the Bankruptcy Code") (quoting *Morrison*, 561 U.S. at 265).

17   Congress's intent to apply the Bankruptcy Code's avoidance statutes extraterritorially is

18   evident in the text of the Bankruptcy Code and its overall statutory scheme. Section 541(a) defines

19   property of the estate as all "interests of the debtor in property . . . wherever located and by

20   whomever held." Congress stated that this "make[s] clear that a trustee in bankruptcy is vested with

21   the title of the bankrupt in property which is located without, as well as within, the United States."

22   *French*, 440 F.3d at 151 (quoting H.R. Rep. No. 82-2320, at 15 (1952)). The Fourth Circuit

23   explained that by incorporating the broad language of § 541 to define the property a trustee may

24   recover under his avoidance powers, "§ 548 plainly allows a trustee to avoid any transfer of property

25   that *would have been* 'property of the estate' prior to the transfer in question – as defined by § 541

26   – even if that property is not 'property of the estate' *now*." *Id.* (emphasis original). By doing so,

27   "Congress made manifest its intent that § 548 apply to all property that, absent a prepetition transfer,

28   would have been property of the estate, wherever that property is located." *Id.*; *see also Lyondell*,

543 B.R. at 151-55 (finding that Congress intended § 548 to apply extraterritorially); *Securities Investor Protection Corp. v. Madoff Inv. Securities LLC* ("*Madoff*"), 480 B.R. 501, 527 (Bankr. S.D.N.Y. 2012) ("Congress demonstrated its clear intent for the extraterritorial application of Section 550 through interweaving terminology and cross-references to relevant Code provisions."); *In re FAH Liquidating Corp.*, 572 B.R. 117, 124 (Bankr. D. Del. 2017) (adopting the reasoning in *French* and *Lyondell*).

While the Defendants rely on *In re Estate of Midland Euro Exch. Inc.*, 347 B.R. 708 (Bankr. C.D. Cal. 2006), that case is not binding on this court. *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011). The Ninth Circuit has yet to weigh in on this question, but *Midland Euro* disagreed with *French*, contending that "property held by third-party transferees only becomes 'property of the estate' after the transfer has been avoided." 347 B.R. at 717. However, in both *Lyondell* and *Madoff*, the Bankruptcy Court for the Southern District of New York rejected *Midland Euro* and instead followed the Fourth Circuit's decision in *French*. *Lyondell*, 543 B.R. at 153-54; *Madoff*, 480 B.R. at 528. *Madoff* explained that *Midland Euro* "misunderstood *French*'s holding," i.e., that extraterritorial application of § 548 "was not premised on fraudulent transferred assets constituting actual property of the estate prior to recovery," but rather, that § 548's reference to § 541 "expressed congressional intent to grant the Trustee authority to avoid and recover *all transfers* that but for a fraudulent transfer, would have been property of the estate, even if not currently property of the estate" including "assets fraudulently transferred overseas." 480 B.R. at 528 (emphasis original).

Moreover, as the *Lyondell* court noted in rejecting *Midland Euro*, "it is hard to believe that Congress intended for the Code to apply extraterritorially with respect to property of the estate, but not to apply extraterritorially with respect to what would have been property of the estate but for a fraudulent transfer." *Lyondell*, 543 B.R. at 154. Even *Midland Euro* recognized that its "[f]ailure to extend application of § 548 to transfers outside the territorial borders of the United States creates a loophole for unscrupulous debtors to freely transfer their assets to shell entities abroad and avoid the reach of the Bankruptcy Code." *Midland Euro*, 347 B.R. at 718. As one commentator has noted, "Why ascribe bad policy to Congress by saying United States avoidance law does not apply? If good policy would be the application of United States law, then it should be applied as Congress

1  would wish." Jay Lawrence Westbrook, *Avoidance of Pre-Bankruptcy Transactions in*

2  *Multinational Bankruptcy Cases*, 42 Tex. Int'l L.J. 899, 910 (2007).[13] For the foregoing reasons,

3  this Court should reject *Midland Euro*'s reasoning and join the weight of the authority finding that

4  Congress intended § 548 to have extraterritorial effect.

5      **B. Filing a proof of claim waives the presumption against extraterritoriality.**

6      Even if this Court were to find that § 548 did not apply extraterritorially, the Defendants'

7  deliberate and voluntary decision to file proofs of claim in these cases waives the presumption

8  against extraterritoriality. That is the clear law in this circuit. The Ninth Circuit has held that, when

9  a creditor files a proof of claim, it *forfeits* any right to challenge the extraterritorial application of

10  this Court's equitable power to adjudicate the debtors' claims under the Bankruptcy Code:

11          When a creditor submits to bankruptcy court jurisdiction by filing a proof of claim
           in order to collect all or a portion of a debt, it assumes certain risks. For example,
12          the creditor loses the right to a jury trial on any counter-claims filed by the debtor
           or the trustee. . . . In addition, the creditor loses previously-held rights to assert
13          'legal claims' against the debtor and his estate . . . By acceding to bankruptcy court
           jurisdiction so that it might recover a portion of the money it was owed, [the
14          appellant] *forfeited* any right it had to claim that the court lacked the power to
           enjoin [the appellant] from commencing a post-bankruptcy collection proceeding
15          against the debtor. Clearly, [the appellant's] participation in the bankruptcy
           subjected it to the court's discharge order pursuant to 11 U.S.C. § 524. A sanction
16          for violating that order is not an improper extraterritorial application of United
           States law. Having decided that the district court properly upheld the bankruptcy
17          court order on this basis, we need not decide whether 11 U.S.C. § 524 itself applies
           extraterritorially in all cases, either as to non-estate assets, or the debtor's personal
18          liability.

19  *In re Simon*, 153 F.3d 991, 997 (9th Cir. 1998) (emphasis added); *see also Diaz-Barba v. Kismet*

20  *Acquisition, LLC*, 2010 WL 2079738, at *7 (S.D. Cal. May 20, 2010) (stating in the context of §§

21  549 and 550(a)(2) that "when a party affirmatively invokes the jurisdiction of the bankruptcy court,

22  the presumption against extraterritoriality does not apply to that party") (citing *Simon*); *In re*

23  *Interbulk, Ltd.*, 240 B.R. 195, 199 (Bankr. S.D.N.Y. 1999) ("[Creditor] has submitted itself to the

24  equitable jurisdiction of this court through the filing of a proof of claim, again unlike in *Maxwell*.

25  I cannot conclude that the application of our laws to this set of facts would be an extraterritorial

26  one."). The Defendants in this case have filed proofs of claim for $286,696,238.84 and, as a result,

27

28  [13] *Midland Euro* also did not consider § 541(a)(3), which includes any "interest in property that the trustee recovers"
    under § 550 as "property of the estate," and thus "strongly suggests that Congress intended the reach of those powers
    to be co-extensive with the broad, global embrace of its definition of estate property." Westbrook, *supra*, at 908.

1   have forfeited any challenge to this Court's equitable power to apply the Bankruptcy Code

2   extraterritorially. Therefore, like *Simon*, given this forfeiture of whatever rights the Defendants may

3   have in this regard, this Court "need not decide whether 11 U.S.C. § 524 [here, § 548] itself applies

4   extraterritorially in all cases, either as to non-estate assets, or the debtor's personal liability." *Simon*,

5   153 F.3d at 997.

6       The Ninth Circuit's decision in *Simon* is in line with Supreme Court precedent addressing

7   bankruptcy courts' equitable power to adjudicate avoidance claims as part of the claims adjustment

8   process. The Supreme Court has long held that a creditor who files a proof of claim submits to the

9   bankruptcy court's equitable jurisdiction to adjudicate any avoidance claim that the estate may have

10   against the creditor. *Langenkamp v. Culp*, 498 U.S. 42, 44 (1990); *Katchen v. Landy*, 382 U.S. 323,

11   333 (1966). In *Stern v. Marshall*, 564 U.S. 462 (2011), the Supreme Court again reaffirmed that

12   "he who invokes the aid of the bankruptcy court by offering a proof of claim and demanding its

13   allowance must abide the consequences of that procedure." *Id.* at 496 (quoting *Katchen*, 382 U.S.

14   at 333 n.9). An avoidance claim by the estate against the creditor is "integral to the restructuring of

15   the debtor-creditor relationship." *Id.* at 497 (quoting *Langenkamp*, 498 U.S. at 44).

16       The Defendants unsuccessfully attempt to distinguish *Simon* and completely ignore *Stern*

17   and the long line of cases confirming the Court's equitable to power to adjudicate avoidance claims

18   as part of the claims adjustment process. Instead, relying on *Morrison*, Minsheng argues that *Simon*

19   was wrongly decided on jurisdictional grounds "because the presumption against extraterritoriality

20   is an issue of statutory interpretation, not jurisdiction." (Yuntian Mot. at 17.) However, a lower

21   court does not have the power to overrule binding precedent based on an argument that such

22   precedent was wrong. *See, e.g, Hart v. Massanari*, 266 F.3d 1155, 1170 (9th Cir. 2001). Moreover,

23   Minsheng misrepresents this section of *Morrison*. This statement merely addressed the *foreign*

24   *defendants'* assertion that the presumption against extraterritoriality deprived the court of subject

25   matter jurisdiction. *See Morrison*, 561 U.S. at 254. This has nothing to do with waiver by submitting

26   to equitable jurisdiction or how a claim necessarily requires determination of a counterclaim.

27   Minsheng also cites *In re Ampal-Am. Israel Corp.*, 562 B.R. 601 (S.D.N.Y. 2017), but that case

28

1   does not address *Stern* or even consider the question.[14] And the case on which *Ampal* relies, *In re*

2   *Maxwell Commc'n Corp.*, 93 F.3d 1036 (2d Cir. 1996), expressly declined to address the

3   presumption against extraterritoriality. *Id.* at 1055. Against decades of consistent Supreme Court

4   precedent and binding Ninth Circuit law, Minsheng's reliance on *Ampal* is unpersuasive.

5       For their part, the Li Qi Entities attempt to circumvent *Simon* by arguing that its holding is

6   limited to orders issued under § 524 and that the avoidable transfers set forth in the Complaint, not

7   the Defendants' proofs of claim, are the "'focus' of Congressional concern" in §§ 547, 548, and

8   550. They are wrong on both counts. *Simon* focuses on the creditor's submission to bankruptcy

9   court jurisdiction by filing of a proof of claim, not a particular Code provision. Again, "[b]y

10  acceding to bankruptcy court jurisdiction so that it might recover a portion of the money it was

11  owed, [the appellant] forfeited any right it had to claim that the court lacked the power to enjoin

12  [the appellant] from commencing a post-bankruptcy collection proceeding against the debtor."

13  *Simon*, 153 F.3d at 997. *Simon* is thus consistent with the Supreme Court case law holding that

14  filing a claim forfeits the right to challenge the bankruptcy court's power to adjudicate avoidance

15  actions as part of the claims process.

16      Simply put, the Defendants knowingly and deliberately triggered the process of

17  adjudicating their claims, including avoidance actions brought against them, when they filed their

18  proofs of claim in the United States hoping to receive a distribution from the estates. Together,

19  Universal Leader, Glove Assets, and the Yuntian Defendants filed proofs of claim totaling over

20  $286 million against the Debtors, or 30 percent of the total claims filed to date.[15] The Trustee seeks

21  to avoid and recover over $75 million from Universal Leader and Glove Assets and almost $30

22  million from the Yuntian Entities. The Defendants cannot now hide behind the inapplicable and, at

23  best, forfeited presumption of extraterritoriality to avoid a fair adjustment of the debtor-creditor

24  relationship as required by Supreme Court precedent.

25      The Supreme Court is clear that "'he who invokes the aid of the bankruptcy court by

26
27
28

---

[14] The Defendants cite *Ampal* to suggest filing of a proof of claim does not waive extraterritoriality. *Ampal* did not analyze the effect the filing had on the question of extraterritoriality. *Ampal* should be given no weight.
[15] *See* Proof of Claim Nos. 110, 111, 122, 123, 124, 125, 148, 149, 150, 151 (Yuntian Defendants) (Yuntian 3—$175,608,213.82; Yuntian 4—$32,218,501.10); 94 (Universal Leader) ($35,660,808.18); 95 (Glove Assets) ($43,208,715.74).

offering a proof of claim and demanding its allowance must abide the consequences of that procedure.'" *Stern*, 564 U.S. at 496. These Defendants must now be held to the consequences of their filings.

**C.  The relevant conduct occurred in the United States.**

Because the avoidance sections of the Code apply extraterritorially and, even if they did not, the Defendants have forfeited the issue, the Court need go no further. *See RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090, 2101 (2016). But in any event, the relevant conduct occurred in the United States, and thus "the case involves a permissible domestic application even if other conduct occurred abroad." *Id*.; *see also Florsheim*, 336 B.R. at 130 (focusing on whether the facts "have a center of gravity outside the United States") (quoting *In re Maxwell Commc'n Corp.*, 170 B.R. 800, 809 (Bankr. S.D.N.Y. 1994)). "This 'flexible' approach allows courts to consider all component events of the transfers . . . including whether the participants, acts, targets, and effects involved in the transaction at issue are primarily foreign or primarily domestic." *FAH Liquidation Corp.*, 572 B.R. at 124 (cleaned up). The Defendants ignore the domestic focus of these transactions – three planes, financed through closings in the U.S., involving transfers into and through the U.S. bank accounts, using U.S. corporate trusts to serve as fronting lessors/lessees, registered with the FAA, operated by a domestic debtor, and generating the income for the transfers the Trustee seeks to avoid and recover.

As stated above, the Debtors and the Defendants deliberately structured the acquisition of the planes and the disguised financing loans to close in and flow through the United States because they needed the planes to be registered with the FAA and operated under Zetta USA's Part 135 certificate. Without FAA registration and the Part 135 Certificate, the planes would have *no* commercial value because the Debtors would not have been able to charter flights for paying customers. Not surprisingly, the Defendants *required* that the planes be registered with the FAA and that the planes be sub-leased to Zetta USA for their actual operation. The Defendants and the Debtors also (1) ensured that the disguised financing transactions closed in the United States; (2) used U.S. corporate trustees to hold legal title to the planes and act as nominal owners, lessors, and lessees; (3) used U.S. escrow agents with U.S. bank accounts who paid proceeds to the Defendants'

1  and the Debtors' (and Bombardier's) U.S. bank accounts; (4) required that the planes be maintained

2  at a U.S. maintenance facility; (5) filed security interests in the United States, and (6) required all

3  payments to be made in U.S. dollars, meaning that transfers had to be made either directly from

4  U.S. banks or through U.S. correspondent banks. (*See supra* at 7-8.)

5       Against this factual backdrop, the Defendants argue that there is no domestic nexus because

6  (1) most of the parties are foreign, (2) choice of law provisions in the governing documents are not

7  governed by U.S. law, (3) the use of the U.S. corporate trusts was only nominal, and (4) the funds

8  came from and went to foreign entities with only a "fleeting" U.S. connection. These arguments

9  are contrary to the allegations in the Complaint (or are improperly based upon adverse inferences

10  drawn from those allegations) and the provisions of the underlying transaction documents

11  referenced in the Complaint that the Defendants attached to the motions to dismiss.

12       First, the nationality of the parties is irrelevant because the entire purpose of these

13  transactions was to lend money to the Debtors to purchase and operate planes based in the United

14  States under the FAA regulatory scheme. Without U.S. entities to register and operate the planes,

15  none of the parties would ever have entered into these transactions. The fact that some of the parties

16  are foreign is insufficient to move the focus of these transfers from the United States. See, e.g., *In*

17  *re Arcapita Bank B.S.C.*, 575 B.R. 229, 245 (Bankr. S.D.N.Y. 2017) (finding that presumption did

18  not apply where the debtor and defendants were all headquartered in Bahrain).

19       Second, the choice-of-law provisions do not change the result. The focus is on the parties'

20  conduct, not a contractual choice of law. In any event, a court may disregard a choice-of-law clause,

21  which does not bind third parties such as a bankruptcy trustee, for lease recharacterization issues.

22  *See In re Eagle Enters., Inc.,* 223 B.R. 290 (Bankr. E.D. Pa. 1998) (disregarding German choice-

23  of-law clause to recharacterize lease as disguised financing under Pennsylvania commercial code).

24       Third, although TVPX and Wells Fargo are "nominal," they are also critical because U.S.

25  corporate trusts are necessary to obtain FAA registration of the planes. Without FAA registration

26  and Zetta USA's Part 135 Certificate, the planes had no commercial value. This is a far cry from

27  the use of "professionals" in the *CIL Ltd.* case cited by the Li Qi Entities.[16] Here, the parties could

28

---

[16] In *In re CIL Ltd.*, the relevant transfer was merely "negotiated and documented at least in part" by the foreign debtor's

1  not have obtained FAA registration and registered title without using U.S. corporate trusts.

2      Finally, the transfers through U.S. bank accounts were not "fleeting," but critical to

3  maintaining the U.S. focus of the transaction for FAA registration and other purposes. All transfers

4  made at the closing on the Minsheng Refinancing occurred in the United States because the

5  transfers were made from a U.S. bank account by IATS, a U.S. escrow agent. (*See* Yuntian Mot. at

6  15.) "[C]ourts have found the use of bank accounts in the United States to be sufficient to displace

7  the presumption against extraterritoriality." *Arcapita*, 575 B.R. at 245. In *Arcapita*, the bankruptcy

8  court found that the defendants' use of a correspondent bank in New York "touched and concerned

9  the United States in a manner sufficient to displace the presumption against extraterritoriality." *Id.*

10 at 245. The court distinguished other cases because "importantly, some of those cases did not

11 involve instances where, such as here, both sides of the challenged transfer used a U.S. bank to

12 complete the transfer." *Id.* at 246. Indeed, the court specifically distinguished both *In re Maxwell*

13 *Commc'n Corp.*, 186 B.R. 807, 820-21 (S.D.N.Y. 1995) and *Loginovskaya v. Batratchenko*, 764

14 F.3d 266 (2d Cir. 2014), both of which are relied on by Minsheng, as cases that "involve a U.S.

15 bank on only one side of the challenged transfer." *Arcapita*, 575 B.R. at 246, n.10; *see also Midland*

16 *Euro*, 347 B.R. at ___ (applying presumption against extraterritoriality in part because neither party

17 used a domestic escrow agent or escrow agreements under U.S. law).

18     Here, as in *Arcapita*, all parties to the Minsheng Refinancing agreed to use a domestic

19 escrow agent and its domestic bank account to complete the transfers.[17] This contact is intentional

20 and meaningful, unlike the "fleeting," one-sided connections in the cases Minsheng cites. This

21 intentional contact and deliberate use of U.S. banking law (by the parties on both sides of the

22 transfers) provides sufficient contact with the United States to make the $55 million transfer to

23 Universal Leader and $12.4 million transfer to Minsheng Financial domestic transfers.[18]

24     In sum, the focus of these transactions was the United States. Accordingly, avoiding and

25

26 directors and professionals in the United States. *In re CIL Ltd.*, 582 B.R. 46, 96 (Bankr. S.D.N.Y. 2018). As described
   herein, Wells Fargo and TVPX are not professionals giving transaction advice, but integral parties to the transactions
   and the relevant contractual obligations themselves.

27 [17] The escrow agreements controlling the parties' contractual relationship were also governed by U.S. law and had a
   choice of venue provision in the U.S. If necessary, the Trustee will amend the Complaint to add these additional facts.

28 [18] The use of U.S. dollars as the denomination of payment further supports this conclusion. *Cf. FAH Liquidating Corp.*,
   572 B.R. at 124 (considering payment in Euros as one factor in finding that focus was in Germany).

recovering the transfers would not violate the presumption against extraterritoriality.

### D. The Court may disgorge or avoid extraterritorial transfers made on domestic obligations.

For the reasons stated above, the Debtors' obligations arising under the Minsheng Refinancing and Master Leases were domestic obligations. Accordingly, there is no extraterritoriality issue with respect to avoiding these obligation under § 548. When obligations are avoided, the transfers made pursuant to those obligations should be disgorged. *See In re TOUSA, Inc.*, 2017 WL 8785510, at *5-6 (S.D. Fla. Mar. 7, 2017) (affirming disgorgement of $505 million in loan proceeds where underlying loan obligation was avoided).

In addition, because the avoidance of the obligations incurred in the United States is a domestic application of § 548, any ancillary remedy under §§ 548 or 550 to recover transfers made on account of the avoided obligations is not subject to the presumption against extraterritoriality. In *In re Picard* ("*Madoff II*"), 917 F.3d 85 (2d Cir. 2019), the Second Circuit noted that focus of both § 548(a)(1)(A) and § 550 was on the *initial* transaction subject to avoidance under Section 548 that depleted the bankruptcy estate which, in that case, was the debtor's initial transfer. *See Madoff II*, 917 F.3d at 98 ("the focus of § 550(a) . . . depends on the avoidance provision that enables a trustee to recover property"); *see also WesternGeco*, 138 S. Ct. at 2137 ("determining how the statute has actually been applied is the whole point of the focus test"). Once the court determined that the presumption did not apply to that initial transaction, subsequent transfers on that obligation are not subject to the presumption. *Madoff II*, 917 F.3d at 98. "While the subsequent transfer may indirectly harm creditors by making property more difficult to recover, it is the initial transfer that fraudulently depletes the estate." *Id*.

Accordingly, it is the initial transaction—here, the avoidable obligations under the Minsheng Refinance and the Master Leases that were incurred in the United States through U.S.-based corporate trusts and funded through a U.S.-based escrow agent—that fraudulently depleted the estates and is thus subject to avoidance under § 548. Subsequent transfers on account of the avoidable obligations thus are subject to recovery without regard to extraterritoriality.

**II.    The principle of international comity does not mandate dismissal of the Complaint.**

The Defendants allege that the principle of international comity requires dismissal of the complaint because (1) a "true conflict" exists between U.S., Singapore, and English avoidance law and (2) the application of U.S. law against them is unreasonable. The Defendants bear the burden of proof on the applicability of the comity doctrine, *see Mujica v. Occidental Petro. Corp.*, 381 F. Supp. 2d 1134, 1155 (C.D. Cal. 2005), but cannot meet that burden here. Both arguments fail.

**A.    There is no true conflict of law.**

The Defendants argue that there is a conflict of law between U.S., Singapore, and English law because it is easier for the Trustee to prove a fraudulent transfer under U.S. law. But that is not enough. "[M]ere inconsistencies between U.S. law and foreign law is insufficient to raise serious concerns of international comity." *Florsheim*, 336 B.R. at 133. Rather, courts do not abstain unless there is a pending, parallel proceeding in a foreign court. *Id.* (finding "no actual conflict with foreign law in this case that would make application of U.S. law unreasonable" because there was "no parallel proceeding in any other country that competes with this bankruptcy case"); *see also In re French*, 320 B.R. 78, 85 (Bankr. D. Md. 2004) ("[C]omity is typically invoked where there are competent proceedings in two countries."); *Maxwell*, 93 F.3d at 1053 (noting that comity applies "in the context of parallel bankruptcy"); *Simon*, 153 F.3d at 999 (rejecting comity argument because the "case does not involve competing bankruptcy proceedings; indeed, there is no proceeding pending in Hong Kong"); *Arcapita*, 575 B.R. at 241 (rejecting comity argument because "the Second Circuit's international comity decisions primarily emphasize the doctrine's bankruptcy significance in the context of parallel insolvency proceedings."). In *Maxwell*, upon which Defendants heavily rely, the "parallel" proceeding to the debtor's chapter 11 bankruptcy involved a petition filed in High Court of Justice in London for an insolvency order which was the "closest equivalent in British law to Chapter 11 relief." *See Maxwell*, 93 F.3d at 1042.

It is undisputed that there is no bankruptcy proceeding pending in England. Nor is there a parallel, much less competing, proceeding in Singapore. Rather, the Trustee *obtained recognition of this U.S. bankruptcy case* in Singapore and has been recognized as the "foreign representative" with the U.S. bankruptcy cases being recognized as the main proceeding. The Singapore

recognition order does not establish a parallel "chapter 11 like" proceeding noted by *Maxwell*. Rather, it is similar to an "ancillary" proceeding under § 1504 to assist a foreign representative in the exercise of his duties. Under § 1511, upon recognition, a foreign representative must file a petition to commence a chapter 7 or 11 case, but only if the U.S. Bankruptcy Court finds the foreign proceeding to be the main proceeding.[19] Accordingly, there is no actual conflict between U.S. and Singapore or English law due to the absence of a parallel, competing proceeding.

**B.   The application of U.S. law against the Defendants is reasonable.**

In determining whether to apply the doctrine of international comity, courts also analyze whether the application of U.S. law against the defendants is unreasonable and, in doing so, consider (1) the strength of the United States' interest in the matter; (2) the strength of the foreign interest in the matter; and (3) the adequacy of the forum. *See Mujica v. Airscan, Inc.*, 771 F.3d 580, 604-612 (9th Cir. 2014). Each of these factors weighs against abstaining from this matter under the principles of international comity.

**1.   The United States has a strong interest in adjudicating the avoidance claims.**

In determining the strength of the U.S. interests in the matter, courts consider the following nonexclusive factors: "(1) the location of the conduct in question; (2) the nationality of the parties; (3) the character of the conduct in question; (4) the foreign policy interests of the United States; and (5) any public policy interests." *Id.* at 604. Here, each factor weighs against the application of international comity because, as described above, the relevant transactions were focused in the United States. In addition, the United States has a strong public policy interest in this matter. In *Florsheim*, the defendant claimed that "preferential transfers are not of national importance." 336 B.R. at 133. The court disagreed, stating that the "importance of preferential transfers to bankruptcy proceedings cannot be understated. They often provide the primary source of funds for distribution to creditors." *Id.* The Bankruptcy Court for the Southern District of New York has also emphasized

---

[19] *See also* Hon. Louise De Carl Adler, *Managing the Chapter 15 Cross-Border Insolvency Case, A Pocket Guide for Judges*, 2nd ed., Federal Judicial Center (2014) (available at https://www.fjc.gov/sites/default/files/2014/Adler-Chapter-15-2D-FJC-2014.pdf ) ("Claims issues may not arise at all unless the foreign representative decides, upon obtaining recognition, to file a parallel chapter 11 case.") Only filing a separate chapter 7 or 11 petition could create a parallel bankruptcy proceeding capable of plenary jurisdiction over property of the estate, claims adjudication and distribution of assets to creditors.

our country's strong interest in having avoidance actions adjudicated in the United States:

> With regard to the nature of the regulated activity and its importance to this jurisdiction as compared to the international system, the composition of a debtor's estate is clearly central to a U.S. bankruptcy case. The laws at issue in this case – Sections 362, 542, 547 and 550 of the Bankruptcy Code – are designed to protect and pool the assets of the Debtor's estate for the equitable benefit of all its creditors. These provisions are the bedrock of the protections afforded to creditors under the Bankruptcy Code.

*Arcapita*, 575 B.R. at 240. The United States has a strong interest in adjudicating claims that arise under the Bankruptcy Code. This factor weighs against dismissal of the Complaint.

### 2. This matter lacks the relevant foreign interests.

In analyzing the strength of any foreign interest in this matter, as noted above, there are no parallel (as opposed to ancillary) insolvency proceedings pending in any other forum whereby the foreign forum is attempting to exercise control over the assets at issue here. In *Madoff II*, the Second Circuit noted the absence of any parallel insolvency proceeding in any foreign court and stated that "the absence of such proceedings seriously diminishes the interest of any foreign state in our resolution of the Trustee's claims." 917 F.3d at 103-04. Moreover, the relevant conduct in these transactions was in the United States, so Singapore and England have little interest in this case.

### 3. The Defendants fail to identify a proper alternative forum.

The Defendants allege that courts in both Singapore and England would be adequate alternate fora to adjudicate the Trustee's avoidance claims. However, the Trustee does not have recognition of Zetta PTE's bankruptcy proceedings in England. There is no other proceeding in England involving the Debtors. The Defendants thus have not shown that the Trustee would be able to bring avoidance actions there. Moreover, while this Court has personal jurisdiction over the Defendants, the Defendants do not argue that a Singapore court would have personal jurisdiction over them. The Defendants thus fail to prove the adequacy of any alternative forum.

The Defendants fail to meet their burden on any of these factors; accordingly, the comity doctrine does not apply in this case.

### III. The Complaint states claims to avoid and recover fraudulent transfers.

The Defendants argue that the fraudulent transfer claims in Counts I, II, and VI are insufficient because some of the transfers were not of the Debtors' property and because the

DLA Piper LLP (US)
Los Angeles

-21-

Complaint fails to plead actual intent or constructive fraudulent transfer. These arguments all fail.

**A. All of the transfers were of the Debtors' property.**

To avoid a transfer, § 548(a)(1) requires that the transfer at issue is "an interest of the debtor in property." Section 541(a) describes property of the estate as "all legal or equitable interest of the debtor in property as of the commencement of the case" "wherever located and by whomever held." The scope of § 541(a) is broad and ubiquitous and includes all "[p]roceeds . . . or profits of or from property of the estate." *U.S. v. Whiting Pools*, 462 U.S. 198, 204 n.9 (1983); § 541(a)(6). Property of the estate includes "all kinds of proceeds derived from property of the estate." *In re Allegheny Label, Inc.*, 128 B.R. 947, 952 (Bankr. W.D. Pa. 1991).

The Defendants do not dispute that *most* of the transfers involved the Debtors' property. Rather, they limit their dispute to two specific transfers in the Minsheng Refinancing: the $55 million that Universal Leader received to pay off the restructured loan on Plane 7 and the $12.4 million that Minsheng Business received to pay fees and costs as well as down payments on four additional planes. The Trustee addresses each of these transfers separately below.

**1. The Li Qi Entities rewrite the Complaint and ignore the economic reality of the Minsheng Refinancing and the prior agreements with the Debtors.**

The Li Qi Entities argue that the $55 million was not the Debtors' property because it was "transferred by Minsheng to [Universal Leader]" and the "transaction was between two non-debtors: one party—Minsheng—paid the other—[Universal Leader]—for title to an asset." (LQE Mot. at 20.) This description of the transaction both attempts to rewrite the Complaint and ignores the economic realities of the Minsheng Refinancing and the prior agreements with the Debtors.

The Complaint (as confirmed by the documents referenced in the Complaint and attached to the Defendants' motions) plausibly alleges that the transactions were disguised financing arrangements because the Debtors operated and maintained the planes, required payments equal to the total debt service, and had fixed purchase price options.[20] Once the leases are properly

---

[20] In general, the question of whether the arrangement is a "true lease" or a disguised financing comes down to (i) which party has "the normal risks and responsibilities" of ownership and (ii) whether the "rent payments" are reasonably designed to compensate the lessor for the use of the property or "simply reflect a repayment of the lessors' acquisition cost plus interest." *See, e.g.*, *In re Nite Lite Inns*, 13 B.R. 900, 908 (Bankr. S.D. Cal. 1981). Courts also consider if there is a nominal purchase option at the end of the "lease" term. *Id.* at 908 n.12. These agreements tick all three boxes.

recharacterized as disguised financings, the relationship between the Defendants and the Debtors

transforms the nominal relationship of lessor/lessee into a creditor/borrower relationship in which

the Debtors own the planes subject to the Defendants' interest as creditors. *In re Lykes Bros. S.S.*

*Co., Inc.*, 196 B.R. 574, 585 (Bankr. M.D. Fla. 1996) (finding that debtor was owner of subject

properties after determining that lease was a disguised financing rather than a "true lease" ).

Accordingly, Universal Leader could not simply sell Plane 7 to Yuntian 4 for $55 million

because it did not own the plane. Instead, as part of the refinancing of the Debtors' ownership

interests, the Debtors directed that $55 million be paid out of their loan proceeds from Minsheng

to repay the obligations under the initial disguised financing for Plane 7. (¶ 101.) This was a

constructively fraudulent transfer because it involved not only the principal balance remaining on

the loan but also an exorbitant "interest" prepayment penalty. Second, although Minsheng lent the

Debtors $40 million on each plane, Universal Leader received $55 million for Plane 7 *and* Glove

Assets retained an unsecured loan for the remaining amount due on Plane 6 *plus* nearly $2 million

more that was allegedly still owing on Plane 7. (¶¶ 101, 110.) The net result was that Universal

Leader, an insider, received a 40 percent annualized return on Plane 7 (considering both the $55

million payment and the nearly $12 million in "rent" payments it received from the Debtors); Glove

Assets had an unsecured loan for more than the amount that it was owed for Plane 6, which the

Debtors had to continue to pay; and the Debtors also had to make "rent" payments to Minsheng

under the new disguised financing agreements on Planes 6 and 7. Third, the $55 million price was

based on the amount allegedly due on the original agreements between Universal Leader and the

Debtors including the exorbitant interest prepayment penalty. (¶¶ 99, 107.) It had nothing to do

with the value of the plane that Universal Leader purchased nine months earlier for $50 million.

In short, the Li Qi Entities are asking this Court to disbelieve the Complaint in favor of their

own description of the transaction. The Li Qi Entities do not get to assert alternative facts or draw

alternative inferences under the auspices of Fed. R. Civ. P. 12(b). The "Defendants' factual

allegations . . . are irrelevant to the Motion to Dismiss." *In re Know Weigh*, 576 B.R. 189, 213

(Bankr. C.D. Cal. 2017). The Court may not simply disbelieve the Trustee's allegations in favor of

the Defendants' competing inferences: "Rule 12(b)(6) does not countenance dismissals based on a

DLA Piper LLP (US)
Los Angeles

1    judge's disbelief of a complaint's factual allegations." *Zochlinski v. Regents of the Univ. of Cal.*,

2    578 F. App'x 636, 638 (9th Cir. 2014) (quoting *Neitzke v. Williams*, 490 U.S. 319, 327 (1989)).

3    **2.   Whether the funds were paid from escrow or the Debtors' account is irrelevant.**

4         The Defendants also argue that the proceeds were not within the Debtors' control because

5    the funds were dispersed directly from escrow to Universal Leader and Minsheng Business, rather

6    than through the Debtors' accounts. (LQE Mot. at 20-21; Yuntian Mot. at 22-24.) But proceeds

7    held in escrow for a debtor are the property of the debtor's estate. They do not need to touch the

8    debtor's account. In *In re Allegheny Label*, for example, the bankruptcy court determined after trial

9    that funds held in escrow were the property of the estate because the debtor "unquestionably had a

10   property interest in its assets at the time of the closing [of the sale] . . . [and] . . . [t]he funds

11   distributed to [the broker] were part of the proceeds realized from the sale of debtor's assets." 128

12   B.R. at 952. The court further explained that the purchaser's funds that were escrowed were part of

13   the consideration for the assets. *Id*. Similarly, in *In re S.E.L. Maduro (Fla.), Inc.*, 205 B.R. 987

14   (Bankr. S.D. Fla. 1997), the bankruptcy court entered partial summary judgment for the trustee on

15   preference claims relating to payments made from escrowed funds even though they never touched

16   the debtor's accounts. *Id*. at 989. The transferee argued that the debtor did not control the proceeds.

17   *Id*. at 991. The court rejected this argument because "control" must be "viewed in the context of

18   the asset sale." *Id.* Although the debtor "never actually controlled any of the funds at issue," the

19   purchaser did not make the transfers to the transferees gratuitously; rather, they were part of the

20   "consideration for the acquisition of the Debtor's assets." *Id.* The debtor's "'control' was

21   established" in the purchase agreement when it agreed to "sell its assets . . . in return for . . .

22   transfers to the [transferee] and other designated creditors." *Id.*[21]

23         Much like in *Allegheny Label* and *S.E.L. Maduro*, the Complaint pleads that the $55 million

24   and $12.4 million were disbursed from the escrowed loan proceeds from new debt obligations that

25   the Debtors incurred. (¶¶ 106, 119, 190.) It is irrelevant whether that disbursement was made from

26   the Debtors' accounts or from an escrow account.

27

28

_____

[21] Because the definition of property of the estate is the same under § 547 and § 548, the fact that *S.E.L. Maduro* involved preference transfers rather than fraudulent transfers is irrelevant.

The Debtors' control over the proceeds is driven home even further by two facts. First, the Debtors did not use the proceeds of the Minsheng Refinancing to pay off both Planes 6 and 7. Instead, they paid off Plane 7 (in part) and transferred the remaining obligation on Plane 7 and the entire obligation on Plane 6 into a single unsecured loan. (¶¶ 101, 110.) By choosing between creditors, the Debtors exercised control over the proceeds from the Minsheng Refinancing. Second, if the Debtors had not entered into the Challenger Transactions, they could have used the $12.4 million for other purposes, including paying down unsustainable aircraft debt or trade payables.

### 3. The earmarking doctrine does not apply.

Minsheng argues that the $12.4 million in proceeds from the Minsheng Refinancing was never the Debtors' property because those funds were earmarked for the purchase of four new Challenger aircraft. Minsheng misunderstands the earmarking doctrine.

"Under the 'earmarking doctrine,' funds provided to a debtor for the purpose of paying a specific indebtedness may not be recoverable as a preference from the creditor to which they are paid, because the property 'transferred' in such a situation was never property of the debtor and so the transfer did not disadvantage other creditors." 5 Collier on Bankruptcy ¶ 547.03[2][a]. The earmarking doctrine applies where the only change is the identity of the creditor, while the nature of the debt does not change: "If all that occurs in a 'transfer' is the substitution of one creditor for another, no preference is created because the debtor has not transferred property of his estate; he still owes the same sum to a creditor, only the identity of the creditor has changed." *Id.* The earmarking doctrine requires the defendant to establish each of three elements: "(1) the existence of an agreement between the new lender and the debtor that the new funds will be used to pay a specified antecedent debt; (2) performance of that agreement according to its terms; (3) the transaction viewed as a whole . . . does not result in any diminution of the estate." *In re Straightline Invs.*, 525 F.3d 870, 881-82 (9th Cir. 2002). As a judge-made exception, it is narrowly construed against the defendant. *In re BR Festivals, LLC*, 2015 WL 1216836, at *2 (Bankr. N.D. Cal. Mar. 11, 2015) (citing 5 Collier on Bankruptcy ¶ 547.03[2][a]). If the defendant fails to establish all three elements, the earmarking doctrine does not apply. None of the three elements are met.

The first element of the earmarking doctrine is not met because Minsheng was both the old

and the new creditor. The earmarking doctrine is "typically applicable when a third party makes a loan to a debtor specifically to enable the debtor to satisfy the debt of a designated creditor. In other words, a *new creditor is substituted for an old creditor*." *In re Interior Wood Prods. Co.*, 986 F.2d 228, 231 (8th Cir. 1993) (emphasis added). For that to occur, the new creditor and old creditor cannot be the same. *See In re Libby Int'l*, 247 B.R. 463, 468 (B.A.P. 8th Cir. 2000) (holding that earmarking doctrine does not apply when same bank is both the old and new creditor). The Complaint pleads that Minsheng purchased each of Plane 6 and Plane 7 and, from the proceeds, the Debtors transferred the $12.4 million to Minsheng. (¶ 106.) Minsheng does not dispute that fact in the Motion. (*See* Yuntian Mot. at 33). The new creditor and the old creditor are the same.

The second element of the earmarking doctrine is not met because the $12.4 million transfer was for a new debt, not an antecedent one. For a debt to be "antecedent" it must be an existing debt. *See In re Hobbick*, 2001 WL 34076375, at *8 (Bankr. C.D. Ill. Sept 10, 2001). The court in *Hobbick* rejected the earmarking defense in part because the transferred funds were paid out of the proceeds from an asset purchase agreement, "not a 'new lender' who is making a loan to the debtors for the purpose of paying a specified antecedent debt." *Id.* at *10 (cleaned up). In this case, the funds at issue were not a loan from Minsheng to the Debtors to pay off an antecedent (i.e., pre-existing) debt. Rather, they were proceeds from an asset sale used to enter into *new* purchase agreements a month later for new aircraft. The Minsheng Refinancing (involving Planes 6 and 7) closed on September 21, 2016. (¶¶ 106, 111.) Zetta PTE purchased Plane 12 on October 26, 2016. (¶ 123.) So the transfer involved a new debt on different planes a month later.

The third element of the earmarking doctrine is not met because the $12.4 million transfer diminished the debtor's estate. "The fundamental inquiry in determining whether the doctrine applies is whether the transfer at issue has diminished the debtor's estate." *Allegheny Label*, 128 B.R. at 952. Diminishing the estate results in assets not being available to other creditors that otherwise would be. *In re Bullion Reserve of N. Am.*, 836 F.2d 1214, 1217 (9th Cir. 1988). The estate is not diminished if the result of the transaction merely substitutes a new creditor for an old creditor. *See Libby Int'l*, 247 B.R. at 467. In this case, the third element is not met because, absent the $12.4 million transfer to Minsheng, the proceeds could have been used to pay other creditors.

**B. Actual Intent: Cassidy actually intended to hinder, delay, or defraud creditors through the initial purchases of Planes 6 and 7 and the Minsheng Refinancing.**

Counts I and II plead actual fraudulent transfer claims relating to the initial purchases of Planes 6 and 7 and the Minsheng Refinancing, respectively. "The elements of an actual fraudulent transfer are: (i) the debtor transferred an interest in property or incurred a debt; (ii) on or within two years before the petition filing date; (iii) with actual intent to hinder, delay, or defraud a present or future creditor." *Know Weigh*, 576 B.R. at 212; *see also* § 548(a)(1)(A). Rule 9(b) applies to actual fraudulent transfer claims, *Know Weigh*, 576 B.R. at 212-13, but the standard is "more liberal" and "less stringent" because "the trustee, a third party, . . . is pleading fraud based on second-hand information." *Smith v. Arthur Andersen L.L.P.*, 175 F. Supp. 2d 1180, 1201 (D. Ariz. 2001), *aff'd*, 421 F.3d 989 (9th Cir. 2005). The complaint need only "give defendants notice of the particular misconduct so that they can defend against the charge and not just deny that they have done anything wrong." *Screen Capital Int'l Corp. v. Library Asset Acquisition Co.*, 510 B.R. 248, 255 (C.D. Cal. 2014) (quoting *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009)). To state a claim for actual fraudulent transfer, it is sufficient if the complaint sets forth the "details of the allegedly fraudulent transfers—including the transferor, transferees, amounts, and time period" and the details of the "underlying fraudulent scheme." *See, e.g.*, *In re Life Partners Holdings, Inc.*, 926 F.3d 103, 119 (5th Cir. 2019); *see also Janvey v. Alguire*, 647 F.3d 585, 599 (5th Cir. 2011) (finding allegations sufficient under Rule 9(b) because they included period in which transfers occurred, details of underlying Ponzi scheme, and total amount each defendant received).

The Complaint pleads three separate, independent bases for actual intent. First, the Minsheng Refinancing was evidence that Cassidy's operation of the Debtors was a Ponzi-like scheme. The payment of above-market returns to Li Qi using investments in the form of loans from a subsequent party, Minsheng, and the use of additional proceeds to extend the scheme are both hallmarks of a Ponzi scheme. Second, Cassidy knew or was substantially certain that the amount of debt the Debtors were incurring would hinder, delay, or defraud the creditors in the future. Third, that Cassidy caused the Debtors to enter into the Minsheng Refinancing to steal millions from the proceeds and give Li Qi (and the Li Qi Entities) a preference over other creditors rather than pay

down critical debt obligations when the Debtors only had "breathing room of 1.5 months."

### 1. First Basis: Cassidy had actual intent because he operated the Debtors as a Ponzi-like scheme.

Cassidy's Ponzi-like scheme establishes actual intent to defraud for both Counts I and II. The "mere existence of a Ponzi scheme" establishes "the requirement of actual intent on the part of the debtor." *In re Agric. Research & Tech. Grp.* ("*Agretech*"), 916 F.2d 528, 536 (9th Cir. 1990); *see also In re Cohen*, 199 B.R. 709, 717 (B.A.P. 9th Cir. 1996) ("Proof of a Ponzi scheme is sufficient to establish the Ponzi operator's actual intent to hinder, delay, or defraud.").[22] To be sure, the scheme does not need to be a pure Ponzi scheme. Courts will also find actual intent in cases involving a Ponzi-like scheme, *see In re Nat'l Audit Def. Network* ("*NADN*"), 367 B.R. 207, 222 (Bankr. D. Nev. 2007), or a "similar illegitimate enterprise," *see In re LLS Am., LLC*, 2013 WL 3305393, at *7-10 (Bankr. E.D. Wash. July 1, 2013) (quoting *Rieser v. Hayslip*, 343 B.R. 615, 636 (Bankr. S.D. Ohio 2006)).

The Li Qi Entities argue that the Complaint fails to plead "the required elements of a Ponzi scheme." (LQE Mot. at 26-27.) But there is no "precise definition of a Ponzi scheme." *LLS Am.*, 2013 WL 3305393, at *7. Instead, courts "look for a general pattern, rather than specific requirements." *Id.* Although Ponzi schemes share the "characteristic or pattern of payment of earlier investors with funds of later investors," the precise scheme "is limited only by the imagination of the perpetrator." *Id.* at *7. Other characteristics of a Ponzi scheme include the "promise of a high rate of return," the perpetrator's use of investor funds for personal use, and providing "false or misleading financial information to existing and new investors." *Id.* at *7-10.

Courts have specifically applied the Ponzi scheme presumption in cases in which the scheme involved lenders rather than investors. *LLS America*, for example, involved a Ponzi-like scheme in which the perpetrator operated the debtor as a payday loan business, sought loans and investments purportedly for operating that business, and repaid her earlier lenders with the funds she received from later lenders. *Id.* at *3, 10. The court noted that the evidence showed that the debtor's legitimate operations "did not generate sufficient profits or cash flow to repay lenders."

---

[22] The standard for "actual intent" to hinder, delay, or defraud creditors is the same under the Bankruptcy Code and state fraudulent transfer laws. *See, e.g., In re Cohen*, 199 B.R. at 717.

*Id.* at \*6. The debtor's business "was operated at a loss from its beginning and did not produce profits sufficient to pay lenders," so the perpetrator relied on new lender deposits to repay earlier lenders. *Id.* Indeed, even Charles Ponzi himself structured his eponymous scheme around promissory notes and used the funds obtained from later lenders to pay off earlier ones. *See Cunningham v. Brown*, 265 U.S. 1, 7-8 (1924).

The Complaint pleads facts that plausibly allege that Cassidy was running the Debtors as a Ponzi scheme. In short, Cassidy enticed Li Qi to invest through the Li Qi Entities with the promise of above market returns. (¶ 2.) He then convinced Minsheng to provide two loans totaling $80 million dollars for Planes 6 and 7. (¶ 96-116.) Cassidy used $55 million to pay Universal Leader for Plane 7, which the Debtors had purchased in a disguised financing structure nine months before for $50 million. (*See* Lyons Decl. Ex. B at Annex 4.) Glove Assets not only retained the outstanding amounts on the disguised financing lease for Plane 6 as an unsecured loan, Cassidy and Li Qi also agreed to transfer $2 million of the amount due on Plane 7 to this unsecured loan. (¶¶ 101, 110.) Combined with the nearly $12 million in payments that Universal Leader received, the Li Qi Entities received an annualized return of almost 40 percent on this deal. (¶¶ 190-95.) This is squarely within the high rate of return that the Li Qi Entities cite. (LQE Mot. at 27.)[23]

Cassidy also stole millions from the proceeds of the Minsheng Refinancing for his own use, another hallmark of a Ponzi scheme. (¶ 76, 113-16, 184.) Even Cassidy's own business partners described the Debtors as a Ponzi scheme shortly before they removed him from the Debtors' board and his management roles. (¶¶ 134-35.) And, as in *LLS Am.*, the Debtors' business operated at a loss from the beginning and never produced profits or revenues sufficient to pay down the mountain of debt or their trade creditors.

---

[23] The Li Qi Entities also confuse the Ponzi-scheme presumption with the "net winner" rule. (LQE Mot. at 28.) The "net winner" rule comes into play only in the context of reasonably equivalent value for a constructive fraudulent transfer or the "for value" portion of a good faith defense. *See In re Int'l Mfg. Grp., Inc.*, 538 B.R. 22, 32 (Bankr. E.D. Cal. 2015). The Li Qi Entities were not good-faith transferee victims in this case. Li Qi, an insider, was actively involved in negotiating preferences for the Li Qi Entities when he should have been investigating why Cassidy needed the funds and whether (in the context of Li Qi's role as a director) the Debtors should have entered into the Minsheng Refinancing and continued to purchase planes. Indeed, the Li Qi Entities do not even attempt to argue that they are a good faith transferee, only that they were a net loser. The net-winner rule does not protect a bad-faith (or even a negligent) transferee who is able to extract a return before the scheme collapses. *See id.* at 33 ("Facts that should have put a reasonable person on notice of a fraudulent scheme, which would have been discovered through a diligent inquiry, constitute bad faith in receiving fraudulent transfers.").

Cassidy was actively searching for another lender-victim in 2017 because he needed more than $40 million to keep his scheme from imploding (including to pay above-market returns on debts to Li Qi). (¶¶ 97, 132.) Cassidy was thwarted by the Debtors' severe liquidity issues and an honest chief financial officer who blew the whistle on Cassidy's fraudulent scheme. (¶ 133.) The other board members of the Debtors accused Cassidy of making fraudulent misrepresentations to potential investors, a hallmark of a Ponzi scheme. (¶ 134.) Cassidy was removed from his positions by the other board members before he could victimize additional lenders or investors. (¶¶ 132-35.)

Minsheng argues that the transactions could not have been fraudulent because the Debtors were legitimate businesses and failed because they expanded too quickly. (Yuntian Mot. at 27.) But all Ponzi schemes are "founded upon some legitimate business enterprise, whether that enterprise actually exists or is only a 'sham' which exists only in the mind of the perpetrator." *LLS Am.*, 2013 WL 3305393, at *8. Even the Debtors' block-hour sales had a Ponzi-like nature. At the rates that the Debtors received, these block hours were almost never profitable and overall sold for 25 percent less than Cassidy expected. (¶ 68.) Yet these pre-paid block hours allowed Cassidy to sell future obligations for present cash flow. *See NADN*, 367 B.R. at 215 (debtor's management took pre-payment for services that were never performed and used funds to perpetuate the scheme).

Minsheng also argues that the refinancing did not extend the scheme. (Yuntian Mot. at 28.) The Minsheng Refinancing extended the scheme because it allowed Cassidy more time to embezzle from the Debtors and receive kickbacks and bribes, and more time to induce other investors to invest additional funds to cover up his misappropriations. The Complaint pleads that Cassidy operated the Debtors' as a Ponzi-like scheme, and thus all of the transfers made to Minsheng are presumed to have been made with actual intent to defraud creditors.

### 2. Second Basis: Cassidy knew or was substantially certain that his actions would hinder, delay, or defraud creditors.

The Complaint pleads another independent basis for actual fraud for both Counts I and II: that Cassidy knew or was substantially certain that his actions (misappropriating the Debtors' funds for his own personal use while acquiring planes and debt service obligations the Debtors could never repay in exchange for kickbacks) would be to hinder, delay, or defraud creditors. The actual

intent element can be satisfied by showing that the debtor knew that the "natural consequences" of his acts would be to hinder, delay, or defraud creditors. *See In re Sentinel Mgmt. Grp., Inc.*, 728 F.3d 660, 667 (7th Cir. 2013); *see also U.S. v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1305 (3d. Cir. 1986) (finding actual intent under state fraudulent conveyance statute because "a party is deemed to have intended the natural consequences of his acts," including the effect of those acts on creditors). Although the Ninth Circuit has not directly addressed the "natural consequences" doctrine from *Sentinel*, it has held that "knowledge that a transaction will operate to the detriment of creditors is sufficient for actual intent." *Agretech*, 916 F.2d at 535.

In this case, the Complaint pleads in detail that Cassidy knew both the Minsheng Refinancing and the initial purchases would operate to the detriment of future creditors. The Complaint pleads that Cassidy had a business plan that detailed the rates the Debtors would need to charge and the debt service they could afford to pay. (¶ 68.) Cassidy's business plan was failing on both counts: the rates were 25 percent lower and the debt service obligations were twice what he expected. (¶¶ 68-71.) The initial purchases of Planes 6 and 7 (as well as the other kick-back induced transactions) in December 2015 put the Debtors in the red and they never recovered. (¶¶ 74-75.) By the time of the Minsheng Refinancing, the Debtors trade payables were increasing and they could not pay bills as they came due. (¶ 96.) Cassidy told Seagrim and Walter that they had "no choice" but to do the deal because the Debtors only had "breathing room of 1.5 months." (¶ 103.) Cassidy nevertheless continued buying planes and stealing money rather than considering whether to pay off existing debt or considering bankruptcy much earlier. Cassidy should not have entered into any of the transactions. Cassidy knew his creditors would be left holding the bag. Yet he continued to incur further debt obligations and embezzle more funds. Under *Sentinel*, that knowledge is enough to establish actual intent to hinder, delay, or defraud.

### 3. Third Basis: Cassidy entered into the Minsheng Refinancing to steal millions of dollars for his personal use and pay off Li Qi at the expense of other creditors.

The Complaint also pleads both direct evidence of actual intent and the badges of fraud. Specifically, the Complaint alleges facts that show that the Minsheng Refinancing was motivated by two purposes: (1) to allow Cassidy to steal millions in cash and to pay for a yacht and a condo

and (2) to give Li Qi a significantly above-market payout on the existing obligations. As to the former, the Complaint alleges that Cassidy entered into an agreement to purchase a yacht immediately before the Minsheng Refinancing (¶¶ 93-95) and then took almost $5 million from the proceeds of the transaction in cash, in an installment payment on the yacht, and to pay for a deposit on a condo (¶¶ 113-16). As to the latter, the Complaint pleads that Cassidy and Li Qi agreed to pay a significant above-market return to Universal Leader on Plane 7, while leaving the entire obligation in place to Glove Assets on Plane 6. (¶¶ 4, 65, 97.) The net result of this transaction was that the Debtors incurred more than $20 million in incremental debt (between the $80 million owed to Minsheng plus another $48 million on the unsecured note to Glove Assets). This intent is confirmed by Cassidy and Li Qi's own words: Cassidy told Li Qi that they were "the priority over the banks," (¶ 98), while Li Qi told Cassidy that "if business is not good, repay me first not mengshen [*sic*] and avic [*sic*], they are the company, I am the personal money," (¶ 103).

The Defendants argue that the Complaint fails to plead the badges of fraud, but the direct evidence above makes that unnecessary. Courts apply the "badges of fraud" because it is "often impracticable" to demonstrate actual intent to defraud "on direct evidence." *In re Acequia, Inc.*, 34 F.3d 800, 805 (9th Cir. 1994).

In any event, the Complaint also pleads the badges of fraud. The Li Qi Entities flatly misstated the law to this Court when they wrote that "[a] single badge of fraud is not sufficient to support actual intent to defraud; instead, multiple badges of fraud are required to state a claim." (LQE Mot. at 5.) The law is crystal clear and the opposite: "No minimum number of factors is required to establish actual intent, and a court may find actual intent based on the evidence in the case *even if no badges of fraud are present*." *In re E. Coast Foods, Inc.*, 2017 WL 3701211, at *7 (Bankr. C.D. Cal. Aug. 25, 2017); *see also In re Beverly*, 374 B.R. 221, 236 (B.A.P. 9th Cir. 2007) (holding that the trier of fact may find actual intent "even if no 'badges of fraud' are present."). The badges of fraud are "neither a counting rule, nor a mathematical formula," and "[n]o minimum number of factors tips the scales toward actual intent." *In re Beverly*, 374 B.R. at 236. The Ninth Circuit emphasizes these five badges of fraud: "(1) actual or threatened litigation against the debtor; (2) a purported transfer of all or substantially all of the debtor's property; (3) insolvency or other

unmanageable indebtedness on the part of the debtor; (4) a special relationship between the debtor and the transferee; and, after the transfer, (5) retention by the debtor of the property involved in the putative transfer." *Acequia*, 34 F.3d at 806. While the Complaint does not need to plead any badges of fraud to show actual intent, it pleads at least four of the five badges of fraud.

First, Cassidy caused the Debtors to enter into the Minsheng Refinancing because they needed to avoid defaulting on existing loans and "keep[] off the wolves." (¶ 96, 103.) Courts have used this exact language to describe a transfer made in the face of actual or threatened litigation. *See In re Lang*, 246 B.R. 463, 470 (Bankr. D. Mass. 2000) (finding fraudulent intent when a debtor made transfers with the "wolf at the door"); *see also In re Huber*, 493 B.R. 798, 803, 812 (Bankr. W.D. Wash. 2013) (finding first badge of fraud because debtor "was or had to be aware of the 'gathering storm clouds'" and litigation "was becoming increasingly certain"). Second, the Complaint pleads insolvency or unmanageable indebtedness: the Debtors overdue trade payables were increasing, they were behind on their bills, and Cassidy himself said they only had "breathing room of 1.5 months," yet the transaction massively increased the Debtors' indebtedness and Cassidy himself stole millions from the proceeds. (¶¶ 77, 103, 114.) Third, the Debtors had a special relationship with Universal Leader in the form of Li Qi, who controlled Universal Leader and was a director of the Debtors at the time of the transaction. (¶¶ 37, 89-90.) The contemporaneous e-mails between Li Qi and Cassidy further confirm that this was an insider transaction. (¶¶ 98-103.) Finally, the Debtors retained the property involved in the putative transfer because Plane 7 stayed in their control. (¶ 109.) These four badges of fraud are more than sufficient to plead actual intent.

The Li Qi Entities also argue that Cassidy's intent cannot be attributed to the Debtors. (LQE Mot. at 16.) Of course it can. With a corporate transferor, "the relevant intent is the intent of its officers and directors, as supplemented by the intent of the party executing the transaction (signing the check; authorizing the wire transfer)." *NADN*, 367 B.R. at 220 (collecting cases). This allows the recovery of "impermissibly transferred corporate assets" and facilitates creditor recovery. *In re James River Coal Co.*, 360 B.R. 139, 161-62 (Bankr. E.D. Va. 2007). *In pari delicto* does not apply to claims under §§ 547 and 548, *see In re Delano Retail Partners, LLC*, 2014 WL 4966476, at *4 (Bankr. E.D. Cal. Sept. 29, 2014), so the sole case the Li Qi Entities cite is irrelevant because it is

about the adverse interest exception to *in pari delicto*, not whether actual fraudulent transfers could

be imputed to the corporation. *In re Kalisch*, 413 B.R. 115, 131 (Bankr. S.D.N.Y. 2008).

**C. Constructive Fraud: The initial purchases of Planes 6 and 7 and the Minsheng Refinancing resulted in constructive fraudulent transfers.**

As an alternative basis for fraudulent transfer, Counts I, II, and VI plead that the initial

acquisitions of Planes 6 and 7 and the Minsheng Refinancing transfers were constructive fraudulent

transfers. "The elements of a constructive fraudulent transfer are that (i) the debtor transferred

property or incurred a debt for less than 'reasonably equivalent value;' and (ii) the debtor: (I) was

insolvent at the time or was rendered insolvent by the transfer; or (II) was engaged or about to

engage in a business or transaction for which the debtor's remaining assets were unreasonably small

in relation to the business or transaction; or (III) intended to incur or believed (or reasonably should

have believed) that it would incur debts beyond its ability to repay; or (IV) made the transfer (or

incurred the obligation) to or for the benefit of an insider under an employment contract and not in

the ordinary course of business." *Know Weigh*, 576 B.R. at 213; *see also* 11 U.S.C. § 548(a)(1)(B).

To plead a constructive fraud claim, "all that is needed . . . is an allegation that there was a transfer

for less than reasonably equivalent value at a time when the Debtors were insolvent." *In re*

*PennySaver USA Publ'g, LLC*, 587 B.R. 445, 456 (Bankr. D. Del. 2018); *In re BMT-NW*

*Acquisition, LLC*, 582 B.R. 846, 856 (Bankr. D. Del. 2018).

Rule 9(b) does not apply to constructive fraudulent transfer claims. *See Know Weigh*, 576

B.R. at 212-13. A complaint that identifies "the dates, amounts, source, and transferee of each of

the alleged transfers successfully support claims of constructive fraudulent transfer under Fed. R.

Civ. Pro. 8(a)(2)'s pleading standard." *Id.* Indeed, it is sufficient to allege only that the value of the

transfers exceeded the benefit received because the totality of the circumstances test requires an

analysis of "the good faith of the parties, the difference between the amount paid and the market

value, and whether the transaction was at arms-length." *In re Evergreen Energy, Inc.*, 546 B.R.

549, 563-64 (Bankr. D. Del. 2016). "The analysis is inherently fact driven." *Id.* The Complaint

pleads both that the transfers were not for reasonably equivalent value and also the first three of the

four options to meet the second element: insolvency, unreasonably small capital, and inability to

pay debts as they come due.

### 1.  The Complaint pleads that the Debtors did not receive "reasonably equivalent value."

Depending on the transactions at issue, the Complaint pleads three alternative bases for why the Debtors did not receive "reasonably equivalent value."

First, although Glove Assets was the lender on the unsecured loan for the balance of the original Plane 6 agreement following the Minsheng Refinancing, the Debtors made the Plane 6 Loan Transfers to Universal Leader, not Glove Assets. Because these transfers were made to a third party, Universal Leader, rather than to Glove Assets, they were constructively fraudulent. *In re Richards & Conover Steel, Co.*, 267 B.R. 602, 613 (8th Cir. B.A.P. 2001) (finding that transfers made solely for the benefit of a third party are not for reasonably equivalent value).

Second, as explained above, the Debtors did not receive reasonably equivalent value in the Minsheng Refinancing for at least two reasons. One, Cassidy and Li Qi agreed to increase the purchase price on Plane 6 and 7 as the "first step" of the Minsheng Refinancing to pay off principal plus an above-market "prepayment penalty" providing Universal with a 40% annualized return on an already overpriced aircraft. (¶ 104-05.) Two, as a result of Cassidy and Li Qi's machinations, the transaction added over $20 million in incremental debt to the Debtors' balance sheet. (¶ 97.) Immediately before the refinancing, the Debtors had remaining principal on the original Plane 6 and 7 agreements of approximately $47 million each or $94 million in total.[24] After the transaction, the Debtors owed Minsheng $40 million on each plane and still had an outstanding unsecured loan from Glove Assets with a principal balance of $48.4 million, or $128.4 million in total. The sole purpose of these changes was to increase the payout to Li Qi through Universal Leader and Glove Assets. The Debtors received no value for the incremental debt—particularly because Cassidy stole almost $5 million of the cash proceeds as part of the deal.[25]

---

[24] The Li Qi Entities bizarrely argue that the "leases" were not above-market because the Trustee did not seek to "restructure" them post-petition. (LQE Mot. at 21-22.) To the extent they are referring to the Trustee's reference to his motion to reject leases in the status report, it did not apply to Planes 6 and 7 which were subject to disguised financings, not true leases subject to rejection under § 365.

[25] Although the precise valuation of the two aircraft is not known, and thus the Trustee pleaded these allegations on information and belief, the allegations have a strong foundation: the more than $20 million in incremental debt. Minsheng's suggestion that this was mere speculation is simply incorrect. (Yuntian Mot. at 30.)

Third, because the actual intent of the Minsheng Refinancing was to give Li Qi (through the Li Qi Entities) a preference over other creditors and allow Cassidy to steal millions and buy new aircraft that the Debtors could not hope to afford to extend the scheme, the Trustee is entitled to avoid all of the obligations incurred in the Minsheng Refinancing. Once those fraudulent obligations are avoided, then "transfers made by the debtor on account of [those] obligation[s] are not made for reasonably equivalent value, and may be set aside," 5 Collier on Bankruptcy ¶ 548.03[4][a], or disgorged, *See TOUSA*, 2017 WL 8785510, at *5-6. Thus, the Trustee is entitled to avoid and recover the proceeds of the Minsheng Refinancing that were disbursed to Universal Leader and Minsheng Business, the Plane 6 Loan Transfers to Universal Leader on the unsecured loan to Glove Assets, and the "rent" and goodwill transfers on Plane 6 and Plane 7. (¶ 190.) Minsheng argues that debt repayments are generally not avoidable as fraudulent transfers, (Yuntian Mot. at 31), but that assumes that the obligation is not subject to avoidance.

### 2.   The Complaint pleads the second element of constructive fraudulent transfer.

The Li Qi Entities also contend that the Complaint fails to plead the second element of constructive fraudulent transfer. They are incorrect and they fundamentally misconstrue the Trustee's pleading requirements. The Complaint plausibly alleges that the Debtors were balance-sheet insolvent, cash-flow insolvent (i.e., unable to pay debts as they came due), and had unreasonably small capital.

Contrary to the Li Qi Entities' assertions, that is all the Trustee is required to allege on insolvency at this stage in the proceedings. The Trustee is "not required to include precise calculations evidencing balance sheet insolvency." *BMT-NW Acquisitions*, 582 B.R. at 858 (stating insolvency "is not appropriate for resolution in a motion to dismiss"). Insolvency should be determined through discovery and expert testimony, not on a motion to dismiss. *Pennysaver USA Publ'g*, 587 B.R. at 459 ("[i]nsolvency is best left to discovery to determine and should not generally decided on a motion to dismiss . . . because the determination of insolvency is highly fact-specific and 'should be based on seasonable appraisals or expert testimony'").

The Li Qi Entities contend that the Complaint fails to allege any of the bases to satisfy the second element of a constructive fraudulent transfer claim. (LQE Mot. at 17.) Once again, not true.

The Complaint here pleads numerous facts that support its insolvency allegation: (i) the Debtors were unable to pay their debts as they became due (¶ 63.); (ii) Cassidy embezzled funds from the Debtors each time they received a cash infusion (¶¶ 66, 75-76, 113-15); (iii) the Debtors incurred twice the debt obligations as expected and could not sell block hours at a sufficient price to support their debt obligations (¶ 68); (iv) the Debtors could not make down payments (¶ 70); (v) the Debtors had no cash and more than $400 million of aircraft debt (¶ 119); and (vi) the Debtors did not have capital to fund day-to-day operations and needed repeated shareholder loans (¶ 126-27). These facts make it plausible that the Debtors were insolvent almost from inception and had unreasonably small capital to fund their operations.

The cases on which the Li Qi Entities rely miss the mark. Three of the five cases were post-trial decisions, and thus are entirely irrelevant on a motion to dismiss. *Moody v. Security Pacific Bus. Credit, Inc.*, 971 F.2d 1056, 1058 (3d. Cir. 1992); *In re Nirvana Restaurant Inc.*, 337 B.R. 495, 498 (Bankr. S.D.N.Y. 2006); *Credit Mgrs. Ass'n of S. Cal. v. Fed. Co.*, 629 F. Supp. 175, 176 (C.D. Cal. 1985). Obviously if the Trustee cannot prove insolvency (or another basis for the second element) after a full trial, the constructive fraudulent transfer claim will fail.

The other two cases at least involved a motion to dismiss, but are entirely distinguishable because of one key fact. In both cases, the trustee's own pleadings showed that the debtors were technically solvent. In *In re Blue Earth, Inc.*, the Debtors' public balance sheets showed that it was not insolvent. 2019 WL 4929933, at *2 (B.A.P. 9th Cir. 2019). The Trustee claimed that certain overstated assets caused the balance sheets to be incorrect, but failed to "allege that the overstated assets caused [the debtor's] liabilities to exceed its assets." *Id.* at *6. Similarly, in *In re Operations NY LLC*, the bank statements attached to the complaint showed that "substantial funds were moving in and out of the Debtor's bank account, and a number of the payees appear to be trade vendors." 490 B.R. 84, 98 (S.D.N.Y. 2013). The Complaint also failed to plead facts "relating to the Debtor's sales, its ability to generate cash or its ability to pay its debts and sustain itself." In this case, the Complaint pleads that the Debtors' sales were insufficient to generate cash sufficient to pay its debts, that the Debtors were unable to pay their trade vendors, and that the Debtors were unable to sustain themselves. (¶¶ 73, 96, 119.) Further, the Complaint pleads that Cassidy subjectively knew

1    the Debtors were on life support, and yet he continued to steal millions from the Debtors. (¶¶ 3,

2    114-15.) The Complaint plausibly alleges insolvency under all three bases.

3    **IV.    The Complaint states claims to avoid and recover preference transfers.**

4            Counts III, IV, V, VIII, IX, X, and XII each state preference claims. The elements of a

5    preference claim are (i) a transfer of an interest of the Debtor in property[26]; (ii) to or for the benefit

6    of a creditor[27]; (iii) for or on account of an antecedent debt; (iv) made while the debtor was

7    insolvent; (v) during the 90 days before the petition date[28]; and (vi) that enabled the creditor to

8    receive more than it would under chapter 7. *See* § 547(b); *In re Caremerica, Inc.*, 409 B.R. 759,

9    763-66 (Bankr. E.D.N.C. 2009). "The purpose of the preference pleading requirements 'is to ensure

10   that the defendant receives sufficient notice of what transfer is sought to be avoided.'" *In re CRC*

11   *Parent Corp.*, 2013 WL 781603, at *2 (Bankr. D. Del. March 1, 2013) (quoting *In re Crucible*

12   *Materials Corp.*, 2011 WL 2669113, at *3 (Bankr. D. Del. July 6, 2011)). The Complaint provides

13   sufficient notice if it includes: "(a) an identification of the nature and amount of each antecedent

14   debt and (b) an identification of each alleged preference transfer by (i) date [of the transfer], (ii)

15   name of the debtor/ transferor, (iii) name of transferee, and (iv) the amount of the transfer." *Id.*

16   (citing *In re Oakwood Homes Corp.*, 340 B.R. 510, 522 (Bankr. D. Del. 2006); *see also In re Valley*

17   *Media, Inc.*, 288 B.R. 189, 192 (Bankr. D. Del. 2003). The Complaint satisfies this burden because

18   it pleads (a) the nature and amount of each antecedent debt and (b) each alleged preference transfer

19   by (i) date, (ii) name of the debtor/ transferor, (iii) name of transferee, and (iv) the amount of the

20   transfer. (¶¶ 271-274, 281-85, Sch. C).

21           Both sets of Defendants focus their challenges on the fourth (insolvency) and sixth (receive

22   more than under chapter 7) elements. Their challenges fail.

---

[26] There is no dispute that Counts III, IV, VIII, IX, and X involved an interest of the Debtors in Property. (Yuntian
Mot. at 31-34; LQE Mot. at 29-33.) The Li Qi Entities' argument that the $55 million transfer at issue in Count V was
not the Debtors' property is disposed of above.

[27] Minsheng argues that the Trustee fails to allege that the Legal Fees Transfers were for their benefit as a creditor
because the Trustee filed separate adversary proceedings against the law firms. (Yuntian Mot. at 34.) As is common in
these transactions, these attorneys were representing the lender but were paid out of the proceeds of the loan. The
Trustee filed the adversary proceedings to assert preference claims against the law firms directly to protect the estates
if these claims were unsuccessful. The Trustee is permitted under § 550(d) to seek recovery from multiple parties until
he recovers a single satisfaction for the estates. There is no inconsistency here.

[28] The Complaint inadvertently included three transfers (on April 8, 2016; March 27, 2017; and May 31, 2017) that
were made outside the 90-day preference period. Even if the Trustee is unable to avoid and recover these transfers
under § 547, the Trustee may also seek to recover them as actual or constructive fraudulent transfers under § 548.

1    **A.  The Complaint sufficiently pleads insolvency.**

2        The Defendants argue that Count IV should be dismissed because the Trustee fails to plead

3    facts to show that the Debtors were insolvent at the time of each transfer. (Yuntian Mot. at 32 n.24;

4    LQE Mot. at 30). However, as explained above, the Complaint does plead facts showing that the

5    Debtors were insolvent, including that they bought numerous planes with no plan to pay for them,

6    incurred much higher debt than expected, could not charge the rates they needed to service the debt,

7    and were drained of cash by Cassidy's embezzlement. (¶¶ 63, 68, 66, 70, 75-76, 113-15, 119, 126-

8    27.) The Complaint sufficiently pleads insolvency.

9        The Li Qi Entities cite to *AWTR Liquidation Inc.*, 548 B.R. 300, 334 (Bankr. C.D. Cal.

10   2016), but the court in that case held that the plaintiff had *sufficiently* pleaded insolvency based on

11   similar allegations: the debtor added hundreds of employees with no planning, incurred cost

12   overruns, had thin net revenue, and was drained of liquidity by insiders at a time its financials were

13   unsustainable. *Id.* at 334. The court also noted that a "valuation of assets and liabilities almost

14   certainly will require expert testimony, which is inappropriate to require on a motion to dismiss."

15   *Id.* Minsheng cites to *In re Imperial Corp. of Am.*, 144 B.R. 115, 120 (Bankr. S.D. Cal. 1992), but

16   that case is even further afield. The Trustee did not even plead that the debtor was insolvent and

17   "even the initial schedules filed by the debtor claimed the company was solvent." *Id.* at 119. Neither

18   is the case here.

19   **B.  Each of the Counts pleads that the Defendants received more than they would under
     a Chapter 7 liquidation.**

20

21       Minsheng contends that the Trustee fails to allege it received more than it would have

     received in a chapter 7 liquidation because the Complaint fails to plead it was undersecured.
22
     (Yuntian Mot. at 32.) It is wrong. The Complaint alleges that the Debtors purchased overpriced
23
     aircraft in a down market (¶¶ 1, 63) and incurred secured debt obligations on Planes 6, 7, and 12.
24
     (¶¶ 97-112, 119-25). Based on that information and belief, the Trustee's allegation that Minsheng
25
     were undersecured is plausible. The Trustee does not need to plead evidence or the specific value
26
     of each of the planes (which will undoubtedly be the subject of expert testimony). For these reasons,
27
     the determination of Minsheng's secured status cannot be addressed at this stage in the proceeding.
28

1  *See In re Qimonda Richmond, LLC*, 467 B.R. 318, 324 (Bankr. D. Del. 2012).

2      Even if Minsheng was not undersecured, the Complaint also seeks to avoid its secured

3  status, which would leave it wholly unsecured and thus meet this element. "The general rule that

4  payment to a fully secured creditor is not preferential 'has no application if the creditor's claim of

5  fully secured status is built on a security interest or lien in collateral that *is avoided or could have*

6  *been avoided.*'" *In re RDM Sports Grp., Inc.*, 250 B.R. 805, 815 (Bankr. D. Del. 2000) (emphasis

7  original). As discussed above, the Trustee is seeking to avoid the underlying obligations that created

8  Minsheng's security interest. If successful, Minsheng will be wholly unsecured and will have

9  certainly received more by way of the preference transfers than it would in a chapter 7.

10      The Li Qi Entities argue that the Trustee's reliance on the schedules without identifying

11  specific details is insufficient to plead that they received more than they would have received in a

12  chapter 7 liquidation. (LQE Mot. at 30-31.)[29] Yet, the Complaint only needs to "provide enough

13  factual allegations to raise a reasonable expectation that discovery might lead to evidence that [the

14  defendants] received more than they would have under [chapter 7]." *In re Alpha Protective Servs.,*

15  *Inc.*, 531 B.R. 889, 900 (M.D. Ga. 2015). Reference to a debtor's schedules, which in this case list

16  hundreds of millions of dollars in unsecured claims, is sufficient to plausibly allege that unsecured

17  creditors will not receive a 100% recovery and thus that the defendant received more from a

18  preference transfer than under a chapter 7 liquidation. *See In re TransVantage Solutions, Inc.*, 2016

19  WL 5854197, at *5 (Bankr. D.N.J. Oct. 6, 2016); *Matter of Lawrence*, 82 B.R. 157, 160-61 (Bankr.

20  M.D. Ga. 1988). "The Trustee's allegations that the Defendants received the payments during the

21  preference period, coupled with the amounts received by the Defendants, at a minimum, raises the

22  likelihood Defendants improved their positions above the speculative level." *Alpha Protective*

23  *Servs.*, 531 B.R. at 900.

24      **C.   The "ordinary course of business" and "new value" defenses are affirmative
           defenses, which cannot form the basis of a motion to dismiss.**

25

26      The Defendants also argue that the Debtors' preference claims should be dismissed based

27  on the "new value" and "ordinary course of business" exceptions, codified in § 547(c). (*See* Yuntian

28

[29] As of January 31, 2020, the Trustee website lists $765,855,966.14 in unsecured claims.

1    Mot. at 43-44; LQE Mot. at 32-33.) However, those exceptions are affirmative defenses, (*see In re*

2    *Gluth Bros. Const., Inc.*, 424 B.R. 379, 398 (Bankr. N.D. Ill. 2009); *Tamayo v. Blagojevich*, 526

3    F.3d 1074, 1090 (7th Cir. 2008)), making such an argument "irrelevant for purposes of a motion to

4    dismiss." *Gluth Bros. Const.*, 424 B.R. at 398; *see also Adelphia Commc'ns Corp. v. Bank of Am.,*

5    *N.A.*, 365 B.R. 24, 79 (Bankr. S.D.N.Y. 2007). "Affirmative defenses . . . notwithstanding their

6    likelihood of success, cannot be used to dismiss a plaintiff's complaint under Rule 12(b)(6)." *In re*

7    *The Russ Cos., Inc.*, 2013 WL 4028098, at *5 (Bankr. D.N.J. Aug. 6, 2013) (citing *In re Adams*

8    *Golf, Inc. Sec. Litig.*, 381 F.3d 267, 277 (3d Cir. 2004); *In re Autobacs Strauss, Inc.*, 473 B.R. 525,

9    571 (Bankr. D. Del. 2012) (rejecting motion to dismiss based on subsequent new value defense).

10    Indeed, the "ordinary course" and "new value" defenses relied on by Minsheng raise

11    numerous factual issues in this case, making them inappropriate for decision at this time. First, the

12    "new value" defense only protects transfers to the extent "the transfer was a contemporaneous

13    exchange for new value," therefore "[a] court must measure the value given to the creditor and the

14    new value given to the debtor in determining the extent to which the trustee may void a

15    contemporaneous exchange." *In re Jet Florida Systems, Inc.*, 861 F.2d 1555, 1558-59 (11th Cir.

16    1988). The Complaint alleges that the Debtors did not receive "new value" after the unusual and

17    desperate blowout payment in June 2017, which is enough to require discovery and a trial. (¶ 202.)

18    Second, the ordinary course of business defense requires a "peculiarly factual analysis," *Lovett v.*

19    *St. Johnsbury Trucking*, 931 F.2d 494, 497 (8th Cir. 1991) and "unusual collection practices" such

20    as threats are viewed as not in the ordinary course of business, *In re Bender Shipbuilding & Repair*

21    *Co.*, 479 B.R. 899, 905 (Bankr. S.D. Ala. 2012) (finding threat to discontinue services unless

22    overdue invoices paid was an unusual collection practice). The Complaint's allegations of threats

23    by Minsheng and other unusual practices require a factual analysis. (*See* ¶ 154-55.)

24    The Li Qi Entities attempt to establish a subsequent new value defense by consolidating

25    their transfers. But as the Complaint describes, the $15 million was transferred to the Debtors from

26    Truly Great (¶ 154), while the preference transfers were made to Universal Leader as initial

27    transferee for the benefit of Glove Assets (¶ 192) and also depends on whether the $15 million loan

28    should be recharacterized as equity. Therefore, the "subsequent new value" was not provided by

the entities that received the benefit of the preference payments.

## V.    Counts VII and XI State § 542 turnover claims against Minsheng.

Minsheng contends that Counts VII and XI fail to state a turnover claim[30] because they fail to allege that Minsheng ever received the Undelivered Aircraft and that the Debtors had no right to ownership in Plane 12. (*See* Yuntian Mot. at 34-35.) Again, Minsheng is wrong.

### A.    Count VII states a claim for turnover of the equity in the Undelivered Aircraft.

The Complaint pleads that Minsheng received $5.5 million in transfers for payment on the Undelivered Aircraft. (¶ 242.) If those aircraft were completed and resold, the Trustee would be entitled to a portion of the profits because of an equity interest based on the $5.5 million paid. The Trustee pleads this claim on information and belief because Minsheng refused to provide any detail on what happened to that $5.5 million payment despite clear requests for this information. Minsheng does not refer to it in the relevant proofs of claims. *See* Proof of Claim Nos. 110, 111, 122, 123, 124, 125, 148, 149, 150, 151. Minsheng ignored clear requests for this information about the status of the $5.5 million. Based on those these facts, the Trustee had an ample basis to plead a claim for turnover based on the equity in the Undelivered Aircraft.[31]

### B.    Count XI states a claim for turnover of the equity in Plane 12.

The Complaint pleads two independent bases for the Debtors' interest in the profits from the sale of Plane 12: (i) the Debtors purchased Plane 12 through a disguised financing arrangement (¶ 123); and (ii) the Debtors paid millions of dollars towards the purchase of Plane 12 (¶¶ 120, 293). Minsheng argues that upon the repossession, the terms of the Aircraft Lease Agreements control and, under those agreements, (i) the Debtors do not have any right to ownership of Plane 12 "until the lease term had ended, all rental payments were made, and all obligations were performed" and (ii) Minsheng "had the right to repossess and then dispose of the aircraft in their sole authority as

---

[30] "A turnover action 'invokes the court's most basic equitable powers to gather and manage property of the estate.'" *Bencomo v. Avery* (*In re Bencomo*), 2016 WL 4203918, at *5 (B.A.P. 9th Cir. Aug. 8, 2016) (quoting *Braunstein v. McCabe*, 571 F.3d 108, 122 (1st Cir. 2009)). The elements of a turnover claim are (1) the property is in the possession, custody or control of a noncustodial third party; (2) the property constitutes property of the estate; (3) the property is of the type that the trustee could use, sell or lease pursuant to section 363 or that the debtor could exempt under section 522, and (4) that the property is not of inconsequential value or benefit to the estate. *In re Process Am., Inc.*, 588 B.R. 82, 98 (Bankr. C.D. Cal. 2018) (citing 5 Collier on Bankruptcy ¶ 542.02); *see also* § 542.

[31] Indeed, the notices of default cited by Minsheng show that Minsheng had the option to make the payments necessary to cure the default. [Dkt. No. 537, Ex. D.] The Trustee pleads more than enough to get discovery into what happened to the $5.5 million payment.

1    they saw fit in the event of default." (*See* Yuntian Mot. at 34-35.)

2          Contrary to Minsheng's assertions, its rights under § 1110 and the disguised financing

3    arrangements are not unfettered. Failure to perform obligations under § 1110 within 60 days after

4    commencement of the cases only removes the protection of the automatic stay. Yuntian still must

5    comply with applicable law in exercising its remedies under the security documents under disguised

6    financing arrangement. *See, e.g.*, *Crocker Nat'l Bank v. Emerald*, 221 Cal. App. 3d 852, 861 (3d

7    Dist. 1990).

8          As secured creditors, Yuntian 3 and 4 were required to comply with Article 9 of the Uniform

9    Commercial Code and other relevant similar requirements under applicable law. Their compliance

10   may be a potential defense to the Trustee's turnover count but it is not obvious from the face of the

11   Complaint. *See ASARCO, LLC v. Union P. R. Co.*, 765 F.3d 999, 1004 (9th Cir. 2014).

12         By pleading that Plane 12 was financed through a disguised financing and that the Debtors

13   made considerable payments towards the purchase of Plane 12, the Complaint sufficiently pleads

14   that the Debtors have a property interest in Plane 12.

15   **VI.    Counts XIII and XIV state claims against the Li Qi Entities.**

16     **A.  Count XIII states a claim for recharacterization of the Third Loan.**

17         The Li Qi Entities assert that the Trustee incorrectly brought the recharacterization claim

18   under § 105(a), but the Ninth Circuit in *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1148 (9th

19   Cir. 2013), on which the Li Qi Entities rely, allowed a recharacterization claim after construing it

20   as a request to disallow the lender's claim under § 502. *See also In re L. Scott Apparel, Inc.*, 2019

21   WL 1768235, at *57 (Bankr. C.D. Cal. Jan. 29, 2019) (discussing recharacterization under §

22   105(a)). Courts look to seven factors under California law to determine whether to recharacterize

23   debt as equity: "(1) the name given to the instrument; (2) the intent of the parties; (3) the presence

24   or absence of a fixed maturity date; (4) the right to enforce payment of principal and interest; (5)

25   the presence or absence of voting rights; (6) the status of the contribution in relation to regular

26   corporate contributors; and (7) certainty of payment in the event of the corporation's insolvency or

27   liquidation." *See id.* The Complaint pleads facts supporting all but the first factor: the parties

28   intended the investment as an equity infusion, Cassidy and Li Qi agreed that Li Qi would not

1    enforce the maturity date or seek interest until a new investor was found, Li Qi got significant

2    additional voting rights, the form and structure was significantly different from prior loans, and the

3    parties understood that Li Qi and his entities would not be repaid if the Debtors failed. (¶ 311.)

4        The Li Qi Entities also contend that Hong Kong law controls pursuant to a choice of law

5    provision and the Trustee failed "to plead facts supporting a claim for recharacterization under

6    Hong Kong law." (LQE Mot. at 34.) The Trustee pleaded numerous facts, and the Li Qi Entities do

7    not argue that Hong Kong law is any different from California law. "Absent a showing to the

8    contrary, it is presumed that foreign law is the same as the law of the forum." *See, e.g.*, *AMA*

9    *Multimedia, LLC v. Sagan Ltd.*, 720 F. App'x 873, 874 (9th Cir. 2018).

10        **B.  Count XIV states a claim for violation of the automatic stay.**

11        The Li Qi Entities state that the Complaint fails to plead how the Singapore Injunction

12    Action violated any of the eight subsections of § 362. (LQE Mot. at 34-35.)[32] The Li Qi Entities

13    are wrong for three reasons. First, this Court has already found that the Singapore Injunction "was

14    obtained in violation of the stay and it is void." Sep. 29, 2017 Hrg. Tr. 44:1-8. That ruling is now

15    the law of the case. *See In re Martinez*, 2019 WL 6112676, at *2 (Bankr. N.D. Cal. Nov. 15, 2019).[33]

16    Second, § 362(a)(1) applies because the Singapore Injunction Action involved not only the

17    bankruptcy proceedings but also the board members' pre-petition conduct, and thus it "could have

18    been commenced before the commencement of" the Debtors' bankruptcy proceedings. *See* §

19    362(a)(1). Third, the injunction violated § 362(a)(3), which bars "any act to obtain possession of

20    property of the estate or of property from the estate or to exercise control over property of the

21    estate." This section prevents the dismemberment of the estate and assures orderly distribution of

22    assets. *In re City of San Bernardino*, 558 B.R. 321, 327 (C.D. Cal. 2016). Put simply, an injunction

23    which prevents the Debtors and the Trustee from acting, including taking action to collect assets of

24    the Debtors, violates the automatic stay because it "reduces money available to the estate, and thus

25    reduces the pot of money available to distribute to creditors." *Id.* at 328.

26

27

---

[32] The Li Qi Entities do not dispute that the Complaint pleads the other elements necessary for the Trustee to recover

28    damages for a stay violation. *See In re Preserve, LLC*, 2018 WL 4292023, at *8 (B.A.P. 9th Cir. Sep. 7, 2018).

[33] In the bankruptcy context, "case" refers to both the main case and all related adversary proceedings. *Id.*

1

**VII.    Count XV states a claim for disallowance of claims.**

2

Both Minsheng and the Li Qi Entities contend that Count XV fails because the other claims

3

fail. (Yuntian Mot. at 35; LQE Mot. at 35.) The Complaint states numerous claims. Accordingly,

4

the Complaint states a claim for disallowance of the Defendants' claims.

5

**VIII.    In the event of dismissal, the Court should grant leave to re-plead.**

6

The Complaint states each of the claims alleged, but even if it did not, the proper remedy

7

here would be a dismissal without prejudice and with leave to replead. Leave to amend should be

8

granted unless the court "determines that the pleading could not possibly be cured by the allegation

9

of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc); *Bly–Magee v.*

10

*California*, 236 F.3d 1014, 1019 (9th Cir. 2001) (holding that when dismissing for failure to comply

11

with Rule 9(b) "leave to amend should be granted unless the district court determines that the

12

pleading could not possibly be cured by the allegation of other facts"); *see also Knevelbaard*

13

*Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 983 (9th Cir. 2000) ("An order granting [a motion to

14

dismiss] must be accompanied by leave to amend unless amendment would be futile").

15

**CONCLUSION**

16

The Trustee thus respectfully requests that the Court deny all three Motions in their entirety.

17

DATED: January 31, 2020                    DLA PIPER LLP (US)

18

By: */s/ John K. Lyons*

19

ROBBIN L. ITKIN

20

JOHN K. LYONS (*Pro Hac Vice*)
JEFFREY S. TOROSIAN (*Pro Hac Vice*)
JOSEPH A. ROSELIUS (*Pro Hac Vice*)

21

22

Attorneys for the Chapter 7 Trustee

23

24

25

26

27

28

DLA PIPER LLP (US)
LOS ANGELES