I.      Motions Before the Court

        a.    UL/GA/TG Motion to Dismiss

Before the Court is a "Motion to Dismiss Counts I, II, VI, VII, VIII, IX & X and Motion to Strike Counts VIII & I [sic] of Amended Adversary Complaint" (Motion) filed by Universal Leader Investment Limited (UL), Glove Assets Investment Limited (GA), and Truly Great Global Limited (TG, and together with UL and GA, UL/GA/TG).  AP Docket #238.[1] In support of the Motion, UL/GA/TG and Li Qi filed a "Request for Judicial Notice . . ." (UL/GA/TG/LQ RJN).[2]  AP Docket #240.

On 6/3/21, Jonathan D. King (King), in his capacity as chapter 7 trustee (Trustee) of Zetta Jet USA, Inc. (Zetta USA) and Zetta Jet PTE, Ltd. (Zetta Singapore, and together with Zetta USA, Debtors), filed an "Opposition to Defendants Universal Leader Investment Limited, Glove Assets Investment Limited, and Truly Great Global Limited's Motion to Dismiss Counts I, II, VI, VII, VIII, IX & X and Motion to Strike Counts VIII & IX of Amended Adversary Complaint" (Opposition).  AP Docket #259.  In support of the Opposition, the Trustee filed an "Opinion of Rosalind Phelps QC," a "Limited Objection to Requests for Judicial Notice" (Objection to UL/GA/TG/LQ RJN), an "Objection and Motion to Strike Declaration of Peter Ferrer in Support of Li Qi's Motion to Dismiss and Declaration of Harprabdeep Singh,"[3] and a "Request for Judicial Notice" (Trustee RJN). AP Docket #s 259, 260, 261, 262.

On 6/17/21, UL/GA/TG filed: 1) a "Reply in Support of Motion to Dismiss . . . and Motion to Strike . . ." (Reply); 2) a "Supplemental Declaration of Harprabdeep Singh;" 3) a "Declaration of John A. Kimbell QC;" and 4) a "Reply . . . to Trustee's Limited Objection to Request for Judicial Notice . . ." (Reply to RJN Objection).  AP Docket #s 281, 283.

On 6/27/21, UL/GA/TG and Li Qi filed a "Response to Objection and Motion to Strike Declaration of Peter Ferrer in Support of Li Qi's Motion to Dismiss and Declaration of Harprabdeep Singh in Support of UL Defendants' Motion to Dismiss."  AP Docket #294. That same day, they filed an "Objection[] to the . . . Opinion of Rosalind Phelps QC . . . ."  AP Docket #295.

---

[1] All references to "Zetta USA Docket" are to the docket in In re Zetta Jet USA, Inc., 17-bk-21386-SK.  All references to "Zetta Singapore Docket" are to the docket in In re Zetta Jet PTE Ltd., 17-bk-21387-SK.  All references to "AP Docket" are to the docket in King v. Yuntian 3 Leasing Company Designated Activity Company et al., 19-ap-1383-SK.

[2] The UL/GA/TG/LQ RJN was filed in support of UL/GA/TG's Motion and the Li Qi Motion (defined below). AP Docket #240.

[3] The "Declaration of Harprabdeep Singh" was filed on 2/21/20 in support of UL/GA/TG's reply in support of their motion to dismiss Counts 1, 2, 4, 5, 8, 13, 14, and 15 of the original complaint, which was filed on 9/13/19.  AP Docket #62-2.

On 8/4/21, the Trustee filed a "Reply in Support of Objection and Motion to Strike Declarations of Peter Ferrer and Harprabdeep Singh," AP Docket #308, and an "Objection to Supplemental Declaration of Harprabdeep Singh."  AP Docket #309.

      b.  Li Qi Motion to Dismiss

Also before the Court is a "Motion to Dismiss Counts I, II, VII, VIII, and IX of Adversary Complaint for Lack of Personal Jurisdiction, Insufficient Service of Process and Failure to State a Claim" filed by Li Qi (Li Qi Motion).  AP Docket #239.  In support of the Li Qi Motion, Li Qi filed a "Declaration of Li Qi" and a "Declaration of Peter Ferrer."  AP Docket #239.

On 6/3/21, the Trustee filed: 1) a "Motion for Limited Jurisdictional Discovery . . ." (Discovery Motion); and 2) an "Opposition to Defendant Li Qi's Motion to Dismiss Counts I, II, VII, VIII, and IX of Amended Adversary Complaint."  AP Docket #s 255, 257.  In support of the Discovery Motion, the Trustee filed a "Declaration of Joseph A. Roselius."  AP Docket #255.  In support of the Opposition to Li Qi Motion, the Trustee filed a "Declaration of Joseph A. Roselius" and a "Witness Statement of Nicholas Charles Burkill."  AP Docket #257.

On 6/16/21, Li Qi filed an "Opposition to Trustee's Motion for Jurisdictional Discovery" and a "Supplemental Declaration of Peter Ferrer."  AP Docket #274.

On 6/23/21, the Trustee filed: 1) a "Reply in Support of Motion for Limited Jurisdictional Discovery . . . ," with a "Witness Statement of Nicholas Charles Burkill" and a "Second Witness Statement of Nicholas Charles Burkill," AP Docket #288; 2) a "Request for Judicial Notice in Support of the Trustee's Reply in Support of Motion for Limited Jurisdictional Discovery . . . ," AP Docket #289; and 3) an "Objection and Motion to Strike Supplemental Declaration of Peter Ferrer in Support of Defendant Li Qi's Opposition to Trustee's Motion for Jurisdictional Discovery," AP Docket #290.

On 7/9/21, Li Qi filed a "Reply in Support of Motion to Dismiss Counts I, II, VII, VIII, and IX of Amended Adversary Complaint for Lack of Personal Jurisdiction, Insufficient Service of Process, and Failure to State a Claim."  AP Docket #305.

On 8/11/21, the Court held a hearing on the: 1) Motion and 2) the Li Qi Motion.  During the hearing, counsel for the Trustee and UL/GA/TG and Li Qi appeared and were given an opportunity to be heard.  At the conclusion of the hearing, the Court took the Motion and the Li Qi Motion under submission.  Based on the argument in the pleadings and argument of counsel during the hearing, and for the reasons stated in the analysis below, the Court rules as follows: the Motion to dismiss Counts 1, 2, 6, 7, 8, 9, and 10 is granted without leave to amend.  Because Li Qi is only named as a defendant in Counts 1, 2, 7, 8, and 9, all of which are being dismissed, the Court need not address the issues raised in the Li Qi Motion or the Discovery Motion.

This memorandum constitutes the Court's findings of facts and conclusions of law regarding the legal sufficiency of the counts at issue in the Motion.

II.    Facts

a.    Bankruptcy Cases

On 9/15/17, Zetta USA and Zetta Singapore filed chapter 11 petitions (collectively, Cases).  Zetta USA Docket #1; Zetta Singapore Docket #1.  King was appointed as the chapter 11 trustee, and after the Cases were converted, he was appointed as the chapter 7 trustee.  Zetta USA Docket #s 159, 452, 458.

b.    Adversary Proceeding

On 9/13/19, the Trustee filed an adversary complaint (Original Complaint) against: 1) Yuntian 3 Leasing Company Designated Activity Company f/k/a Yuntian 3 Leasing Company Limited (Yuntian 3); 2) Yuntian 4 Leasing Company Designated Activity Company f/k/a Yuntian 4 Leasing Company Limited (Yuntian 4); 3) Minsheng Financial Leasing Co., Ltd. (Minsheng Financial); 4) Minsheng Business Aviation Limited (Minsheng Business); 5) Export Development Canada (EDC); 6) UL; 7) GA; 8) TG; and 9) Li Qi (collectively, the Defendants), which alleged that Zetta Singapore was formed and run by a con artist, Geoffrey Cassidy (Cassidy),[4] who, over a two-year period, with the help of the Defendants, obtained $10 million from kickbacks, bribes and embezzlement, while saddling the Debtors with almost $500,000,000 in unsustainable debt incurred by purchasing overpriced aircraft in a down market.  AP Docket #1.

The Original Complaint contained the following counts against the following parties:

| Count # | Type of Claim | Statute(s) | Defendant(s) | Page # |
|---|---|---|---|---|
| I | Avoidance and Recovery of Fraudulent Transfers (2015 Acquisitions) | 11 U.S.C. §§ 548, 550 | Universal Leader; Glove Assets;  Li Qi | 30 |
| II | Avoidance and Recovery of Fraudulent Transfers (Plane 6 and Plane 7) | 11 U.S.C. §§ 548, 550 | Li Qi; Universal Leader; Glove Assets; Yuntian 3; Minsheng Financial; and Minsheng Business | 30 |
| III | Avoidance and Recovery of Preference Transfer | 11 U.S.C. §§ 547, 550 | In the Alternative – Against Yuntian 3 | 34 |
| IV | Avoidance and Recovery of Preference Transfers (Plane 6 Loan Transfers) | 11 U.S.C. §§ 547, 550 | In the Alternative – Against Li Qi, Universal Leader and Glove Assets | 36 |
| V | Avoidance and Recovery of Preference Transfer ($55 Million Transfer) | 11 U.S.C. §§ 547, 550 | In the Alternative – Against Li Qi and Universal Leader | 37 |
| VI | Avoidance and Recovery of Fraudulent Transfers | 11 U.S.C. §§ 548, 550 | In the Alternative - Against Minsheng Business and Yuntian 4 | 39 |
| VII | Turnover of Property of the Bankruptcy Estate | 11 U.S.C. § 542 | In the Alternative – Against Yuntian 4, Minsheng Business, and Minsheng Financial | 40 |
| VIII | Avoidance and Recovery of Preference Transfers (Interest Payment Transfers) | 11 U.S.C. §§ 547, 550 | Universal Leader;  Li Qi | 41 |
| IX | Avoidance and Recovery of Preference Transfer | 11 U.S.C. §§ 547, 550 | EDC; Yuntian 4 | 42 |
| X | Avoidance and Recovery of Preference Transfer | 11 U.S.C. §§ 547, 550 | Yuntian 4 | 44 |
| XI | Turnover of Property of the Bankruptcy Estate | 11 U.S.C. § 542 | In the Alternative – Against Yuntian 4, Minsheng Financial, and Minsheng Business | 45 |
| XII | Avoidance and Recovery of Preference Transfers (Legal Fees Transfers) | 11 U.S.C. §§ 547, 550 | Minsheng Business; Minsheng Financial; Yuntian 3; Yuntian 4 | 46 |
| XIII | Recharacterization of the Third Investment as Equity Interest | 11 U.S.C. § 105(a) | Universal Leader | 47 |
| XIV | Violation of the Automatic Stay | 11 U.S.C. § 362 | Truly Great; Li Qi | 49 |
| XV | Disallowance of Claims | 11 U.S.C. § 502(d) | Minsheng Financial; Minsheng Business; Yuntian 3; Yuntian 4; Universal Leader; Glove Assets; EDC | 50 |

AP Docket #1.

i.    Yuntian and Minsheng Motions to Dismiss

The Court granted in part and denied in part a "Motion to Dismiss Counts II, III, VI, VII, IX, X, XI, XII, and XV of Adversary Complaint" filed by Yuntian 3 and Yuntian 4 (Yuntian

---

[4] Cassidy was the Debtors' Managing Director and a Director of Zetta Singapore.  FAC ¶ 29.

MTD), and a "Motion to Dismiss Counts II, VI, VII, XI, XII, and XV of Adversary Complaint" filed by Minsheng Business (Minsheng MTD),[5] dismissing Counts 2, 3, 6, 9, 10, 11, and 12, with leave to amend those counts  (Original Yuntian/Minsheng Ruling). AP Docket #s 32, 44, 175, 186.

### ii. UL/GA/TG Motion to Dismiss

The Court granted in part and denied in part a "Motion to Dismiss Counts I, II, IV, V, VIII, XIII, XIV, & XV of Adversary Complaint" filed by UL/GA/TG (Original UL/GA/TG MTD), dismissing the following counts with leave to amend those counts (Original UL/GA/TG MTD Ruling):

| Count # | Type of Claim | Statute(s) | Defendants |
|---|---|---|---|
| 1 | Avoidance and Recovery of Fraudulent Transfer (2015 Acquisitions) | 11 U.S.C. §§ 548; 550 | UL, GA, and Li Qi |
| 2 | Avoidance and Recovery of Fraudulent Transfers (Plane 6 and Plane 7) | 11 U.S.C. §§ 548; 550 | Li Qi, UL, GA, Yuntian 3, Minsheng Financial, and Minsheng Business |
| 4 | In the Alternative, Avoidance and Recovery of Preference Transfers (Plane 6 Loan Transfers) | 11 U.S.C. § 547; 550 | Li Qi, UL, and GA |
| 5 | In the Alternative, Avoidance and Recovery of Preference Transfer ($55 Million Transfer) | 11 U.S.C. § 547; 550 | Li Qi and UL |
| 8 | Avoidance and Recovery of Preference Transfers (Interest Payment Transfers) | 11 U.S.C. § 547; 550 | UL and Li Qi |
| 13 | Recharacterization of the Third Investment as Equity Interest | 11 U.S.C. § 105(a) | UL |
| 15 | Disallowance of Claims | 11 U.S.C. § 502(d) | Minsheng Financial, Minsheng Business, Yuntian 3, Yuntian 4, UL, GA, |

AP Docket #s 45, 174, 188.

### iii. EDC Motion to Dismiss

The Court granted a "Motion to Dismiss Counts IX and XV of Adversary Complaint . . ." filed by EDC, dismissing Count 9 with leave to amend, and dismissing Count 15 with leave to amend if EDC filed a proof of claim.  AP Docket #s 88, 173, 187.

### iv. First Amended Complaint

On 3/29/21, the Trustee filed a First Amended Complaint (FAC) and approximately two months later, he filed a redlined FAC, which contain the following counts against the following parties:

| Count # | Type of Claim | Statute(s) | Defendant(s) | Page # |
|---|---|---|---|---|
| 1 | Avoidance and Recovery of Fraudulent Obligations and Subsequent Transfers Made on Account of Such Obligations (Plane 6 and Plane 7 Finance Leases) | 11 U.S.C. §§ 548, 550 | Universal Leader; Glove Assets; Li | 99 |
| 2 | Avoidance and Recovery of Fraudulent Obligations and Transfers on Account of Such Obligations (Minsheng Refinancing) | 11 U.S.C. §§ 548, 550 | Li  Universal Leader  Glove Assets  Yuntian 3  Minsheng Financial  Minsheng Business | 103 |
| 3 | Avoidance and Recovery of Fraudulent Transfers | 11 U.S.C. §§ 548, 550 | In the Alternative – Against Yuntian 4, Minsheng Business and Yuntian 4 | 111 |
| 4 | Turnover of Property of the Bankruptcy Estate | 11 U.S.C. § 542 | In the Alternative – Against Yuntian 4, Minsheng Business, and Minsheng Financial | 113 |
| 5 | Turnover of Property of the Bankruptcy Estate | 11 U.S.C. § 542 | Yuntian 4; Minsheng Financial; Minsheng Business | 117 |
| 6 | Recharacterization of the Third Investment as Equity Interest | 11 U.S.C. § 105(a), 502 | Universal Leader | 120 |
| 7 | Violation of the Automatic Stay | 11 U.S.C. § 362 | Truly Great; Li | 120 |
| 8 | Recharacterization of 2016 Plane 6 Lease Agreement | 11 U.S.C. § 105(a) | In the Alternative – Against Minsheng Business, Yuntian 3, Li, Glove Assets, and Universal Leader | 122 |
| 9 | Recharacterization of Yuntian 3 (Plane 7) 2016 Plane 7 Lease Agreement | 11 U.S.C. § 105(a) | In the Alternative – Against Minsheng Business, Yuntian 3, Li, Glove Assets, and Universal Leader | 123 |
| 10 | Disallowance of Claims Under 11 U.S.C. § 502(d) and Assertions of Counterclaims Under 28 U.S.C. §157(b)(2)(C) | N/A | Yuntian 3; Yuntian 4; Universal Leader; Glove Assets | 125 |

AP Docket #s 232, 253.

The FAC alleges the following:

---

[5] In the Minsheng MTD, Minsheng Business, which is an affiliate of Yuntian 3 and Yuntian 4, indicated that it was represented by the same counsel as Yuntian 3 and Yuntian 4 and that each substantive argument in the Yuntian MTD applied "with full force to the Trustee's claims asserted against Minsheng," and it incorporated by reference the Yuntian MTD.  Minsheng MTD at 7.  Therefore, the Court analyzed the Yuntian MTD and the Minsheng MTD together.  AP Docket #175 at 3 n.2.

1) Cassidy was a con artist.  FAC ¶¶ 74-78.
2) On 7/15/15, Cassidy, James Seagrim (Seagrim) and Matthew Walter (Walter)[6] incorporated Zetta Singapore.  Id. ¶¶ 79-84.
3) Cassidy had actual and effective control of key functions of Zetta Singapore and drove it into an immediate financial crisis by purchasing high-priced aircraft that saddled the company with almost half a billion dollars in insurmountable debt.  Id. ¶¶ 85-90.
4) Cassidy funded a "lifestyle of the rich and famous" at the Debtors' expense by accepting bribes and kickbacks, stealing funds, and operating the Debtors as a Ponzi-like scheme.  Id. ¶¶ 91-150.
5) The Debtors were insolvent almost from the inception of Zetta Singapore in July 2015.  Id. ¶¶ 151-65.
6) Cassidy knew or was substantially certain that his actions would hinder, delay, or defraud the Debtors' creditors.  Id. ¶¶ 166-73.
7) Li Qi, through UL, provided a $50 million loan to Zetta Singapore to buy a Bombardier Global Express 6000 with manufacturer serial number (MSN) 9688 (Plane 6).  The fair market value of Plane 6 was $39 million.  Zetta Singapore paid for Plane 6 with an 11/24/15 $2 million transfer from UL to Bombardier, Inc.[7] and a 12/6/15 $48 million transfer from UL to Zetta Singapore, and Zetta Singapore then paid Bombardier Aerospace Corporation $46.3 million on 12/15/15 and $1 million 12/28/15.  Zetta Singapore and GA documented the $48 million loan via a 12/29/15 agreement for Zetta Singapore to "lease" Plane 6 (2015 Plane 6 Lease).  Id. ¶¶ 174-77, 180-83.  Plane 6 was required to be registered with the Federal Aviation Agency (FAA) and operated by Zetta USA.  Id. ¶ 178.
8) Li Qi also provided a $50 million loan to Zetta Singapore to buy a Bombardier Global Express 6000 with MSN 9606 (Plane 7), which was owned by UL and was worth $37.6 million as of November 2015.  Id. ¶¶ 174-77, 204.  On 12/31/15, Zetta Singapore entered into an agreement with UL to "lease" Plane 7.  Id. ¶¶ 176, 204-05.  Plane 7 was required to be registered with the FAA and operated by Zetta USA.  Id. ¶ 178.
9) Li Qi used his companies, including UL, TG, and GA, interchangeably and as alter egos of one another and treated them as extensions of himself.  Id. ¶¶ 54-64.
10) The Debtors incurred obligations regarding Planes 6 and 7 in the US.  UL, GA, and the Debtors:
   a. Ensured that the transactions for the 2015 Plane 6 Lease and 2015 Plane 7 Lease closed in the US to enable the Debtors to register Planes 6 and 7

---

[6] Seagrim was the Debtors' Director of Operations and a Director of both Zetta Singapore and Zetta USA. FAC ¶ 31.  Walter was the Debtors' Director of Sales and a Director of both Zetta Singapore and Zetta USA. Id. ¶ 32.

[7] The FAC does not mention repayment of this $2 million transfer.

with the FAA and operate them under Zetta USA's Part 135 certificate,[8] id. ¶ 178;

b. Required that Zetta Singapore confirm that it "became obliged" to GA under the 2015 Plane 6 Lease and UL under the 2015 Plane 7 Lease when it took delivery of Planes 6 and 7 at Windsor Locks, Connecticut, id. ¶ 178, 193;

c. Wanted the transactions for Planes 6 and 7 to close in Connecticut because Connecticut law exempted aircraft sales from sales and use tax, id. ¶ 178;

d. Used a US corporate trustee, Wells Fargo Bank Northwest, N.A. (Wells Fargo) to act as the principal "lessor" party and the "owner" to satisfy US citizenship requirements for FAA registration, id.;

e. Used a US law firm in Oklahoma to conduct the closings and file closing documents with the FAA, id.;

f. Required that Planes 6 and 7 be maintained at a US maintenance facility, id.; and

g. Required all payments to be made to "[UL]'s bank account in New York" in US dollars, id. ¶¶ 178, 406.

11) During the summer of 2016, Cassidy engineered a refinancing of the 2015 Plane 6 Lease and 2015 Plane 7 Lease by Minsheng Business and Minsheng Financial (Minsheng Refinancing). The Minsheng Refinancing added over $10 million in incremental debt to the Debtors' balance sheet (not including $4.5 million that Cassidy took from the closing proceeds), duplicated debt on Plane 6, paid UL $55 million for Plane 7 (which was worth $35.7 million at most by this time), and provided Minsheng Business and Minsheng Financial with $12.4 million, some of which was used for down payments on four aircraft, only one of which was ever delivered. Id. ¶¶ 229-317.

a. The Minsheng Refinancing closed in the US. Id. ¶ 11.

b. All closing payments from the Minsheng Refinancing were made into and through US bank accounts to bolster FAA registration of Planes 6 and 7. Id. ¶¶ 11, 272-74. Additional payments under the Minsheng Refinancing were "likely either made through banks that were subject to US laws or through US-based intermediary correspondent banks." Id. ¶ 11.

c. As part of the Minsheng Refinancing, Yuntian 3 (through Wells Fargo as lessor) and the Debtors (through TVPX ARS, Inc. (TVPX) as trustee and lessee) entered into: i) a 9/20/16 "Aircraft Lease Agreement" for Plane 6 (Minsheng Plane 6 Lease), and ii) a 9/20/16 "Aircraft Lease Agreement" for Plane 7 (Minsheng Plane 7 Lease). Id. ¶¶ 258-59. The Debtors and Yuntian 3 deliberately chose US-based corporate trustees to act as the principal contract parties under the Minsheng Plane 6 Lease and Minsheng Plane 7 Lease to meet FAA US citizenship requirements. Id. ¶ 275.

---

[8] A Part 135 certificate is an "Air Carrier and Operator Certificate" issued under 14 C.F.R. Part 135 by the FAA, which is required to operate certain commercial charter flights in the US. Id. ¶ 78.

d. As a condition of closing under the Minsheng Plane 6 Lease and Minsheng Plane 7 Lease, TVPX simultaneously sub-leased Planes 6 and 7 to Zetta USA as sublessee and operator (Subleases). Id. ¶¶ 262-63.

e. To ensure that Zetta Singapore would be obligated to repay the amount due on Plane 6 after the Minsheng Refinancing, Wells Fargo, UL, GA, Zetta Singapore, and TVPX executed a 9/20/16 "Supplemental Agreement to the Sale and Purchase Agreements and Sale and Leaseback Purchase Clarification" (Clarification). Id. ¶ 265.

f. Yuntian 3, Minsheng Financial, EDC, and Wells Fargo required that the Debtors execute a "Deed of Guarantee and Indemnity Dated September 20, 2016" (Guarantee), which provided that the Debtors, Cassidy and Asia Aviation Company Pte. Ltd. (Asia Aviation),[9] guaranteed all of the obligations under the Minsheng Plane 6 Lease and Minsheng Plane 7 Lease.  FAC ¶ 267.

g. The Daugherty Fowler law firm was retained to act as FAA counsel to: 1) gather signature pages for the Minsheng Refinancing documents; 2) release signature pages in the closing room in Oklahoma City; and 3) file and register documents with the FAA in Oklahoma City. Id. ¶¶ 270-71.

12) In the summer of 2017, in exchange for a 6/27/17 $15 million transfer from UL to Zetta Singapore (6/27/17 Transfer), Seagrim and Walter transferred additional Zetta Singapore shares to TG. Id. ¶¶ 318-23.

13) The "scheme" fell apart in mid-2017, and on 8/22/17, Cassidy and Miranda June Tang Kim Choo were removed from the board and their roles at the Debtors, and on 9/15/17, the Cases were filed. Id. ¶¶ 324-31.

14) Li Qi, via his alter egos, UL and GA, filed proofs of claims in the Cases. Id. ¶ 332.

### 1.  UL/GA/TG Motion to Dismiss

In the Motion, UL/GA/TG move to dismiss the following counts:

1) Avoidance and Recovery of Fraudulent Obligations and Subsequent Transfers (2015 Plane 6 and 7 Leases), under 11 U.S.C. §§ 548 and 550, against UL, GA and Li Qi (Count 1);

2) Avoidance and Recovery of Fraudulent Obligations and Transfers on Account of Such Obligations (Minsheng Refinancing), under 11 U.S.C. §§ 548 and 550 against Li Qi, UL, GA, Yuntian 3, Minsheng Financial, and Minsheng Business (Count 2);

3) Recharacterization of the 6/27/17 Transfer as Equity Interest, under 11 U.S.C. §§ 105(a) and 502, against UL (Count 6);

4) Violation of the Automatic Stay, under 11 U.S.C. § 362, against TG and Li Qi (Count 7);

5) Recharacterization of Minsheng Plane 6 Lease, under 11 U.S.C. § 105(a), against Minsheng Business, Yuntian 3, Li Qi, GA, and UL (Count 8);

---

[9] Asia Aviation was owned by Cassidy and his then-wife, Miranda June Tang Kim Choo, and operated a single jet on behalf of the jet's owner until it merged with Zetta Singapore. Id. ¶ 28.

6) Recharacterization of Minsheng Plane 7 Lease under 11 U.S.C. § 105(a) against Minsheng Business, Yuntian 3, Li Qi, GA, and UL (Count 9); and

7) Disallowance of Claims under 11 U.S.C. § 502(d) and Assertions of Counterclaims under 28 U.S.C. § 157(b)(2)(C), against Yuntian 3, Yuntian 4, UL, and GA (Count 10).

### v.  Settlement Agreement

On 6/8/21, the Court entered an order approving a "Settlement Agreement" among the Trustee, Yuntian 3, Yuntian 4, Minsheng Business, Minsheng Financial, and EDC (Settlement), which provided that:

1) Yuntian 3, Yuntian 4, Minsheng Financial, and Minsheng Business, would pay the Trustee $2,250,000 within 15 days after the entry of the Court order approving the Settlement (Effective Date), and another $2,250,000 on 1/26/22.

2) Within 15 days after the Effective Date, Yuntian 3, Yuntian 4, Minsheng Financial, and Minsheng Business would withdraw their proofs of claims filed in the Cases with prejudice.

3) Within 15 days after the Effective Date, the Trustee would dismiss with prejudice the Trustee's complaints and any amendments thereto against Yuntian 3, Yuntian 4, Minsheng Financial, Minsheng Business, and EDC, and cease pursuing the litigation against them.

Zetta USA Docket #1469-2.

### III.   Legal Standards

Rule 12(b)(6) of the Federal Rules of Civil Procedure (FRCP) applies in adversary proceedings and provides that a party may assert the defense of "failure to state a claim upon which relief can be granted."  Fed. R. Bankr. P. 7012(b); In re Kvassay, 2014 WL 2446181, at *9 (B.A.P. 9th Cir. May 30, 2014).  A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the allegations in the complaint. Lee v. City of L.A., 250 F.3d 668, 688 (9th Cir. 2001); Student Loan Mktg. Ass'n v. Hanes, 181 F.R.D. 629, 634 (S.D. Cal. 1998).  "A Rule 12(b)(6) dismissal may be based on either a 'lack of a cognizable legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.'"  Johnson v. Riverside Healthcare Sys., LP, 534 F.3d 1116, 1121-22 (9th Cir. 2008) (quoting Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990)).

In resolving a Rule 12(b)(6) motion, the Court must construe the complaint in the light most favorable to the plaintiff, and accept all well-plead factual allegations as true. Johnson, 534 F.3d at 1122; Knox v. Davis, 260 F.3d 1009, 1012 (9th Cir. 2001).  The Court, however, is not bound by conclusory statements, statements of law, and unwarranted inferences cast as factual allegations.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-57 (2007); Clegg v. Cult Awareness Network, 18 F.3d 752, 754-55 (9th Cir. 1994).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (citations omitted). A complaint "must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under *some* viable legal theory." Id. at 562 (emphasis in original) (quoting Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1106 (7th Cir. 1984)).

In Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), the Supreme Court elaborated on the Twombly standard:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." . . . A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. . . . Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.

The allegations of a complaint, along with other materials properly before the court on a motion to dismiss, can establish an absolute bar to recovery. See Weisbuch v. Cty. of L.A., 119 F.3d 778, 783 n.1 (9th Cir. 1997) ("If the pleadings establish facts compelling a decision one way, that is as good as if depositions and other expensively obtained evidence on summary judgment establishes the identical facts."). Generally, when ruling on a Rule 12(b)(6) motion to dismiss, courts cannot consider material outside the pleadings. Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988, 998 (9th Cir. 2018); Lee v. City of L.A., 250 F.3d 668, 688 (9th Cir. 2001). If matters outside of the pleadings are "presented to and not excluded by the court," the motion to dismiss is converted to a motion for summary judgment under Rule 56 and all parties must be given a "reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). There are, however, two exceptions to this rule: 1) matters that the Court can take judicial notice of under Rule 201 of the Federal Rules of Evidence; and 2) the incorporation-by-reference doctrine, which treats certain documents as if they were "part of the complaint itself." Khoja, 899 F.3d at 999, 1002.

The party seeking dismissal under Rule 12(b)(6) has the burden of proof. In re Reed, 532 B.R. 82, 88 (Bankr. N.D. Ill. 2015); In re Enron Corp., 316 B.R. 434, 449 (Bankr. S.D.N.Y. 2004).

IV.    Arguments and Analysis

    a.   Requests for Judicial Notice

        i.   UL/GA/TG/LQ RJN

In the UL/GA/TG/LQ RJN, UL/GA/TG and Li Qi request that the Court take judicial notice of various documents filed in the following cases:

| Case | RJN # |
|---|---|
| In re Zetta Jet USA, Inc., 17-bk-21386-SK (Proof of Claim # 95-1) | 1 |
| In re Zetta Jet USA, Inc., 17-bk-21386-SK | 2, 3, 4 , 5 |
| King v. Bombardier, 19-ap-1147-SK | 6, 7, 8 |
| King v. Jetcraft, 19-ap-1382-SK | 9 |
| King v. Yuntian, 19-ap-1383-SK | 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23 |
| Re Zetta Jet PTE Ltd. and others, in the High Court of the Republic of Singapore, Originating Summons No 1391 of 2017 | 24, 25 |
| Truly Great Global Ltd. v. Seagrim, BC694919, California Superior Court | 26, 27 |

UL/GA/TG/LQ RJN at 3-7. [10]

They also request that the Court take judicial notice of a "Confirmatory Deed of Loan," Ex. 12-B, and an "HSBC List of Correspondent Banks" (HSBC List), Ex. 28. Id.

The Trustee objects to the UL/GA/TG/LQ RJN claiming that:

1) UL/GA/TG and Li Qi do not adequately identify what they seek to have judicially noticed;
2) Many requests improperly seek judicial notice of disputed facts or conclusions contained within or drawn from public documents rather than of the existence or filing of documents themselves;
3) Several requests seek judicial notice of irrelevant, non-adjudicative documents and facts;
4) UL/GA/TG and Li Qi have not properly authenticated the HSBC List; and
5) It is unnecessary for the Court to take judicial notice of every document cited in the pleadings.

UL/GA/TG and Li Qi reply that the Court should overrule each of the Trustee's objections. Reply to RJN Objection at 3.

Under Federal Rule of Evidence (FRE) 201, the Court can take judicial notice of "a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." The burden is on the party requesting judicial notice. In re James, 300 B.R. 890, 894 (Bankr. W.D. Tex. 2003)

---

[10] UL/GA/TG and Li Qi request that the Court take judicial notice of Proof of Claim #95-1 filed in the Zetta USA case, which they describe as the "Glove Assets Investment Limited Proof of Claim." UL/GA/TG/LQ RJN at 3. Proof of Claim #95-1 in the Zetta USA case, however, was filed by American Express Bank, FSB. In the Trustee RJN, addressed below, the Trustee requests that the Court take judicial notice of Proof of Claim #95-1 in the Zetta Singapore case, filed by GA.

(ruling that the party requesting judicial notice has the burden of persuading the Court
that the fact is "appropriate for judicial notice").

The Court can take judicial notice of Exhibits 1 through 27, which are: 1) a proof of claim
filed in the Zetta USA bankruptcy case; 2) documents filed in the Zetta USA bankruptcy
case; 3) documents filed in King v. CAVIC Aviation Leasing (Ireland) 22 Co. Designated
Activity Company, 19-ap-1147-SK (CAVIC AP), King v. Jetcraft Corp., 19-ap-1382-SK
(Jetcraft AP), or this adversary proceeding; or 4) documents filed in Re: Zetta Jet Pte
Ltd. and others, in the High Court of the Republic of Singapore (High Court), or Truly
Great Global Ltd. v. Seagrim, BC694919, in California Superior Court (LASC Action).
The Court, however, cannot take judicial notice of any facts or argument contained in
those documents.  See Aceituno v. Vowell (In re Intelligent Direct Mktg.), 2015 WL
925565, at *1 (E.D. Cal. Mar. 3, 2015) (granting a request for judicial notice of proofs of
claims filed in the underlying bankruptcy case because they were public records, and
their authenticity was undisputed); Tuma v. Firstmark Leasing Corp. (In re Tuma), 916
F.2d 488, 491 (9th Cir. 1990) (indicating that when adjudicating issues in an adversary
proceeding, judicial notice can be taken of bankruptcy records in an underlying
proceeding); In re Eckert, 485 B.R. 77, 81 (Bankr. M.D. Pa. 2013) (stating that a
bankruptcy judge may take judicial notice of his or her own docket, but the truth of the
contents of those records is not inferred by a judge taking judicial notice of documents);
Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp., Inc., 99 F.Supp.3d 1110,
1125 (C.D. Cal. 2015) (noting that courts may take judicial notice of public records,
including court records from another case, but cannot take judicial notice of the veracity
of arguments or facts contained in those documents); U.S. ex rel. Robinson Rancheria
Citizens Council v. Borneo, Inc., 971 F.2d 244, 248 (9th Cir. 1992) (indicating that
courts "may take notice of proceedings in other courts, both within and without the
federal judicial system").

Exhibit 12-B, a "Confirmatory Deed of Loan" between Zetta Singapore as borrower and
UL as lender, is an exhibit to Proof of Claim #94-2 filed on 4/6/18 in the Zetta Singapore
bankruptcy case, and the Court may take judicial notice of the fact that Claim #94-2 was
filed but not of any facts contained within it.  See Maxtor Corp. v. Read-Rite (Thai.) Co.,
2003 WL 24902406, at *9 (N.D. Cal. Dec. 4, 2003).

Finally, UL/GA/TG and Li Qi do not suggest that the HSBC List is publicly available but
instead argue that it is "a document provided by HSBC for customers."  UL/GA/TG/LQ
RJN at 8 (citing MAM Apparel & Textiles Ltd. v. NCL Worldwide Logistics USA, Inc.,
2020 WL 4336362, at *4 n.4 (E.D.N.Y. July 28, 2020)).  MAM is distinguishable because
there, the court took judicial notice of a document that was publicly available on the
SWIFT[11] website and not subject to dispute, whereas here, there is nothing before the
Court indicating that the HSBC List is available on the SWIFT website.  Therefore, the

---

[11] SWIFT, or Society Worldwide Interbank Financial Telecommunication, provides an electronic
communication system by the same name for use in interbank correspondence.  MAM, 2020 WL
4336362, at *2 n.3.

Court finds that UL/GA/TG and Li Qi have not met their burden of showing that the HSBC List is subject to judicial notice.

### ii.  Trustee RJN

In the Trustee RJN, the Trustee requests that the Court take judicial notice of documents filed in the following cases:

| Case | RJN # |
|---|---|
| In re Zetta Jet USA, Inc., 17-bk-21386-SK | 1, 2, 3 |
| Truly Great Global Ltd. v. Seagrim, BC694919, California Superior Court | 4, 5, 6 |
| In re Zetta Jet PTE, Ltd., 17-bk-21387-SK (Proofs of Claim #s 94-2 and 95-1) | N/A |

Trustee RJN at 3-5.  UL/GA/TG did not object to the Trustee RJN.

As noted above, the Court can take judicial notice of the fact that documents were filed in the Zetta USA case and in the LASC Action, as well as the fact that proofs of claims were filed in the Zetta Singapore case.  The Court cannot, however, take judicial notice of facts contained in any of those documents.

### b.  Opinion and Declarations

The Court notes that the parties submitted the following opinion and declarations in support of their respective briefs regarding UL/GA/TG's Motion:

| Declaration/Opinion | Docket # | Filed by |
|---|---|---|
| Opinion of Rosalind Phelps QC | 259 | Trustee |
| Supplemental Declaration of Harprabdeep Singh in Support of Defendants Universal Leader Investment Limited, Glove Assets Investment Limited, and Truly Great Global Limited Motion to Dismiss Counts I, II, VI, VII, IX & X and Motion to Strike Counts VII & IX of Amended Adversary Complaint | 281 | UL/GA/TG |
| Declaration of John A. Kimbell QC in Support of Reply Memorandum of Defendants Universal Leader Investment Limited, Glove Assets Investment Limited, and Truly Great Global Limited in Support of Motion to Dismiss Counts I, II, VI, VII, VIII, IX & X and Motion to Strike Counts VIII & IX of Amended Adversary Complaint | 281 | UL/GA/TG |

The fact that these documents were submitted by the parties does not mean that the Motion was converted into one for summary judgment.  "A motion to dismiss is not automatically transformed into a motion for summary judgment simply because matters outside the pleadings are filed with" the court.  If the court ignores "the supplementary materials and determines the motion under the Rule 12(b)(6) standard, no conversion occurs."  Garita Hotel Ltd. P'ship v. Ponce Fed. Bank, F.S.B., 958 F.2d 15, 18-19 (1st Cir. 1992); see also Swedberg v. Marotzke, 339 F.3d 1139, 1146 (9th Cir. 2003) (stating that a Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating, preferably by an explicit ruling, that it considered those materials). Further, supplementary material, which is not considered by the Court when ruling on a Rule 12(b)(6) motion, does not become part of the record.  Trans-Spec Truck Service, Inc. v. Caterpillar Inc., 524 F.3d 315, 321 (1st Cir. 2008); see also Martinez v. Romero, 2011 WL 13277776, at *2 & n.3 (D.N.M. Dec. 29, 2011) (indicating that minutes of a board meeting offered by the plaintiff in opposition to a motion to dismiss were not part

of the record or evidence, were not relied on by the court, and did not convert the motion to dismiss into a motion for summary judgment).

The Court did not consider the opinion, declarations or objections thereto, because they were not relevant to the Court's analysis below regarding Counts 1, 2, 6, 7, 8, 9, or 10. See Marconi v. United States, 2021 WL 1293889, at *2 (N.D. Ind. Apr. 7, 2021) (indicating that while the court could consider a declaration filed in support of a motion to dismiss and convert the motion to one for summary judgment, it need not do so).[12]

c. Presumption Against Extraterritoriality

UL/GA/TG contend that the Bankruptcy Code provisions on which the Trustee relies— §§ 105, 502, 548 and 550—do not apply extraterritorially to the foreign transactions at issue in the Complaint, which are transfers from Zetta Singapore, a Singaporean company's Singapore account, to the Hong Kong account of UL/GA/TG, British Virgin Island (BVI) residents, with Chinese ownership.  Motion at 13, 21-22.  They assert that the relevant contracts are governed by the laws of Singapore, the United Kingdom and Hong Kong.  Id. at 13.  UL/GA/TG argue that the Trustee's new "subterfuge," seeking to avoid the obligations rather than the transfers, which the Court found were extraterritorial, does not change the fact that the transactions at issue are foreign.  Id.

The Trustee responds that this adversary proceeding does not involve extraterritorial application of § 548.  Opposition at 18.  According to the Trustee, UL/GA/TG ignore that the obligations were incurred in the United States, arguing that: 1) signature pages were sent to and released from closing rooms in the US; 2) US corporate trusts acted as principals under the operative documents; and 3) all closing funds for the Minsheng Refinancing were wired into a US bank account and disbursed by a US closing agent to the parties.  Id. (citing FAC ¶¶ 252, 266, 270-71, 275).  He highlights that Zetta Singapore was required to and did accept delivery of Planes 6 and 7 in Connecticut.  Id. (citing UL/GA/TG FAC ¶ 193, Exs. B-2, C, D).  The Trustee contends that virtually "all of the conditions to the effectiveness of the agreement [sic] occurred in the US," which was by design of all parties.  Id. at 20.  According to the Trustee, the Court's Original UL/GA/TG MTD Ruling only addressed transfers, not obligations, under § 548.  Id. at 19.

UL/GA/TG reply that the Court must examine the "focus" of the avoidance statute to determine whether the FAC includes extraterritorial claims.  Reply at 12.  They assert that rather than applying that test, the Trustee directs attention to the location where the obligations were incurred, which the Supreme Court has rejected.  Id. at 12-13 (citing Morrison v. Nat'l Austl. Bank, Ltd., 561 U.S. 247, 267 (2010)).  They argue that this case involves a Singaporean company incurring obligations to transfer funds to a Hong Kong account for the benefit of BVI entities.  Id. at 13.  UL/GA/TG acknowledge that transfers and obligations are not the same, but they assert that the relevant question is whether §

---

[12] Because the Court is not ruling on the substance of the Li Qi Motion, the Court need not consider any declarations, statements, opinions or objections thereto submitted regarding that motion to dismiss.

548 has a different focus when it regulates transfers, rather than obligations.  Id. at 14.
They contend that it does not.  Id.

The Court notes that the parties have diametrically opposing views of the allegations in
the FAC.  UL/GA/TG assert that the statutes which are at issue in Counts 1, 2, 6, 8, 9,
and 10—§§ 105, 502, 548, and 550 of the Bankruptcy Code—do not apply
extraterritorially, as the Court found in the Original UL/GA/TG MTD Ruling.  Motion at
18.  And, they contend that the Trustee's focus in the FAC on the Debtors' obligations,
rather than their transfers of property does not change that fact.  Id. at 18.  In contrast,
the Trustee contends that the Court need not consider or analyze whether the FAC's
allegations involve foreign transfers because he is only seeking to avoid domestic
obligations not transfers.  Opposition at 19.

The Court need not spend much time on the presumption against extraterritorial
application of federal law, because that issue was addressed extensively in the Original
UL/GA/TG MTD Ruling.  AP Docket #174 at 10.  Suffice it to say that unless there is
clear congressional intent to the contrary, "federal laws will be construed to have only
domestic application."  RJR Nabisco, Inc. v. Eur. Cmty., 136 S. Ct. 2090, 2100 (2016).
There is a two-step framework for analyzing whether the presumption against
extraterritoriality has been rebutted.  First, courts consider whether the statute provides
a clear, affirmative indication that it applies extraterritorially.  Id. at 2101.  Second,
courts examine a statute's "focus" to determine whether the case involves a domestic
application.[13]  Id.

        i.  Avoidance and Recovery of Fraudulent Obligations and
            Subsequent Transfers Made on Account of Such Obligations (2015
            Plane 6 and 7 Leases) Under 11 U.S.C. §§ 548, and 550 (Count 1)
            and Avoidance and Recovery of Fraudulent Obligations and
            Transfers on Account of Such Obligations (Minsheng Refinancing)
            Under 11 U.S.C. §§ 548, and 550 (Count 2)

                1.  Breadth of Obligations v. Transfers in § 548

---

[13] During the 8/11/21 hearing, Trustee's counsel highlighted that because UL/GA/TG filed the Motion,
they have the burden of demonstrating that the counts at issue fail to "state a claim upon which relief can
be granted."  Although it is true that a defendant who moves for dismissal under Rule 12(b)(6) has the
burden of proof, a plaintiff seeking to overcome the presumption against extraterritoriality has a "heavy
burden" of showing that: 1) a statute applies abroad; or 2) the case involves domestic application of a
statute.  See Doe v. Tapang, 2019 WL 3576995, at *7 (N.D. Cal. Aug. 6, 2019) (granting a Rule 12(b)(6)
motion to dismiss RICO conspiracy claims because plaintiffs had not met their burden to overcome the
presumption against extraterritoriality by establishing a domestic injury); In re Arcapita Bank B.S.C.(c),
575 B.R. 229, 242 (Bankr. S.D.N.Y. 2017) (indicating that when ruling on motions to dismiss, the party
asserting that a statute applies extraterritorially has the burden); In re Maxwell Commc'n Corp. plc, 186
B.R. 807, 819, 820 (S.D.N.Y. 1995) (indicating that the bankruptcy court did not err in granting a Rule
12(b)(6) motion because plaintiffs had not met their "heavy burden" of showing that Congress
unmistakably intended § 547 to apply abroad).

When assessing extraterritoriality, courts must first determine whether Congress intended the statutes at issue to apply extraterritorially.  Here, Counts 1 and 2 are brought under §§ 548 and 550 and in the Original UL/GA/TG MTD Ruling, the Court exhaustively analyzed § 548 and determined that Congress did not intend it to have extraterritorial effect.[14]  AP Docket #174 at 13-16.  Therefore, the Court's analysis will address § 548's "focus" to determine whether the FAC involves a domestic application.

In the Original Complaint, the Trustee focused on various transfers of the Debtors' property, which the Trustee sought to avoid and the Court found were extraterritorial.  AP Docket #174 at 18-40.  The Trustee's focus has shifted in the FAC from transfers to obligations that the Debtors incurred and which the Trustee seeks to avoid.  FAC ¶¶ 5, 8, 11-12, 19, 89, 96, 138, 147, 149, 165, 171, 178-79, 185, 187-89, 191, 193, 199, 201, 203, 206-08, 211, 213, 221, 248-49, 252, 256, 260, 265, 267, 269, 271, 274, 279, 285, 287-91, 293, 304, 307, 309, 317, 335, 337, 345-46, 348, 353, 357, 364-66, 374-76, 384-85, 394-95, 405, 407, 409, 417-18, 432-33, 435-36, 440, 445-52, 455, 457, 461-62, 465-66, 485, 490, 512, 520.

UL/GA/TG contend that implicit in the Trustee's position is that a transfer has a narrower focus than an obligation, but the Trustee's position is "indefensible as a matter of basic statutory construction."  Motion at 20.  They highlight that in § 548, "'obligation' appears . . . in the same operative language in which 'transfer' appears," and the Court's Original UL/GA/TG MTD Ruling forecloses the Trustee's claims based on obligations.  Id. at 18.  According to UL/GA/TG, if the Trustee's interpretation were correct, then every case that the Court relied on in finding that the transfers at issue were extraterritorial would have been incorrectly decided because they each involved US obligations.  Id. at 20.  They highlight that the Trustee's spotlight on obligations rather than transfers is not new: during the 7/22/20 hearing on the Original UL/GA/TG MTD, he repeatedly asserted that the Court should examine the Debtors' obligations.  Id. at 21.  UL/GA/TG conclude by arguing that the obligations on which the Trustee relies were ancillary and extraneous because they are not the focus of § 548 and avoiding them would accomplish nothing.  Id. at 24.

The Trustee responds that incurring an obligation precedes payment based on the obligation, obligations are determined by the place where the obligation was incurred, and here, the Debtors' obligations were "incurred in the US."  Opposition at 19.  The Trustee also asserts that the Original UL/GA/TG MTD Ruling focused on transfers, not obligations, and does not foreclose Counts 1 and 2.  Id.  He claims that the cases cited by UL/GA/TG are inapposite because none involved an attempt to avoid an obligation.  Id. at 19-20.  The Trustee contends that all of the supposed "extraneous" closing steps were "conditions precedent" to the closings and made the agreements legally effective.  Id. at 20.  According to the Trustee, the rationale of In re Picard ex rel. Bernard L. Madoff Inv. Sec. LLC, 917 F.3d 85, 97 (2d Cir. 2019) applies here because § 548

---

[14]  Title 11 U.S.C. § 550 is a "secondary cause of action" and is implicated only after a trustee prevails under the avoidance sections of the Bankruptcy Code.  In re Patts, 470 B.R. 234, 242 (Bankr. D. Mass. 2012) (internal citations omitted).

regulates the fraudulent transfer of property and the fraudulent incurrence of obligations, both of which may be avoided.  Id. at 21.

In the Reply, UL/GA/TG highlight that the Court must look to the "focus" of a statute to determine whether the FAC contains extraterritorial claims.  Reply at 12.  They argue that instead of applying that test, the Trustee asks the Court to examine the location where obligations were incurred, which the Supreme Court has repeatedly rejected.  Id.  UL/GA/TG contend that § 548 seeks to regulate the incurrence of obligations that "unfairly deplete the debtor's estate [because] the debtor does not receive in exchange a consideration roughly equal in value to the obligation incurred."  Id. at 13 (quoting Rubin v. Mfrs. Hanover Tr. Co., 661 F.2d 979, 989 (2d Cir. 1981)).  They assert that the claims at issue involved extraterritorial application of § 548 because the conduct that depleted the estate was a Singaporean company's obligation to transfer funds to a Hong Kong account for the benefit of BVI entities.  Id.

They note that although transfers and obligations are not the same, the Trustee's argument that transfers are distinct from obligations is unavailing because the relevant question is whether § 548 has a different focus when it regulates transfers rather than obligations.  Id. at 14.  They contend that the Trustee cites no authority supporting his position that § 548 applies a different focus to avoidance of obligations rather than transfers nor does he highlight any language that supports such a distinction.  Id.  UL/GA/TG conclude by arguing that the Trustee improperly seeks to transform Zetta Singapore's extraterritorial obligations into domestic ones by focusing on obligations of entities who were not parties to the obligations—Zetta USA, Crowe Dunlevy, Insured Aircraft Title Services, Inc. (IATS), Daugherty Fowler, as well as others.  Id. at 15 & n.5.

Title 11 U.S.C. § 548(a) provides that:

(a) The trustee may avoid any transfer . . .  of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or become insolvent as a result of such transfer or obligation;

(II)  was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; [or]

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

To address the parties' opposing views of transfers and obligations, the Court must begin by examining the language of § 548 itself.  United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241 (1989) (noting that resolving a dispute over the meaning of a statute begins with the statute's language); Am. Tobacco Co. v. Patterson, 456 U.S. 63, 68 (1982) (indicating that "our starting point must be the language employed by Congress").  If Congress' intent is clear, the Court must give effect to the unambiguously expressed intent of Congress.  In re Lewis, 401 B.R. 431, 438 (Bankr. C.D. Cal. 2009) (citing Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 843-44 (1984)).  Unless otherwise defined, words will be interpreted with their ordinary, common meaning.  Id.  And, courts are cautioned against ascribing to one word in a statute "a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the statute."  Nature v. United States, 250 F.Supp.3d 634, 640 (E.D. Cal. 2017) (citing Yates v. United States, 547 U.S. 528, 543 (2015)) (internal quotation marks omitted).

The Bankruptcy Code defines a "transfer" as "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with—(i) property; or (ii) an interest in property."  11 U.S.C. § 101(54)(D).  Although the Bankruptcy Code does not contain a definition of "obligation," it has been defined as "[a] formal binding agreement or acknowledgment of a liability to pay a certain amount or to do a certain thing . . . a duty arising by contract."  In re Asia Glob. Crossing, Ltd., 333 B.R. 199, 203 (Bankr. S.D.N.Y. 2005); see also Obligation, Black's Law Dictionary (11th ed. 2019) (defining "obligation" as a formal, binding agreement or acknowledgment of a liability to pay a certain amount or to do a certain thing for a particular person or set of persons; especially a duty arising by contract).  Considering the ordinary common meaning of obligation, it is essentially a contract or promise to perform some act or do something in the future.  Here, the Court finds that Congress' intent in referencing both a transfer and an obligation in § 548 is clear: avoiding a transfer means that the property transferred would not belong to the transferee and avoiding an obligation would mean that the debtor is not bound by the agreement or contract.  And, based on the canon of statutory construction that cautions against courts ascribing one word in a statute a meaning that would give unintended breadth to the statute, the Court finds that it would be illogical to attribute a broader meaning to obligation than to transfer.  To the extent that the Trustee advocates that the breadth of obligations should be different from and broader than the breadth of transfers in § 548, the Court disagrees.

Although the Trustee cites In re TSIC, Inc., 428 B.R. 103, 110-11 (Bankr. D. Del. 2010), and In re Tribune Co. Fraudulent Conveyance Litigation, 2018 WL 6329139, at *14

(Bankr. S.D.N.Y. Nov. 30, 2018) his reliance on those cases does not further his position.  Neither case involved the extraterritorial application of § 548.  Instead, both addressed a temporal issue that is not before this Court: when an obligation arises and specifically, when it arises in the context of employment agreements.

In TSIC, TSIC, Inc., f/k/a Sharper Image Corporation (TSIC), filed a § 548 complaint seeking to avoid a $6+ million severance payment to Richard Thalheimer (Thalheimer), its former director and CEO.  In re TSIC, Inc., 428 B.R. 103, 106 (Bankr. D. Del. 2010).  The court noted it needed to resolve whether Thalheimer's entitlement to the severance payment was "fixed on the date the transfer was made or when [TSIC] incurred the obligation."  Id. at 109.  Thalheimer argued that the obligation was incurred in 2002, when he executed an employment agreement, which specified his base salary and a severance package he would receive if terminated.  Id. at 110.  TSIC responded that the relevant transfer was made or incurred within the two-year look-back period because the parties executed a December 2006 settlement agreement after Thalheimer was terminated, which provided that he would receive about $6 million.  Id.  The court noted that although Thalheimer did not actually receive the settlement payment until 2007—when he was no longer a member of the board of directors—§ 548 addresses when transfers were made or incurred, not when they were received.  Id. at 110-11.  The court highlighted that the case presented the "very situation that Congress intended to remedy" when it amended § 548 to address "excessive insider payments under employment contracts that prejudice general unsecured creditors in light of the Enron and WorldCom bankruptcy cases."  Id. at 110.  According to the court, construing "the statute to apply only when [TSIC] made the transfer would contradict the plain meaning of the statute and undermine legislative intent," because "insiders could orchestrate the timing of the transfers, i.e., the payment of severance benefits, to occur after resignation when they are no longer insiders."  Id. at 111.

Similarly, in Tribune the issue confronting the court was when an obligation in the employment context was incurred.  After the Tribune Company (Tribune) suffered "deteriorating business," private-equity investor Sam Zell (Zell) and Equity Group Investments negotiated a leveraged buyout (LBO), which the Tribune's board approved in April 2007.[15]  In re Tribune Co. Fraudulent Conv. Litig., 2018 WL 6329139, at *2-3 (Bankr. S.D.N.Y. Nov. 30, 2018).  Within a year, some Tribune executives (Executives) were involuntarily terminated and received severance payments under the Tribune's "Transitional Compensation Plan for Executive Employees" (Compensation Plan), which was created in 1985 and amended in July 2006.  Id. at *12.  The Tribune continued experiencing financial difficulties and it, and many of its subsidiaries, filed chapter 11 bankruptcies in December 2008.  Id. at *4.  In 2010, the Tribune's Official Committee of Unsecured Creditors (Committee) filed numerous civil actions against the Executives and others, seeking to claw back funds transferred during the LBO.  Id. at *4, 12.  A few years later, the bankruptcy court confirmed the Tribune's reorganization plan and

---

[15] A "leveraged buyout" is the "purchase of a publicly held corporation's outstanding stock by its management or outside investors, financed mainly with funds borrowed from investment bankers or brokers and usu[ally] secured by the corporation's assets."  Buyout, Black's Law Dictionary (11th ed. 2019).

transferred the Committee's claims to Marc Kirschner (Kirschner), litigation trustee for the Tribune Litigation Trust. Id. at *4.

The Executives moved to dismiss the actual and constructive fraudulent conveyance claims, asserting that Kirschner could not avoid payments they received under the Compensation Plan because the Tribune's obligations were incurred at the latest in July 2006, which was more than two years before the Tribune filed bankruptcy. Id. at *13. Kirschner responded that the Tribune did not become liable to make any severance payments until the Executives were terminated, which was within two years before the bankruptcy filing. Id. at *12, 13. The court noted that the Bankruptcy Code treats "debt" and "obligation" as equivalent terms and a debt or an obligation is incurred when a contract or agreement is formed, not when payment is due. Id. at *13. According to the court, the relevant contract was formed with the Executives when they began participating in the Compensation Plan (generally on their hiring date) or the date when it was last amended (July 2006), whichever was later. Id. at *15. Because the latest known hiring date of any Executives was September 2006—more than two years before the petition date, the court held that that Kirschner's claims seeking avoidance of the Tribune's obligations under the Compensation Plan failed. Id. at *16.

In contrast to TSIC and Tribune, this case does not involve an employment contract or address the date when an obligation might have been incurred. Instead, the issue before the Court regarding Counts 1 and 2 is whether the obligations alleged in the FAC are extraterritorial or domestic.

UL/GA/TG cite Rubin v. Manufacturers Hanover Trust Co., 661 F.2d 979 (2d Cir. 1981), to support their position that the focus of § 548 is obligations that deplete the Debtors' estate. Reply at 14. Although like the cases cited by the Trustee, Rubin did not address the extraterritorial application of § 548, it did involve a fundamental issue before the Court: what the focus of that statute is when a trustee seeks to avoid an obligation.

In Rubin, bankruptcy trustees for U.S.N., Inc. and Universal Money Order Co., Inc. (collectively USN/UMO), companies that issued money orders to persons without checking accounts, sought to recover funds and securities from Manufacturers Hanover Trust Co. (MHT). Rubin, 661 F.2d at 980. MHT was the principal banker for John Trent and Eugene Skowron (Trent/Skowron), who owned numerous businesses, including USN/UMO and had a controlling interest in National Payroll Services Ltd. (National) and TWO Check Cashing Corp. (TWO), holding companies that owned check cashing corporations. Id. at 982. The check cashers who were sales agents for USN/UMO continuously needed cash, and beginning in 1964, Trent/Skowron caused USN to arrange for its sales agents to receive lines of credit from MHT. Id. at 983. MHT obtained a series of guarantees and cross-guarantees from various entities in the Trent/Skowron business network for the lines of credit (Guarantees). Id. at 983-84. Eventually, the Trenton/Skowron entities became financially unstable, MHT stopped extending credit to UMO check cashers, and UMO and USN filed bankruptcy. Id. at 986. Under the Guarantees, MHT seized the remaining funds in USN's and UMO's

checking accounts, sold securities pledged by UMO as collateral, and applied those sums toward repayment of National's and TWO's outstanding credit lines.  Id. at 986-87.

Two years later, Herbert Rubin and Eliot Lumbard, USN's and UMO's bankruptcy trustees (collectively USN/UMO Trustees), filed an avoidance and recovery action against Trent, Skowron, and MHT to recover the value of USN's/UMO's assets that had been applied to National's and TWO's debts under the Guarantees.  Id. at 987. Although the district court dismissed the USN/UMO Trustees' avoidance and recovery cause of action, the Second Circuit reversed and remanded, finding that the district court had incorrectly applied § 67(d) of the Bankruptcy Act's consideration and insolvency requirements.  Id. at 987-88, 996.  The Second Circuit also noted that there was a dispute regarding the date when the obligations were incurred.  Id. at 989.  The USN/UMO Trustees argued that USN and UMO incurred obligations as guarantors of National's and TWO's debt whenever they drew on their lines of credit.  Id. at 989. According to the USN/UMO Trustees, National and TWO drew on the lines of credit in September and December 1976, and USN/UMO filed bankruptcy in January 1977, within § 67(d)'s one-year look back period.[16]  Id. at 989.  MHT responded that USN and UMO made the transfers and incurred the obligations in 1972 and 1975, when they executed the Guarantees.  Id. at 989-90.

The Second Circuit agreed with the USN/UMO Trustees, noting that USN/UMO incurred obligations in 1976 when National and TWO last drew on their lines of credit.  Id. at 990. According to the court, whenever National and TWO borrowed under the lines of credit, they incurred repayment obligations under their financing arrangements with MHT and Trent/Skowron became contingently liable to discharge the check cashers' obligations upon default.  Id.  Likewise, in the event of a default, USN/UMO, as secondary guarantors, become contingently liable on those obligations.  Id.  Therefore, the court held that USN/UMO incurred a contingent obligation of repayment whenever National and TWO borrowed under the lines of credit, which they did within the one-year period. Id.  In the analysis, the court noted that the focus of § 67 of the Bankruptcy Act, which was at issue in Rubin, was obligations that "unfairly deplete the debtor's estate if the debtor does not receive in exchange a consideration roughly equal in value to the obligation incurred."  Id. at 989.[17]

Rubin is informative because it highlights that the focus of § 67 of the Bankruptcy Act, which is indistinguishable from § 548, is obligations that "unfairly deplete the debtor's estate."  With Rubin in mind, the Court considers the focus of § 548 as it applies to the facts of this case.

---

[16] Before enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA), the avoidance period under 11 U.S.C. §§ 548(a)(1)(A) and (B) was one year.  See In re TSIC, Inc., 428 B.R. 103, 109-10 (Bankr. D. Del. 2010) (indicating that the enactment of BAPCPA extended the one-year look-back period for fraudulent transfers to two years).

[17]  Although Rubin was decided under § 67 of the Bankruptcy Act, it is for "all intents and purposes indistinguishable from § 548(a)(1)."  In re Adler, Coleman Clearing Corp., 218 B.R. 689, 706-07 (Bankr. S.D.N.Y. 1998); see also Roy v. Fed. Nat'l Mortg. Ass'n, 76 B.R. 188, 190 (Bankr. N.D. Fla. 1987) (indicating that § 67(d) was the precursor of § 548 and they are indistinguishable).

### a.  The Focus of § 548

To determine whether a case involves domestic or foreign application of statutes, courts must analyze the "focus" of the relevant statutes.  RJR Nabisco, Inc. v. Eur. Cmty., 136 S. Ct. 2090 (2016); Morrison v. Nat'l Austl. Bank Ltd., 561 U.S. 247 (2010).  As the Court noted in the Original UL/GA/TG MTD Ruling, the question whether transactions are foreign or domestic depends "very heavily" on the facts of each case.  AP Docket #174 at 24 (citing In re Arcapita Bank B.S.C.(c), 575 B.R. 229, 246 (Bankr. S.D.N.Y. 2017)).

UL/GA/TG contend that the obligations the Trustee seeks to avoid are obligations to make the same transfers that the Court previously found were extraterritorial.  Motion at 21 (citing Docket #174 at 24).  UL/GA/TG highlight that the salient aspects of the transfers were that Zetta Singapore, a Singaporean entity, transferred funds from its Singapore account to UL/GA/TG, all BVI entities, into their Hong Kong account.  Id. at 21-22.  They contend that because the act of transferring these funds was non-domestic, so too are the obligations/promises to make these transfers.  Id. at 22.  They argue that the Trustee's attempt to circumvent the Court's prior ruling by characterizing the transfers as involving US banks is unavailing because the Court previously ruled that the use of intermediary banks does not transform a foreign transaction into a domestic one.  Id.  And, they assert that to the extent the Trustee contends that the US banks were more than intermediaries, such an argument is belied by the payment instructions attached to the FAC, which are identical to the ones the Court relied on in the Original UL/GA/TG MTD Ruling.  Id.  UL/GA/TG note that even though the Trustee now focuses on obligations, he does not actually seek to avoid obligations, which were not incurred by Zetta Singapore, such as TVPX's obligation to maintain aircraft's FAA registration.  Id. at 23.  They highlight that "if the conduct relevant to the focus [of the statute] occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory."  Id. at 23-24 (citing RJR Nabisco, Inc. v. Eur. Cmty., 136 S. Ct. 2090, 2101 (2016)).

The Trustee does not directly address the "focus" of § 548, instead arguing that the obligations he seeks to avoid were incurred entirely in the US:

1) Zetta USA's Part 135 certificate, which was issued by the FAA and required to operate commercial charter flights in the US, was critical to all of the financing deals.  Opposition at 16 (citing FAC ¶¶ 8, 178).
2) The 2015 Plane 6 Lease and 2015 Plane 7 Lease required Planes 6 and 7 to be FAA registered and immediately subleased to Zetta USA and operated under its Part 135 certificate.  Id. (citing FAC ¶¶ 178, 254, 269).
3) UL/GA/TG prepared acknowledgement of delivery certificates requiring Zetta Singapore to confirm that it "became obliged" under the 2015 Plane 6 Lease and 2015 Plane 7 Lease when it took delivery of those aircraft in Windsor Locks, Connecticut.  Id. at 16, 18, 20 (citing FAC ¶¶ 178, 193, Exs. B-2, C, D).

4) The 2015 Plane 6 Lease, 2015 Plane 7 Lease, and Minsheng Refinancing closed in the US. Id. at 16-17 (citing FAC ¶ 11). UL, GA, and the Debtors wanted those closings to occur in Connecticut because Connecticut law exempted aircraft sales from sales and use tax. Id. at 16-17 (citing FAC ¶ 11).

5) Yuntian 3 and the Debtors chose US corporate trusts, Wells Fargo and TVPX, to act as principals under the Minsheng Plane 6 Lease and Minsheng Plane 7 Lease. Id. at 18 (citing FAC ¶ 275).

6) All closing payments from the Minsheng Refinancing were made into and through US bank accounts. Id. at 16, 17, 18 (citing FAC ¶¶ 11, 272-74).

7) Additional payments under the Minsheng Refinancing were "likely to be made through banks that were subject to US laws or through US-based intermediary correspondent banks." Id. at 17 (citing FAC ¶ 11).

8) The parties to the Minsheng Refinancing—the Debtors, UL, GA, Yuntian 3, Minsheng Financial, EDC, Cassidy, and Asia Aviation, FAC ¶¶ 249-68—sent their signature pages to closing agents in the US and, upon satisfaction of the closing conditions, including acceptance and delivery of Planes 6 and 7 in the US, signature pages were released and documents were filed with the FAA in Oklahoma City. Id. at 17, 18, 20 (citing FAC ¶¶ 252, 266, 269-71, 276-77).

9) Zetta USA signed the Guarantee and the Subleases in the US when it signed and delivered its signatures to a US closing room. Id. at 17, 18-19 (citing FAC ¶¶ 262-63, 266-68, 270-71).

10) Planes 6 and 7 had to be maintained at a US base. Id. at 17 (citing FAC ¶ 178).

11) UL/GA/TG required the Debtors to make payments in US dollars or to US bank accounts, which necessitated the use of US intermediary or correspondent banks. Id. at 17 (citing FAC ¶ 406).

The Trustee challenges UL/GA/TG's contention that the closing steps were "ancillary" and avoiding them would accomplish nothing. Id. at 20. He asserts that the release of signature pages in Oklahoma City had the same legal effect as if the parties were present and signed the agreements there and virtually "all of the conditions to the effectiveness of the agreement [sic] occurred in the US," which was "by design of all of the parties to the agreements." Id. He highlights that the 2015 Plane 6 Lease and 2015 Plane 7 Lease required Zetta Singapore to confirm that it accepted delivery in Connecticut, at which point it was obligated to pay. Id. According to the Trustee, this was not just an ancillary obligation, but rather an "unequivocal confirmation" required by UL/GA/TG that Zetta Singapore incur its payment obligations in the US. Id.

UL/GA/TG reply that the Trustee wants the Court to examine where the obligations were allegedly incurred, but the Supreme Court has repeatedly rejected attempts to substitute location-based tests for the focus test. Reply at 12-13 (citations omitted). According to UL/GA/TG, § 548 regulates the incurrence of obligations that unfairly deplete the debtor's estate, which they assert were to make lease and loan payments, not any ancillary conduct the Trustee cites. Id. at 14-15. Finally, UL/GA/TG highlight that the Trustee relies on obligations of non-parties to the transactions, such as Zetta USA, which § 548 does not govern. Id. at 15-16.

22

To determine the conduct that is relevant to the analysis, the Court must consider the "focus" of the avoidance and recovery provisions (§§ 548, and 550), which is the transfer or obligation that "depletes the property that would have become property of the estate." In re CIL Ltd., 582 B.R. 46, 93 (Bankr. S.D.N.Y. 2018); In re Ampal-Am. Isr. Corp., 562 B.R. 601, 613 (Bankr. S.D.N.Y. 2017) (same); In re Sherwood Invs. Overseas Ltd., Inc., 2015 WL 4486470, at *19 (Bankr. M.D. Fla. July 22, 2015), aff'd 2016 WL 5719450 (M.D. Fla. Sept. 30, 2016) ("Courts applying the extraterritoriality presumption to fraudulent transfers typically hold that the proper focus is the *transfers* sought to be avoided, not the parties' relationship or locus." (emphasis in original)); see also Rubin v. Mfrs. Hanover Tr. Co., 661 F.2d 979 (2d Cir. 1981) (noting that the focus of § 67 of the Bankruptcy Act was obligations that "unfairly deplete the debtor's estate").

The Trustee relies on the following to support his contention that Counts 1 and 2 involve domestic application of § 548: FAA registration and operation of Planes 6 and 7 under Zetta USA's Part 135 certificate; US closings; use of US professionals in transactions; use of corporate trustees to comply with FAA regulations; maintenance of the aircraft at a US base; payments being made in US dollars; and funds for the 2015 Plane 6 Lease, 2015 Plane 7 Lease and Minsheng Refinancing being routed through US banks. Opposition at 16-20; FAC ¶¶ 8, 11, 178, 191-92, 211-12, 254, 269-70, 272-75, 347-48, 351-53, 406.   Unfortunately for the Trustee, in the Original UL/GA/TG MTD Ruling, the Court considered and rejected the Trustee's contention that each of these US ties transmuted extraterritorial transactions into domestic ones.

The Trustee also mentions the following to support his position that the obligations at issue were US-based:

1)  Zetta Singapore confirmed that it became "obliged" to pay GA under the 2015 Plane 6 Lease and UL under the 2015 Plane 7 Lease when it accepted delivery of the aircraft in Connecticut.  FAC ¶¶ 178, 192-93, 213, 350, 355; Ex. B-2 at 10; Ex. C at 68; Ex. D at 6.
2)  UL, GA, and the Debtors wanted the 2015 Plane 6 Lease and the 2015 Plane 7 Lease to close in Connecticut because Connecticut law exempted aircraft sales from sales and use tax.  FAC ¶ 178.
3)  The Minsheng Refinancing closed in the US, and additional payments under the Minsheng Refinancing were "likely either made through banks that were subject to US laws or through US-based intermediary correspondent banks."  FAC ¶ 11.
4)  Signature pages for the 2015 Plane 6 Lease and 2015 Plane 7 Lease and for the Minsheng Refinancing—including for the Subleases, Clarification, and Guarantee—were sent to closing agents in the US and, once the closing conditions were met, the signature pages were released and documents were filed with the FAA in Oklahoma City.  Id. ¶¶ 192, 194, 212, 214, 252, 262-63, 266-71, 276-77, 349, 351, 354, 356.

In Count 1, the obligations that allegedly depleted the estate were Zetta Singapore's agreeing to make the $11.9 million of transfers outlined in FAC Schedule A for Planes 6 and 7, and the $55 million transfer ($55M Transfer) to UL from the proceeds of the

Minsheng Refinancing.  FAC ¶¶ 451-55.  The Court previously addressed the: 1) six transfers listed in Schedule A—from Zetta Singapore's account in Singapore through an HSBC account in New York for credit to UL's account in Hong Kong; [18] and 2) $55M Transfer from Minsheng Business's Hong Kong account, through an IATS New York escrow account, to UL's account in Hong Kong, and found them to be foreign.  AP Docket #174 at 32-34; see also FAC ¶¶ 272-73 & Sch. D (showing the flow of funds from the Minsheng Refinancing between transferors and recipients).

In Count 2, the obligations that allegedly depleted the estate were:

1) Disbursing funds from the Minsheng Refinancing, including:
   a. The $55M Transfer from Minsheng Business's Hong Kong account, through IATS's New York account, to UL's Hong Kong account, FAC ¶ 466 & Sch. D; and
   b. The $12.4 million transfer ($12.4M Transfer) from Minsheng Business's Hong Kong account, through IATS's New York account, to Minsheng Business's Hong Kong account, id. ¶ 466 & Sch. D;
2) Transferring $10,148,723 from Zetta Singapore's Singapore account, through an HSBC New York account, to UL's Hong Kong account, which Zetta Singapore was required to pay under the Clarification (Plane 6 Loan Transfers),[19] id. ¶ 466 & Sch. B; and
3) Making "rent" and goodwill transfers under the Minsheng Plane 6 Lease, Minsheng Plane 7 Lease, and the Subleases, totaling over $17.3 million, from Zetta Singapore's Singapore account to either Minsheng Business's Hong Kong account or Yuntian 3's Ireland account, id. ¶ 466 & Sch. C.

The Court previously considered the $55M Transfer, the $12.4M Transfer, the Plane 6 Loan Transfers, and the $17.3 million of rent and goodwill transfers in the Original UL/GA/TG MTD Ruling and the Yuntian/Minsheng MTD Ruling and held that they were extraterritorial.  AP Docket #s 174 at 33-35; 175 at 32-34.

---

[18] In the FAC, the Trustee alleges that these six transfers were sent to UL's "US bank account at HSBC Bank in New York, USA."  FAC ¶¶ 195, 215 (citing FAC Exs. B-2, D).  The documents on which the Trustee relies, however, contradict the Trustee's allegations that UL had a US bank account.  Exs. B-2 and D show that the transfers under the 2015 Plane 6 Lease and 2015 Plane 7 Lease were sent from Zetta Singapore's HSBC account in Singapore, through an HSBC account in New York, for credit to UL's HSBC account in Hong Kong.  FAC Ex. B-2 § 3.26; Ex. D § 3.26.  "[W]hen an exhibit to a complaint is inconsistent with the complaint's allegations, the exhibit controls."  Nguyen v. Bank of Am., NA, 563 Fed. Appx. 558, 558 (9th Cir. 2014).  Further, the Court previously considered the documents on which the Trustee relies and held that the transfers were foreign.  AP Docket #174 at 32.  And, routing transfers through an HSBC account in New York does not affect the extraterritoriality analysis.  See In re Maxwell Commc'n Corp. plc, 186 B.R. 807, 817 n.5 (S.D.N.Y. 1995) (holding that a transfer was foreign where the transfer was made from an MCC Natwest account in London to Barclays's branch in New York, through which all payments made to Barclays in dollars were routed, and the funds were then immediately credited to MCC's London Barclays account).

[19] The Trustee alleges "on information and belief" that "a US Correspondent Bank was involved in" the Plane 6 Loan Transfers.  FAC Sch. B.  Assuming that were true, as the Court must when ruling on a Rule 12(b)(6) motion to dismiss, the use of a domestic intermediary bank account does not make a foreign transfer domestic.  See In re Maxwell Commc'n Corp. plc, 186 B.R. 807, 817 n.5 (S.D.N.Y. 1995).

None of the activity that the Trustee highlights pertains to the focus of § 548, which is the transfer or obligation that *depletes* the estate.  As the Supreme Court has explained, the mere existence of domestic conduct does not mean that a statute is being applied domestically.  See RJR Nabisco, Inc. v. Eur. Cmty., 136 S. Ct. 2090, 2101 (2016) (noting that if the relevant conduct occurred abroad, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in the US); Morrison v. Nat'l Austl. Bank Ltd., 561 U.S. 247, 266 (2010) (stating that the presumption against extraterritoriality would be a "craven watchdog indeed if it retreated to its kennel" whenever some domestic activity is involved).

The Trustee contends that § 548 focuses on the initial fraudulent conduct—either a fraudulent transfer of an asset or the fraudulent incurrence of an obligation—that "depletes" the estate to the detriment of the unsecured creditors.  But, the problem for the Trustee, is the obligations on which he relies, did not deplete the estate of anything.  The requirements that: 1) Planes 6 and 7 be: a) FAA registered and operated under Zetta USA's Part 135 certificate; b) delivered to Connecticut for FAA registration and tax purposes; c) maintained at US bases; 2) Zetta Singapore confirm that it became "obliged" to pay GA and UL under the 2015 Plane 6 Lease and 2015 Plane 7 Lease, respectively, when it took delivery of the aircraft in Windsor Locks, Connecticut; and 3) payments be made in US dollars, did not deplete the estate.  Likewise, the occurrence of closings in the US, the use of US professionals in the Minsheng Refinancing and of US corporate trustees to meet FAA citizenship requirements, the routing of payments through US banks, and the signature pages from the Minsheng Refinancing being sent to and released from US closing rooms and filed with the FAA in Oklahoma City, do not pertain to the depletion of the estate.  Finally, the FAC's allegation that additional payments under the Minsheng Refinancing were "likely either made through banks that were subject to US laws or through US-based intermediary correspondent banks," FAC ¶ 11, is vague and insufficient to demonstrate that the obligations that the Trustee seeks to avoid were domestic.

2.  The Avoidance and Recovery of Extraterritorial Transfers
Based on Domestic Obligations

UL/GA/TG contend that even if the Court were to find that the obligations at issue were domestic, the foreign transfers are extraterritorial and not recoverable under 11 U.S.C. § 550.  Motion at 24.  UL/GA/TG highlight that under § 550, the Trustee can only recover property "to the extent a transfer is avoided under . . . § 548."  Id.

The Trustee responds by noting that a general purpose of the Bankruptcy Code's avoidance provisions, including § 548, is to protect "a debtor's estate from depletion to the prejudice of the unsecured creditor."  Opposition at 21 (quoting In re Picard, ex rel. Bernard L. Madoff Inv. Sec. LLC, 917 F.3d 85, 91, 93 (2d Cir. 2019), petition for cert. denied 2020 WL 2814770 (U.S. June 1, 2020) (No. 19-277)).  Although the Trustee recognizes that Picard did not involve fraudulently incurred obligations—as are alleged in the FAC—he asserts that its rationale applies with equal force here.  Id.  The Trustee

contends that by avoiding the obligations under the 2015 Plane 6 Lease, the 2015
Plane 7 Lease, and the Minsheng Refinancing, "which constituted the initial depletion of
the estate, the counterpart provisions of [§] 548 may be invoked to avoid transfers to
pursue remedial relief on account of this regulated conduct since any repayment of an
avoided obligation is unquestionably not made for reasonably equivalent value and may
be set aside provided the other statutory requirements are met." Id. at 21-22.  The
Trustee concludes by arguing that he seeks to recover the "transfers made on account
of the fraudulently incurred obligations under [§] 548 as a second step in the avoidance
and recovery process." Id. at 22.

UL/GA/TG reply that avoiding an obligation does not permit a trustee to recover
property because § 550(a) only permits recovery to the extent a transfer is avoided.  Id.
at 16.  They argue that Picard does not warrant disregarding the Bankruptcy Code.  Id.
at 16-17.  According to UL/GA/TG, if the Trustee could avoid transfers without showing
they were domestic, the presumption of extraterritoriality would be "toothless." Id. at 17.
They conclude that because avoidance of transfers is prerequisite to recovery of
transfers and this Court has already ruled the transfers were foreign, the mere
avoidance of obligations would not permit recovery.  Id.

In the context of § 550, it is important to note the distinction between avoiding a transfer
and avoiding an obligation.  If the Trustee were successful in avoiding a transfer, he
could recover the property transferred or the value of that property under § 550.  In re
Asia Glob. Crossing, Ltd., 333 B.R. 199, 202 (Bankr. S.D.N.Y. 2005).  In contrast, if the
Trustee were successful in avoiding an obligation, the obligation would be rendered
unenforceable but there would be nothing to return to the estate and § 550 would afford
the Trustee no remedy.  Id.; see also In re MacMenamin's Grill Ltd., 450 B.R. 414, 429
(Bankr. S.D.N.Y. 2011) (noting that if a transfer is avoided it is recoverable under § 550
but if an obligation is avoided, it reduces "dollar for dollar the claims that the estate must
pay" but there is nothing to preserve or bring back into the estate); In re Lewis, 574 B.R.
536, 540 n.15 (Bankr. E.D. Pa. 2017) (indicating that when a trustee successfully avoids
an obligation under § 548, the obligation is rendered unenforceable leaving no property
or asset to return and if the trustee succeeded in his attempt to avoid an obligation on a
loan, the obligation to repay the loan would be rendered unenforceable but the transfer
of the loan proceeds would not be avoided).

Although the Trustee asserts that Picard's rationale supports his position, the Court
disagrees.  In Picard, Bernard L. Madoff Investment Securities LLC (Madoff Securities),
a US-based entity transferred billions of dollars from its New York JP Morgan Chase
account to several foreign "feeder funds,"[20] which then transferred the money to foreign
investors.  In re Picard, ex rel. Bernard L. Madoff Inv. Sec. LLC, 917 F.3d 85, 91, 93 (2d
Cir. 2019), petition for cert. denied 2020 WL 2814770 (U.S. June 1, 2020) (No. 19-277).
Irving Picard (Picard), the trustee for the liquidation of Madoff Securities, filed avoidance

---

[20] A "feeder fund" is an entity that pools money from numerous investors and then places it into a "master
fund" on their behalf.  Id. at 92.  A "master fund," which is what Madoff Securities advertised its funds to
be, pools investments from multiple feeder funds and then invests the money.  Id.

and recovery actions under §§ 548 and 550 against the foreign feeder funds, who moved to dismiss.  Id. at 91.  The bankruptcy and district courts held that the avoidance and recovery claims should be dismissed based on the presumption against extraterritoriality or international comity principals.  Id. at 91, 94.  Both courts reasoned that Picard could not recover property that one foreign entity received from another foreign entity.  Id.

The Second Circuit reversed, noting that when a trustee seeks to avoid and recover subsequently transferred property under §§ 548(a) and 550(a), the relevant transfer that must be avoided is the initial transfer.  Id. at 98.  The Second Circuit rejected the lower courts' test that considered the subsequent transfer, reasoning that the relevant conduct was Madoff Securities's "fraudulent *transfer* of property, not the transferees' *receipt* of property."  Id. at 100 (emphasis in original).  The court expressed no opinion regarding whether a domestic debtor or a transfer of property from a US bank account would be sufficient to support a finding of a domestic transfer.  Id. at 99 n.9.  Because Madoff Securities was a domestic entity, which transferred property from its US account to the foreign feeder funds, the court held that the transfers were domestic.  Id.

Here, the Trustee attempts to analogize the conduct that occurred in the US in Picard— the transfer of a US-based company's funds from that company's US account—to Cassidy's fraudulent conduct.  Opposition at 21-22.  He highlights that that the FAC alleges that Cassidy fraudulently incurred obligations in the US under the 2015 Plane 6 Lease, the 2015 Plane 7 Lease and the Minsheng Refinancing.  Id. at 21.  Unfortunately for the Trustee, the obligations that he highlights as occurring in the US—documents sent to the US for signature, maintenance of Planes 6 and 7 at a US facility, payment in US dollars, use of US professionals and corporate trustees, and delivery of Planes 6 and 7 in Connecticut—are not analogous to the initial transfers in Picard because those obligations are not the focus of § 548 and did not deplete the estate.  See WesternGeco LLC v. ION Geophysical Corp., 138 S. Ct. 2129, 2137 (2018) (explaining that the "focus" of a statute is the "object of its solicitude," which can include the conduct that it "seeks to regulate" and the parties and interests it "seeks to protect" or vindicate).  They were preliminary steps to the conduct that actually depleted the estate, which was the transfer of funds from:

1) Zetta Singapore's Singapore account through an HSBC New York account to UL's Hong Kong account;
2) Minsheng Business's Hong Kong account, through an IATS New York escrow account, to UL's Hong Kong account;
3) Minsheng Business's Hong Kong account, through an IATS New York account, back to Minsheng Business's Hong Kong account; and
4) Zetta Singapore's Singapore account to Minsheng Business's Hong Kong account or Yuntian 3's Ireland account.

The Trustee also provides a brief analysis of In re International Manufacturing Group, Inc., 2016 WL 7163588 (Bankr. E.D. Cal. Dec. 6, 2016), in arguing that upon avoidance of a fraudulently incurred obligation, which constituted the initial depletion of the estate,

"the counterpart provisions of Section 548 may be invoked to avoid transfers. . . ."
Opposition at 21-22.  The Trustee's reliance on this case is misplaced.  It did not
address whether obligations were extraterritorial or domestic or whether a domestic
obligation to make a foreign transfer would be sufficient under § 548 to avoid a transfer
based on that obligation.  Further, it involved a trustee seeking to avoid obligations to
invalidate security interests, which would render them void, allowing her to recover
payments made on those obligations from the collateral.  In contrast, here, the FAC
does not allege, nor does the Trustee suggest, that he seeks to avoid obligations to
invalidate security interests.

ii.   Proofs of Claims

In addition to the issues addressed above, the primary area of disagreement between
the parties regarding Counts 1, 2, as well as Counts 6, 8, 9, and 10 is the impact of
UL/GA/TG's filing proofs of claims (POCs).[21]  The Trustee contends that because
UL/GA/TG filed the POCs, they submitted themselves to the Court's jurisdiction and
waived any challenges that they had to the extraterritorial application of §§ 105(a), 502,
548 and 550.  Opposition at 22-26.  In contrast, UL/GA/TG contend that filing the POCs
subjects them to the Court's jurisdiction to adjudicate those claims but does not
transmute extraterritorial transactions into domestic ones.  Reply at 17-19.

UL/GA/TG highlight that in the Original UL/GA/TG MTD Ruling, the Court held that filing
a proof of claim does not render an extraterritorial transaction domestic because it
would "effectively expand the reach of §§ 547, 548 and 550, beyond what those statutes
provide."  Motion at 19 (citing AP Docket #174 at 42).  The Trustee responds that Li Qi,
through UL and GA, filed POCs totaling more than $72 million regarding the same
obligations that UL/GA/TG assert the Court lacks power to avoid under § 548 based on
extraterritoriality.  Opposition at 22-23.  According to the Trustee, it would be unfair for
UL/GA/TG to keep transfers made under the 2015 Planes 6 and 7 Leases and to take
the lion's share of funds available through the claims process without repaying $35.7
million to the estates.[22]  Id. at 25-26 (citing Off. Comm. of Unsecured Creditors v.

---

[21] The FAC alleges that Li Qi, via his alter egos, UL and GA, filed a $35,660,808.18 unsecured claim,
POC #94-2, and a $43,208,715.74 unsecured claim, POC #95-1.

[22] According to the Trustee, UL/GA/TG fraudulently received approximately $35.7 million because Zetta
Singapore paid:

1)  $6,305,382 more than fair market value on account of obligations for Planes 6 and 7: $3,065,043
    more than fair market value for Plane 6, and $3,240,339 more than fair market value for Plane 7,
    FAC ¶¶ 199, 218.  The Trustee's calculation of the amounts alleged in the FAC differs from the
    Court's by $1.  The FAC indicates that Zetta Singapore actually paid $5,944,068 on obligations
    under the 2015 Plane 6 Lease and the monthly financing cost for comparable aircraft at fair
    market value should have been $2,879,025, resulting in excess payments of $3,065,042.  FAC ¶
    199.  But, $5,944,068 - $2,879,025 = $3,065,043.

2)  $19.2 million more than fair market value for Plane 7 under the Minsheng Refinancing, FAC ¶
    286.  According to the FAC, the Minsheng Refinancing resulted in UL receiving $55 million from

Hancock Park Capital II, L.P., 714 F.3d 1141, 1148 (9th Cir. 2013)).  The Trustee highlights that the 6/27/17 Transfer and the Minsheng Plane 6 Lease and Minsheng Plane 7 Lease are property of the estate under § 541, which has no extraterritorial limitations.  Id. at 26 (citing In re Simon, 153 F.3d 991, 995 (9th Cir. 1998); Kismet Acquisition, LLC v. Icenhower (In re Icenhower), 757 F.3d 1044 (9th Cir. 2014)).

UL/GA/TG reply that the Court correctly held that filing proofs of claims does not transmute extraterritorial transactions into domestic ones because "only Congress, not litigants, can determine the breadth of [a] statute," and the Trustee's position would effectively expand the reach of §§ 548 and 550 "beyond what those statutes provide, which Morrison indicated, courts should not do."  Reply at 17-18 (quoting AP Docket #174 at 43).  UL/GA/TG contend that the Trustee incorrectly conflates the Court's jurisdiction over a case with the merits of whether a statute regulates non-domestic conduct, highlighting that:

> to ask what conduct § 10(b) . . . reaches is to ask what conduct § 10(b) prohibits, which is a merits question.  Subject-matter jurisdiction, by contrast, refers to a tribunal's power to hear a case. . . . It presents an issue quite separate from the question whether the allegations the plaintiff makes entitle him to relief.

Id. at 18 (quoting Morrison v. Nat'l Austl. Bank Ltd., 561 U.S. 247, 254 (2010) (internal quotations and citations omitted)).  According to UL/GA/TG, proofs of claims establish the Court's jurisdiction to adjudicate controversies, including whether obligations are avoidable under § 548.  Id. at 18.  But, they contend that the Trustee cannot prevail merely by establishing subject-matter jurisdiction, he must also establish that a statute applies to his claim and the substantive elements are met.  Id.  They contend that whether the obligations are domestic is a merits question, separate from the Court's jurisdiction to decide a dispute.  Id.  They assert that the Trustee cites cases holding that bankruptcy courts have broad jurisdiction over the claims administration process but he does not cite any case suggesting that a bankruptcy court can apply a statute to conduct outside its scope.  Id. at 19.  They discount the Trustee's fairness argument, noting that in the Ninth Circuit, policy considerations alone are insufficient to overcome the presumption against extraterritoriality.  Id. (citing AP Docket #174 at 16).  According to UL/GA/TG, the Trustee can pursue foreign fraudulent transfers but cannot do so under US law.  Id.  UL/GA/TG conclude by arguing that because the Court's "jurisdiction to resolve a dispute does not include the power to expand a statute, the Court should _exercise_ its jurisdiction and dismiss the Trustee's claims on the _merits_."  Id. (emphasis in original).

---

the Debtors for Plane 7, which was worth at most, $35.7 million.  Id. ¶¶ 250, 273(a), 285-86.  The Court calculates that difference as $19.3 million rather than $19.2 million.

3)   $10,149,893 in duplicate financing for Plane 6, FAC Sch. B.

Opposition at 24-25.

As an initial note, when ruling on the Original UL/TG/GA MTD, this Court rejected the Trustee's argument—that UL/GA/TG's "deliberate and voluntary decision" of filing the POCs waived the presumption against extraterritoriality.  AP Docket #174 at 40-44.  The Trustee again cites <u>Katchen v. Landy</u>, 382 U.S. 323, 329-30 (1966), and <u>Langenkamp v. Culp</u>, 498 U.S. 42, 44-45 (1990), which are unavailing because neither case addressed or involved extraterritorial application of the Bankruptcy Code or provide support for the Trustee's position that filing the POCs extends §§ 548 and 550 to extraterritorial conduct.  AP Docket #174 at 44.  And, the Trustee's citations to <u>Northern Pipeline Construction Co. v. Marathon Pipe Line Co.</u>, 458 U.S. 50, 54 (1982), <u>Pepper v. Litton</u>, 308 U.S. 295, 304 n.11 (1939), and <u>U.S. Fidelity & Guaranty Co. v. Bray</u>, 225 U.S. 205, 216-17 (1912), which did not involve extraterritoriality issues but instead stand for the proposition that bankruptcy courts can adjudicate claims as part of the claims allowance process or in the context of fraudulent transfer or preference actions, are likewise unpersuasive.

According to the Supreme Court, a court's jurisdiction to adjudicate a matter is separate from whether a statute regulates extraterritorial conduct.  <u>See</u> <u>RJR Nabisco, Inc. v. Eur. Cmty.</u>, 136 S.Ct. 2090, 2109 (2016) (differentiating between whether a federal court has jurisdiction to adjudicate a claim and whether the court has authority to recognize a cause of action under US law); <u>Morrison v. Nat'l Austl. Bank Ltd.</u>, 561 U.S. 247, 254 (2010) (indicating that to ask what conduct a statute reaches is a merits question, whereas subject-matter jurisdiction refers to a court's power to hear a case, which is a separate issue from whether the allegations entitle the plaintiff to relief).  And, the Trustee's fairness argument does not further his position because in the Ninth Circuit, policy considerations alone are insufficient to overcome the presumption against extraterritoriality.  <u>In re Bankr. Est. of Midland Euro Exch. Inc.</u>, 347 B.R. 708, 719 (Bankr. C.D. Cal. 2006) (citing <u>Subafilms, Ltd. v. MGM-Pathe Commc'ns Co.</u>, 24 F.3d 1088, 1096 (9th Cir. 1994)).

Although the Trustee cites <u>In re Simon</u>, 153 F.3d 991 (9th Cir. 1998), and <u>Kismet Acquisition, LLC v. Icenhower (In re Icenhower)</u>, 757 F.3d 1044 (9th Cir. 2014), to support his position that the 6/27/17 Transfer and the Minsheng Planes 6 and 7 Leases are property of the estate under § 541, his reliance on those cases is not persuasive.  Opposition at 26.  In the Original UL/GA/TG MTD Ruling, the Court extensively analyzed <u>Simon</u>, 153 F.3d 991 (9th Cir. 1998), explained why it was inapposite, and found that UL's and GA's filing the POCs did not waive the presumption against extraterritoriality.  AP Docket #174 at 41-43.

The Trustee's reference to <u>Kismet Acquisition, LLC v. Icenhower (In re Icenhower)</u>, 757 F.3d 1044 (9th Cir. 2014), is likewise unavailing.  In <u>Icenhower</u>, Jerry and Donna Icenhower (Icenhowers) bought a Mexican villa (Villa).  <u>Id.</u> at 1047.  A few years later, they bought a shell company, H&G, and transferred their interest in the Villa to H&G.  <u>Id.</u> at 1048.  Then, they filed bankruptcy.  <u>Id.</u>  About six months later, H&G sold its interest in the Villa to Alejandro Diaz-Barba and Martha Barba de la Torre (Diazes).  <u>Id.</u>  The chapter 7 trustee, Gerald Davis (Davis), filed avoidance and recovery actions, alleging that H&G was the Icenhowers' alter ego and the Villa's sale to the Diazes was an

unauthorized postpetition transfer.  Id.  Shortly thereafter, Kismet Acquisition, LLC (Kismet) bought the estate's assets and was substituted for Davis in both avoidance actions.  Id. at 1048-49.

After trial, the bankruptcy court held that the transfer of H&G's interest in the Villa to the Diazes was an unauthorized postpetition transfer avoidable under § 549(a) and Kismet could recover the Villa or its value from the Diazes, as initial transferees.  Id. at 1049.  The district court affirmed.  Id.  On appeal, the Diazes argued that the bankruptcy court erred by applying US law extraterritorially.  Id. at 1047, 1050-51.  The Ninth Circuit disagreed, noting that "Congress intended extraterritorial application of the Bankruptcy Code [§ 549] as it applies to property of the estate."  Id. at 1051 (quoting In re Simon, 153 F.3d 991, 996 (9th Cir. 1998)).  Because the bankruptcy court ruled that H&G was the Icenhowers' alter ego and substantively consolidated it with their bankruptcy estate, the Ninth Circuit held that the Villa was property of the estate as of the petition date.  Id.

Icenhower is readily distinguishable.  Here, Counts 1 and 2 seek avoidance and recovery under §§ 548 and 550, Count 6 seeks recharacterization of the 6/27/17 Transfer as equity under §§ 105 and 502, Counts 8 and 9 seek recharacterization of the Minsheng Plane 6 Lease and Minsheng Plane 7 Lease as financings rather than true leases under § 105, and Count 10 seeks disallowance of claims under § 502.  In contrast, Kismet involved a § 549(a) action, which governs transfers and avoidance of "property of the estate."  11 U.S.C. § 549(a).  None of the statutes at issue in Counts 1, 2, 6, 8, 9, or 10 address "property of the estate."

Further, although the Trustee claims that this Court has exclusive jurisdiction under § 541 to determine what is "property of the estate," neither case the Trustee cites— Official Committee of Unsecured Creditors v. Hancock Park Capital II, L.P. (In re Fitness Holdings International, Inc.), 714 F.3d 1141 (9th Cir. 2013), nor In re Ames Department Stores, Inc., 542 B.R. 121 (Bankr. S.D.N.Y. 2015)—involved issues of extraterritoriality.  Fitness Holdings addressed whether the debtor's "pre-bankruptcy transfer of funds to its sole shareholder, in repayment of a purported loan, may be a constructively fraudulent transfer under 11 U.S.C. § 548(a)(1)(B)" and Ames addressed whether the bankruptcy court or a state court had jurisdiction to adjudicate disputes regarding Ames Department Stores, Inc. and its affiliates.  In re Fitness Holdings, 714 F.3d at 1143; In re Ames Dep't Stores, 542 B.R. at 126-27.  Therefore, the Court disagrees with the Trustee's argument that UL/GA/TG's filing of POCs allows the Court to apply §§ 105(a), 502, 548 and 550 to extraterritorial conduct.

iii.   Recharacterization of the 6/27/17 Transfer as Equity Interest Under 11 U.S.C. §§ 105(a) and 502 (Count 6)

UL/GA/TG argue that in Count 6—which is nearly identical to Count 13 of the Original Complaint—the Trustee seeks to recharacterize a loan from UL to Zetta Singapore as equity under 11 U.S.C. § 105(a).  Motion at 26.  They contend that the Court ruled that Count 13 of the Original Complaint was extraterritorial because the relevant transaction—a transfer from UL's Hong Kong account to Zetta Singapore's Singapore

account and the transfer of Zetta Singapore's stock to TG—had no US involvement and § 105 does not have extraterritorial scope.  Id.  The Trustee responds by focusing on UL/GA/TG's filing the POCs.  Opposition at 25.  UL/GA/TG reply that the Trustee's claim for recharacterization in Count 6 is an extraterritorial application of § 105(a), which the Court rejected.  Reply at 12, 34 (citing AP Docket #174 at 18, 36-37, 50; Original Complaint ¶¶ 308-12).

Title 11 U.S.C. § 105(a) provides that:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.  No provision of this title . . . shall be construed to preclude the court from . . . making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

The power granted to bankruptcy courts under § 105 is not limitless.  Section 105(a) "does not allow the bankruptcy court to override explicit mandates of other sections of the Bankruptcy Code."  Law v. Siegel, 571 U.S. 415, 421 (2014) (internal quotation marks omitted); see also Jamo v. Katahdin Fed. Credit Union (In re Jamo), 283 F.3d 392, 403 (1st Cir. 2002) (indicating that § 105(a) "does not provide bankruptcy courts with a roving writ, much less a free hand" and it may be invoked only if an equitable remedy "is necessary to preserve an identifiable right conferred elsewhere in the Bankruptcy Code") (citing Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 969 (1988)); see also In re Dairy Mart Convenience Stores, Inc., 351 F.3d 86, 92 (2d Cir. 2003) (stating that § 105(a) provides bankruptcy courts with the power to exercise equity in carrying out provisions of the Bankruptcy Code, rather than to further the purposes of the Code generally, or otherwise to do the right thing, and an exercise of § 105 power must be tied to another Bankruptcy Code section and not merely to a general bankruptcy concept or objective) (emphasis in original).

Here, Count 13 of the Original Complaint sought to recharacterize the 6/27/17 Transfer under 11 U.S.C. § 105(a) as an equity investment by Li Qi.  Original Complaint ¶¶ 309-10.  It alleged that in exchange for $15 million from UL, Walter and Seagrim agreed to transfer 20% of Zetta Singapore's outstanding shares to TG—which was also controlled and owned by Li Qi—resulting in Li Qi receiving additional equity in Zetta Singapore.  Id. ¶ 311.  In the Original UL/GA/TG MTD Ruling, the Court dismissed Count 13 based on the presumption against extraterritoriality and held that: 1) § 105 contains no extraterritorial reference; and 2) there were no allegations of any US involvement with the 6/27/17 Transfer.  AP Docket #174 at 17-18, 36-37.

Although the Court granted the Trustee leave to amend Count 13, the substance of Count 6 of the FAC is virtually identical to that of Count 13.  Compare Original Complaint ¶¶ 308-12 (Count 13), with FAC ¶¶ 499-503 (Count 6).  The Court recognizes that the Trustee did add a reference to 11 U.S.C. § 502 in the caption of FAC Count 6. But, citing § 502 does not alter the fact that Count 6's allegations are unchanged from

those in Count 13 of the Original Complaint or that UL/GA/TG's filing the POCs does not expand § 105 to apply extraterritorially.

> iv. Recharacterization of Minsheng Plane 6 Lease Under 11 U.S.C. § 105(a) (Count 8) and Recharacterization of the Minsheng Plane 7 Lease Under 11 U.S.C. § 105(a) (Count 9)

UL/GA/TG contend that FAC Counts 8 and 9 are non-domestic for the same reasons the § 548 claims in FAC Counts 1 and 2 are non-domestic and highlight that: 1) the Court previously decided that § 105(a) does not have extraterritorial scope; 2) courts must examine the "focus" of § 105(a); and 3) the Trustee is asking the Court to "carry out" § 548, to recharacterize and avoid transfers regarding the Minsheng Plane 6 and 7 Leases.  Motion at 26 (citing FAC ¶ 257).  The Trustee responds that UL/GA/TG's arguments regarding his recharacterization claims are irrelevant because by filing the POCs, they submitted themselves to the Court's jurisdiction.  Opposition at 25-26.  UL/GA/TG reply that the Trustee conflates the Court's jurisdiction with the merits of his claims.  Reply at 17-19.

Count 8, which seeks recharacterization of the Minsheng Plane 6 Lease under § 105(a), is brought against Minsheng Business, Yuntian 3, Li Qi, GA, and UL and alleges that:

1) On 9/20/16, Zetta Singapore entered into the Minsheng Plane 6 Lease.  FAC ¶ 510.
2) The Minsheng Plane 6 Lease is not a true or operating lease, but a finance lease that created a security interest.  Id. ¶ 511.
3) The Minsheng Plane 6 Lease was not subject to termination by TVPX (as trustee for the Debtors) after Plane 6 was accepted for delivery.  Once the Debtors had made all quarterly installments, they could exercise a $1 option to buy Plane 6 (Plane 6 Option).  Id. ¶ 513.
4) Given the Plane 6 Option, Yuntian 3 did not retain any entrepreneurial risk under the Minsheng Plane 6 Lease, it did not expect to retain Plane 6, and its only expectation was to receive rent payments from the Debtors.  The Debtors were at all times the actual economic owners of Plane 6, bearing the risks and benefits of ownership both before and after the Minsheng Refinancing.  Id. ¶ 514.
5) The Debtors had the sole residual equity interest in Plane 6 after they completed all rental payments under the Minsheng Plane 6 Lease.  Id. ¶ 515.
6) The Minsheng Plane 6 Lease should be recharacterized as a secured financing, not an operating lease.  Id. ¶ 516.

Count 9, which seeks recharacterization of the Minsheng Plane 7 Lease under § 105(a), is brought against the same parties and contains virtually identical allegations as Count 8.  Id. ¶¶ 517-25.

The Trustee does not dispute that the focus of § 105(a) is a court's power "to issue any order, process, or judgment that is necessary or appropriate to carry out the provisions

of [Title 11]," nor does he argue that UL/GA/TG are wrong to suggest that in Counts 8 and 9, he is seeking to "carry out" § 548.  In fact, the FAC pleads that:

> [T]he [Minsheng Planes 6 and 7 Leases] constituted secured financings between Yuntian 3 and the Debtors and, to the extent the Debtors were not already vested with ownership of Planes 6 and 7 . . . vested the Debtors with economic ownership of Plane 6 and Plane 7 and also an interest in financing proceeds disbursed at closing [of the Minsheng Refinancing] . . . that is subject to avoidance and recovery under Section 548 of the Bankruptcy Code.

FAC ¶ 257.  As noted above, § 548 does not apply extraterritoriality, and the following transfers from the Minsheng Refinancing the Trustee seeks to avoid and recover are foreign:

1) The $55M Transfer, which was sent from Minsheng Business's Hong Kong account, through an IATS New York escrow account, to UL's Hong Kong account.
2) The $12.4M Transfer, which was sent from Minsheng Business's Hong Kong account, through an IATS New York escrow account, to Minsheng Business's Hong Kong account.

In Counts 8 and 9, the Trustee seeks non-domestic application of § 105(a) for the purpose of avoiding and recovering transfers alleged in Counts 1 and 2 under § 548, which, as analyzed above, are dismissed based on the presumption against extraterritoriality.

UL/TG/GA also contend that Counts 8 and 9 should be dismissed or stricken because they exceed the scope of the Original UL/GA/TG MTD Ruling, in which the Court granted leave to amend regarding "Counts I, II, IV, V, VIII, XIII and XV."  Motion at 46 (citing UL/GA/TG/LQ RJN Ex. 23).  They contend that where leave to amend is granted to cure deficiencies in specified claims, new claims alleged for the first time in the amended pleading should be dismissed or stricken.  Id. (citing Vahora v. Valley Diagnostics Lab'y, Inc. 2017 WL 2572440, at *2 (E.D. Cal. June 14, 2017)).

The Trustee responds with three arguments.  He highlights that the right to amend is broad, it encompasses the right to add new causes of actions or theories, and courts in this circuit "generally allow plaintiffs to add new claims and/or parties to an amended complaint where a prior order of dismissal granted leave to amend without limitation." Opposition at 37 (citing MAO-MSO Recovery II, LLC v. Mercury Gen., 2018 WL 3357493, at *4 (C.D. Cal. May 23, 2018)).  Second, he asserts that even if the amendments exceeded the scope of the Original UL/GA/TG MTD Ruling, Counts 8 and 9 should not be stricken, because courts have long disfavored Rule 12(f) motions, which are generally granted only when "necessary to discourage parties from making completely tendentious or spurious allegations" that could prejudice the opponent.  Id. (citing Sapiro v. Encompass Ins., 221 F.R.D. 513, 518 (N.D. Cal. 2004)).  Finally, he

argues that the Court may construe the FAC or the Opposition as a motion to amend. Id. at 38 (citing Popov v. Countrywide Fin. Corp., 2009 WL 5206679, at *2 (E.D. Cal. Dec. 18, 2009)).

UL/TG/GA reply that the Trustee's position is that any time leave to amend is granted, regardless of what a court's order may provide, he can add any claims that he seeks, which is not the law.  Reply at 37 (citing Vahora v. Valley Diagnostics Lab'y Inc., 2017 WL 2572440, at *2 (E.D. Cal. June 14, 2017)).  They allege that the Trustee "ignores Vahora, and the cases cited by Vahora, which this Court relied on in the Bombardier matter to strike the Trustee's claims filed in violation of a similar order."[23]  Id.

The Trustee's first argument requires little discussion.  He is correct that the right to amend is granted with extreme liberality.  But, the Original UL/GA/TG MTD Ruling made clear which counts the Trustee was authorized to amend.  AP Docket #174 at 50.  The Trustee did not seek leave to add counts to this action nor did the Court rule on any such request.  Further, the Trustee's citation to MAO-MSO Recovery II, LLC v. Mercury General, 2018 WL 3357493, at *4 (C.D. Cal. May 23, 2018) is unavailing.  There, leave to amend without limitation was granted whereas here, the Court explicitly stated which counts could be amended.  AP Docket #174 at 50.

Regarding striking Counts 8 and 9, under Rule 12(f), the Court may strike from a pleading "any redundant, immaterial, impertinent, or scandalous matter."  Motions to strike are disfavored and infrequently granted.  Bakersfield Pipe & Supply, Inc. v. Cornerstone Valve, LLC, 2015 WL 4496349, at *1 (E.D. Cal. July 23, 2015).  The party moving to strike allegations under Rule 12(f) bears the burden of proof.  Carney v. Town of Weare, 2016 WL 320128, at *2 (D.N.H. Jan. 26, 2016); Rees v. PNC Bank, N.A., 308 F.R.D. 266, 275 (N.D. Cal. 2015).  Here, the Court finds that it is more appropriate to dismiss, rather than to strike, Counts 8 and 9, which are beyond the scope of what the Court authorized in the Original UL/GA/TG MTD Ruling.  As noted by the Ninth Circuit:

> Were we to read Rule 12(f) in a manner that allowed litigants to use it as a means to dismiss some or all of a pleading . . . we would be creating redundancies within the Federal Rules of Civil Procedure, because a Rule

---

[23] UL/GA/TG do not specify when the Court struck claims in any adversary proceeding relating to the Cases, nor do they specify in which "Bombardier matter" the Court struck claims.  Although they cite "Dkt. 259 at 37-38," there is no ruling at Docket #259 in this adversary proceeding or in the two other larger adversary proceedings: the Jetcraft AP and CAVIC AP.  The Court interprets UL/GA/TG's reference to a "Bombardier matter" as the Trustee's "Motion to Consolidate Related Adversary Cases" (Consolidation Motion), which he filed concurrently in the Jetcraft AP and CAVIC AP.  Jetcraft AP Docket #153; CAVIC AP Docket #184.  The Court issued an oral ruling on the Consolidation Motion, stating that:

> [W]here leave to amend is given to cure deficiencies in certain specified claims, new claims alleged for the first time in an amended pleading should be dismissed or stricken. That's Vahora v. Valley Diagnostic Laboratory, 2017 WL 2572440, Eastern District of California (2017).

Jetcraft AP Docket #194 at 36 (transcript of the hearing on the Consolidation Motion).  The Court, however, did not strike any claims when ruling on the Consolidation Motion.

12(b)(6) motion (or a motion for summary judgment at a later stage in the proceedings) already serves such a purpose.

<u>Whittlestone, Inc. v. Handi-Craft Co.</u>, 618 F.3d 970, 974 (9th Cir. 2010).  Numerous courts have held that when an amended pleading exceeds the scope of what was authorized, additional counts should be dismissed.  <u>Doe v. Cal. Inst. of Tech.</u>, 2020 WL 8463631, at *6 (C.D. Cal. Feb. 4, 2020) (dismissing a new claim with prejudice because the plaintiff was granted leave to amend certain claims but did not seek leave to amend before adding the new claim); <u>Villanueva v. Wells Fargo Bank, N.A.</u>, 2019 WL 1509183, at *3 (N.D. Cal. Apr. 5, 2019) (dismissing new claims because the court did not provide the plaintiff leave to amend without limitation, and the plaintiff's addition of new claims was improper); <u>Ketab Corp. v. Mesriani & Assoc.</u>, 2015 WL 8022874, at *8 (C.D. Cal. Dec. 4, 2015) (dismissing new claims and denying leave to amend to add the new claims where the previous order of dismissal only granted leave to amend to cure deficiencies in certain specified claims); <u>DeLeon v. Wells Fargo Bank, N.A.</u>, 2010 WL 4285006, at *3, 5 (N.D. Cal. Oct. 22, 2010) (dismissing new claims brought for the first time in an amended complaint because the court had only granted leave to amend certain claims, and plaintiffs were required to seek leave of the court before adding new claims).

Finally, the Trustee did not file a Rule 15 motion and it would be unfair for UL/GA/TG to have to oppose a motion that was never filed.  Where a complaint is dismissed with leave to amend that is limited in scope, the plaintiff must seek leave of the court as required by Rule 15 before adding new claims or new parties.  <u>DeLeon</u>, 2010 WL 4285006, at *3; <u>Kennedy v. Full Tilt Poker</u>, 2010 WL 3984749, at *1 (C.D. Cal. Oct. 12, 2010).

       d.  Objections to Claims and Disallowance of Claims Under 11 U.S.C. § 502 and Assertions of Counterclaims under 28 U.S.C. § 157(b)(2)(C) (Count 10)

UL/GA/TG highlight that § 502, which is at issue in Count 10, contains no extraterritorial language.  Motion at 18.  They claim that § 502(d) applies to avoidable transfers but not to avoidable obligations.  <u>Id.</u> at 47 (citing <u>In re Asia Glob. Crossing, Ltd.</u>, 333 B.R. 199, 202 (Bankr. S.D.N.Y. 2005)).  UL/GA/TG contend that the Trustee cannot state a claim under § 502(d) unless he first pleads a viable claim for avoidance and recovery, which he has not done.  <u>Id.</u>  The Trustee responds that the FAC states numerous viable claims and consequently a viable disallowance claim under § 502(d).  Opposition at 43.  UL/GA/TG reply that § 502(d) does not apply to avoidable obligations and they highlight that the Trustee does not argue that it does.  Reply at 45.

Section 502(d) provides that:

      [T]he court shall disallow any claim of any entity from which property is recoverable under section . . . 550 . . . of this title or that is a transferee of a transfer avoidable under section . . . 548 . . . of this title, unless such

> entity or transferee has paid the amount, or turned over any such property,
> for which such entity or transferee is liable under section . . . 550 . . . of
> this title.

For the Trustee to prevail on Count 10, which seeks disallowance of the POCs, the
Court must first find that UL/GA/TG are liable under §§ 548 and 550.  In re PennySaver
USA Publ'g, LLC, 587 B.R. 445, 468 (Bankr. D. Del. 2018) (noting that disallowance
under § 502(d) requires a judicial determination that a claimant is liable).  As noted
above, the Court is dismissing Counts 1 and 2 because they improperly seek
extraterritorial application of § 548.  Therefore, the Court finds that the Trustee has not
adequately plead a § 502(d) claim.  Id.; see also In re El-Atari, 2012 WL 404947, at *6
(Bankr. E.D. Va. Feb. 8, 2012) (concluding that because the complaint's §§ 548 and
550 claims should be dismissed, there was no basis for an objection to the defendant's
claim under § 502(d) because § 502(d) is limited to a setoff of the Bankruptcy Code's
turnover and avoidance claims); In re Labrum & Doak, LLP, 237 B.R. 275, 309 (Bankr.
E.D. Pa. 1999) (noting that by its terms, § 502(d) is limited in its effect to claimants
subject to avoidance orders under § 548).

Further, in Counts 1 and 2, the Trustee seeks to avoid *obligations*.  FAC ¶¶ 444-72.
Section 502(d), however, applies to avoidable transfers but does not apply to avoidable
obligations.  In re Asia Glob. Crossing, Ltd., 333 B.R. 199, 202-03 (Bankr. S.D.N.Y.
2005) (noting that § 502 "disallows the claim of the transferee of an avoidable transfer,
but does not speak to the claim of an obligee under an avoidable obligation" because
the avoided obligation is rendered unenforceable, and the underlying claim is subject to
disallowance without regard to § 502(d)).  Finally, the Trustee's reference to 28 U.S.C. §
157(b)(2)(C) in Count 10 is unavailing.  Section 157(b)(2)(C) merely indicates that
counterclaims brought by the estate against persons filing claims against the estate are
"core" proceedings.  It does not provide that the Court can adjudicate extraterritorial
claims, which are issue in Counts 1, 2, 6, 8, 9, and 10.

### e.  Violation of the Automatic Stay Under 11 U.S.C. § 362 (Count 7)

UL/GA/TG argue that Count 7 should be dismissed because § 362(k) only permits an
"individual" to recover damages for violation of the automatic stay, and in the Ninth
Circuit, neither a trustee nor a corporation is considered an "individual" under § 362(k).
Motion at 45-46 (citations omitted).  The Trustee responds that the Court previously
determined that he pled sufficient facts to support a claim for violation of the automatic
stay, and the law of the case doctrine bars a challenge to Count 7.  Opposition at 42-43.
UL/GA/TG reply that the law of the case doctrine does not apply because the Court has
not entered a final judgment or been divested of jurisdiction.  Reply at 44.  They contend
that by failing to dispute that stay violation damages are unavailable to a corporate
debtor, the Trustee has waived any argument to the contrary.  Id. (citing Pers. Elec.
Transps., Inc. v. Off. of U.S. Tr., 313 Fed.Appx. 51, 52 (9th Cir. 2009)).

In Count 7, the Trustee seeks compensatory damages under 11 U.S.C. § 362(k)(1)
against TG and Li Qi for violation of the automatic stay, alleging that a lawsuit they filed

in Singapore (Singapore Action)[24] prevented the Debtors and the Trustee from collecting assets that Cassidy misappropriated, and caused the Trustee to spend time and resources seeking to vacate an injunction in the Singapore Action.  FAC ¶¶ 507-08.

Title 11 U.S.C. § 362(k)(1) provides that "an individual injured by any willful violation of a stay . . . shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."  For purposes of § 362(k)(1), "'individual' means an individual, and not a corporation or other artificial entity."  In re Goodman, 991 F.2d 613, 619 (9th Cir. 1993); see also Maritime Asbestosis Legal Clinic v. LTV Steel Co., Inc. (In re Chateaugay Corp.), 920 F.2d 183, 184-87 (2d Cir. 1990) (holding that a bankruptcy court may impose sanctions only for violating a stay as to debtors who are natural persons).[25]  A bankruptcy trustee is not an "individual" for these purposes "because any harm suffered in the form of costs and attorney's fees is actually incurred by a thing, viz., the bankruptcy estate, and not by the trustee as a natural person."  In re Pace, 67 F.3d 187, 193 (9th Cir. 1995).

Although the Trustee contends that the law of the case doctrine applies here, that is incorrect.  The law of the case doctrine only applies when the court has "previously entered a final decree or judgment."  Askins v. U.S. Dep't of Homeland Sec., 899 F.3d 1035, 1042 (9th Cir. 2018).  No judgment has been entered in this case.  Further, and more importantly, the law of the case doctrine provides that a court is precluded from "reconsidering an issue that has already been decided by the same court, or a higher court in the identical case."  Thomas v. Bible, 983 F.2d 152, 154 (9th Cir. 1993).  The law of the case doctrine applies if the issue in question was "decided either expressly or by necessary implication" in a previous disposition.  Id. (citations and internal quotation marks omitted).

In the Original UL/TG/GA MTD Ruling, the Court addressed whether the Singapore Action violated §§ 362(a)(1) and (a)(3).  AP Docket #174 at 46-48.  The Court found that the Original Complaint pled sufficient factual allegations to withstand the Original UL/GA/TG MTD.  Docket #174 at 48.  Neither party briefed or addressed the Trustee's standing to bring a § 362(k) claim on behalf of the estate nor did the Court decide that issue.  Therefore, the law of the case doctrine is inapplicable here.  And, the Court finds that Count 7 must be dismissed because the Trustee cannot bring a § 362(k) claim for damages.[26]

---

[24]  The FAC indicates that on 9/18/17, TG, at the direction of Li Qi (along with Asia Aviation), filed a lawsuit in the High Court, seeking to enjoin Zetta Singapore's bankruptcy case.  FAC ¶ 506.  Two days later, the High Court issued an injunction enjoining Zetta Singapore from "carrying out any further steps in and relating to the purported bankruptcy filings" before this Court.  Id.

[25]  Both Goodman and Chateaugay analyzed § 362(h).  BAPCPA amended former § 362(h) and redesignated that provision as § 362(k).  In re Glenn, 379 B.R. 760, 761 n.1 (N.D. Ill. 2007).

[26]  During the 8/11/21 hearing, the Trustee asserted that in Count 7, which is brought against TG and Li Qi for "Violation of the Automatic Stay" under 11 U.S.C. § 362, he is seeking contempt damages under § 105 rather than damages under § 362(k).

   f. Leave to Amend

UL/GA/TG do not address leave to amend in the Motion, nor does the Trustee address in the Opposition Rule 15 or whether leave to amend should be granted.[27] UL/GA/TG

---

The Trustee's focus on § 105 is unpersuasive for a number of reasons. Count 7 mentions neither § 105 nor contempt, and in the Opposition, the Trustee did not reference § 105 nor contempt regarding Count 7. See Deseret Tr. Co. v. Unique Inv. Corp., 2018 WL 8110959, at *3-4 (D. Utah July 3, 2018) (noting that federal district courts around the country reject arguments raised for the first time at oral argument); Star Fabrics, Inc. v. Zappos Retail, Inc., 2013 WL 12124096, at *6 n.20 (C.D. Cal. July 19, 2013) (declining to consider an argument that was raised for the first time during a hearing because the opposing party was deprived of a meaningful opportunity to respond). Counsel for the Trustee's referencing "notice pleading" and highlighting FAC ¶ 22—which lists all of the statutes and rules at issue in the FAC—does not further his position. See Lee v. City of L.A., 250 F.3d 668, 679 (9th Cir. 2001) (noting that FRCP 8 means what it says and requires a short and plain statement that provides the defendant fair notice of the claim and the grounds upon which it rests) (citing Leatherman v. Tarrant Cty. Narcotics Intel. and Coordination Unit, 507 U.S. 163, 168 (1993)); see also Phomthevy v. WinCo Holdings, Inc., 2019 WL 3067105, at *4-5 (E.D. Cal. July 12, 2019) (dismissing a count under Rule 8 where plaintiff's opposition to a Rule 12(b)(6) motion identified Cal. Labor Code § 246.5 as the statute under which the count was brought, but the complaint itself did not); Boyd v. Fed. Home Loan Mortg. Corp., 2011 WL 13228241, at *5 (D. Haw. Aug. 10, 2011) (dismissing UCC claims for failure to comply with Rule 8 where the complaint did not provide notice to the defendants of what provision of the UCC, if any, they violated).

Finally, a party seeking civil contempt sanctions under § 105 must do so by motion rather than by including a cause of action in an adversary proceeding. See In re Matthews, 2017 WL 2821532, at *1 (Bankr. C.D. Cal. June 29, 2017) (noting that Local Bankruptcy Rule 9020-1 governs contempt proceedings for violations of court orders or directives, such as the automatic stay under 11 U.S.C. § 362 or the discharge injunction under 11 U.S.C. § 524); Loc. Bankr. R. 9020-1(a) (providing that unless otherwise ordered by the court, contempt proceedings are initiated by filing a motion and a lodged order to show cause); see also Barrientos v. Wells Fargo Bank, N.A., 633 F.3d 1186, 1191 (9th Cir. 2011) (holding that an order of contempt under § 105 to enforce a discharge injunction must be sought via motion in the bankruptcy action, not via an adversary proceeding); Enodis Corp. v. Emps. Ins. of Wausau (In re Consol. Indus. Corp.), 360 F.3d 712, 716 (7th Cir. 2004) (indicating that "an adversary proceeding is not the proper vehicle to present a contempt claim, as civil contempt is a method of enforcing a court order, not an independent cause of action"); In re Chionis, 2013 WL 6840485, at *4 (B.A.P. 9th Cir. Dec. 27, 2013) (noting that generally, "civil contempt sanctions for violation of the discharge injunction must be sought by contested matter rather than an adversary proceeding" and bankruptcy courts may dismiss a complaint seeking contempt sanctions and require the party to proceed by way of motion); Fed. R. Bankr. P. 9020 (indicating that Rule 9014, "Contested Matters," governs a motion for order of contempt brought by a party); Fed. R. Bankr. P. 9014 (indicating that in a contested matter, relief shall be requested by motion).

[27] The Court recognizes that the Trustee, when addressing Counts 8 and 9, contends that the Court may "construe the [FAC] or this opposition as a motion to amend." Opposition at 38. The Court declines to do so. See Cozzarelli v. Inspire Pharms. Inc., 549 F.3d 618, 630-31 (4th Cir. 2008) (affirming denial of a request to amend a complaint because the request was made in response to a motion to dismiss and in an objection to a magistrate judge's recommendation); Long v. Satz, 181 F.3d 1275, 1279-80 (11th Cir. 1999) (holding that the court did not abuse its discretion in denying leave to amend a complaint because the request was included in a memorandum filed in opposition to a motion to dismiss rather than as a separate motion to amend); Raiser v. City of Temecula, 2017 WL 10525953, at *4 (C.D. Cal. July 27, 2017) (indicating that for the plaintiff to assert new claims or to assert claims against new defendants, he had to do so in accordance with Rule 15(a), seeking leave in a noticed motion).

summarily argue in the Reply that the FAC should be dismissed against them without leave to amend.  Reply at 45.

Federal Rule of Bankruptcy Procedure 7015 provides that Rule 15 of the FRCP applies to supplemental and amended pleadings in bankruptcy cases.  Rule 15(a)(2) indicates that "a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires."

Courts have the discretion to grant or deny leave to amend a complaint.  <u>Swanson v. U.S. Forest Serv.</u>, 87 F.3d 339, 343 (9th Cir. 1996).  "In exercising this discretion, a court must be guided by the underlying purpose of Rule 15 to facilitate decision on the merits, rather than on the pleadings or technicalities."  <u>United States v. Webb</u>, 655 F.2d 977, 979 (9th Cir. 1981).  Consequently, the policy to grant leave to amend is applied with "extreme liberality."  <u>Id.</u>  Although, if a court has previously granted leave to amend, the court's "discretion in deciding subsequent motions to amend is 'particularly broad.'"  <u>Chodos v. W. Publ'g Co., Inc.</u>, 292 F.3d 992, 1003 (9th Cir. 2002) (citing <u>Griggs v. Pace Am. Grp., Inc.</u>, 170 F.3d 877, 879 (9th Cir. 1999)).

Parties seeking leave to amend have the initial burden to show a legitimate reason for seeking amendment.  <u>See</u> <u>Safeco Ins. Co. of Am. v. Sw. Eng'g, Inc.</u>, 2009 WL 10672414, at *2 (C.D. Cal. Apr. 16, 2009); <u>Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.</u>, 989 F. Supp. 1237, 1241 (N.D. Cal. 1997).  Assuming the movant meets that burden, the burden then shifts to the party opposing amendment to show that leave to amend is not warranted based on:

    1) Bad faith;
    2) Undue delay;
    3) Prejudice to the opposing party;
    4) Futility of amendment; or
    5) Whether the plaintiff has previously amended the complaint.

<u>In re W. States Wholesale Nat. Gas Antitrust Litig.</u>, 715 F.3d 716, 738 (9th Cir. 2013); <u>see also</u> <u>Agua Caliente Band of Cahuilla Indians v. Coachella Valley Water Dist.</u>, 2020 WL 5775174, at *2 (C.D. Cal. July 8, 2020) (indicating that the party opposing amendment bears the burden of showing prejudice, unfair delay, bad faith, or futility of amendment).  "The court has the discretion to determine whether the presence of any of these elements justifies refusal of a request to amend the pleading."  <u>Advanced Cardiovascular Sys.</u>, 989 F. Supp. at 1241.

Of the factors courts analyze when adjudicating motions for leave to amend, the potential for prejudice to the opposing party "carries the greatest weight."  <u>Reed v. Dynamic Pet Prods.</u>, 2016 WL 4491597, at *1 (S.D. Cal. Jan. 5, 2016).  The opposing party has the burden of establishing prejudice.  <u>DCD Programs, Ltd. v. Leighton</u>, 833 F.2d 183, 187 (9th Cir. 1987).  Absent prejudice or a strong showing of any of the remaining factors, "there exists a *presumption* under Rule 15(a) in favor of granting

leave to amend." <u>Eminence Capital, LLC v. Aspeon, Inc.</u>, 316 F.3d 1048, 1052 (9th Cir. 2003) (emphasis in original).

"Futility of amendment can, by itself, justify the denial of a motion for leave to amend." <u>Bonin v. Calderon</u>, 59 F.3d 815, 845 (9th Cir. 1995). "For an amendment to be futile, it must appear on its face that it is not actionable." <u>Coble v. Derosia</u>, 2011 WL 444961, at *4 (E.D. Cal. Feb. 8, 2011).

In the context of a very detailed ruling that specified the deficiencies of the Original Complaint, the Court dismissed Counts 1, 2, 4, 5, 8, 13, and 15 of the Original Complaint, and granted the Trustee leave to amend those counts. AP Docket #174 at 50. As analyzed above, the FAC suffers from the same deficiencies as the Original Complaint regarding the avoidance and recovery claims in Counts 1 and 2 of the FAC and the recharacterization claim in Count 6 of the FAC, because despite the Trustee's focus on the obligations they are extraterritorial, rather than domestic, and not actionable under §§ 105 or 548. Counts 8 and 9, which were not contained in the Original Complaint are recharacterization claims brought for the purpose of avoiding and recovering transfers alleged in Counts 1 and 2 under § 548. And, Count 10's claim for disallowance depends on the Trustee avoiding the obligations in Counts 1 and 2. Finally, the Trustee lacks standing to assert Count 7, a damages claim for violation of the automatic stay, and a party seeking civil contempt sanctions under § 105 must do so by motion rather than by asserting a cause of action in an adversary proceeding.

Further, the Trustee, who has the burden of demonstrating a legitimate reason for amendment, did not set forth any reason why amendment would be warranted here. Twice, the Trustee has attempted to assert extraterritorial claims as domestic ones but he has been unsuccessful both times. The Court finds that any further amendment would be futile and would be prejudicial to UL/GA/TG, who have been required to respond to complaints that are based almost entirely on conduct that falls outside the purview of US bankruptcy laws. Therefore, the Court declines to grant leave to amend and Counts 1, 2, 6, 7, 8, 9, and 10 are dismissed with prejudice. <u>See e.g.</u>, <u>Bui v. Nguyen</u>, 712 Fed. Appx. 606, 610 (9th Cir. 2017) (noting that courts have "particularly broad" discretion regarding leave to amend where a plaintiff has been previously afforded an opportunity to amend but the court must still consider undue delay, bad faith, prejudice to the opposing party or dilatory tactics); <u>Gifford v. Hornbrook Cmty. Serv. Dist.</u>, 690 Fed. Appx. 1001, 1001-02 (9th Cir. 2017) (finding no abuse of discretion where the court dismissed a first amended complaint without leave to amend because the plaintiff had been provided with an opportunity to amend and any further amendment would be futile); <u>Doan v. Singh</u>, 617 Fed. Appx. 684, 686 (9th Cir. 2015) (holding the court did not abuse its discretion in denying leave to amend because the amended complaint suffered from the same deficiencies as the original complaint); <u>Krantz v. Prudential Invs. Fund Mgmt. LLC</u>, 305 F.3d 140, 144-45 (3d Cir. 2002) (finding the court did not abuse its discretion in denying leave to amend when the plaintiff was on notice of the complaint's deficiencies and failed to rectify them with the first amended complaint).

V.       Conclusion

For the reasons stated above, the Motion is granted, and the Court dismisses Counts 1, 2, 6, 7, 8, 9, and 10 without leave to amend.  Although Li Qi filed a separate motion in which he seeks dismissal of Counts 1, 2, 7, 8, and 9, those counts are subsumed within the counts being dismissed and therefore, the Court need not rule on the substance of the Li Qi Motion (or the Discovery Motion, which relates to the substance of the Li Qi Motion).

Pursuant to LBR 9021-1(b), UL/GA/TG must lodge and serve a proposed order via LOU within seven days of the issuance of this Memorandum of Decision.